IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| LISA MARIE MONTGOMERY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 2:21-cv-00020-JPH-DLP |
| v. | ) | |
| | ) | |
| WARDEN OF USP TERRE HAUTE,) | | |
| MICHAEL CARVAJAL, | ) | |
| JEFFREY ROSEN, | ) | SCHEDULED FOR EXECUTION |
| | ) | |
| | ) | **January 12, 2021** |
| Respondents. | ) | |

---

**PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241
(corrected)**

---

## I.  INTRODUCTION

Ms. Montgomery suffers from several mental illnesses and defects;[1]

Respondent's agents have been medicating her for sixteen years for these illnesses

that result in dissociation and psychosis.  Given her childhood,[2] her inherited

---

[1] *Montgomery v. United States*, No. 4:12-cv-08001-GAF, slip op. at 85 (W.D. Mo. Mar. 3, 2017)(2255 Proceedings)("Order").  *See* Appendix (App.) A, filed with this petition.

[2] Ms. Montgomery's stepfather Jack Kleiner entered her life when she was five years old.  He made her his sexual captive as he and others raped her

genes,[3] and her head injuries and brain damage, such illnesses are not surprising--

———————————————

constantly.  For example:

> Lisa told me [David Kidwell, a law enforcement officer] that those men and Jack raped her. The rapes were anal, oral, and vaginal. She said it was over and over, one man right after the other, and went on for hours. They were also physically violent. They would beat and slap her if she was "doing it wrong." When they were done, they urinated on her like she was trash.
>
> I asked Lisa if these men did this to her just one time and she said no. It happened a lot of times. I was horrified. I wanted to go and beat the living daylights out of Jack right then. I told Lisa that she needed to tell the police. She said that she couldn't. She was terrified that Jack would kill her. I knew she had reason to believe that. Jack was a ruthless person and a mean drunk. I had seen the bruises on Judy, I knew what a drunk Jack was and if he would do all these things it wasn't a stretch to believe that he was capable of killing Lisa. I didn't have any law enforcement contacts in Sperry. Sperry was just a little rural town and I know how those places work. I couldn't protect her from Jack down there. If it had been in my jurisdiction it would have been a whole different story. I was afraid for Lisa and I had given her my word. I was sick to my stomach and heart broken. But I dropped Lisa back at home and went back to Kansas.

2255 Proceedings, Exhibit 10, p. 3-5, *Kidwell Declaration*. 2255 Exhibits are in Appendix B, filed with this petition.

[3]Mental health and trauma experts have found  the familial and genetic vulnerability Lisa Montgomery inherited from her ancestors. *See* 2255 proceedings, Exhibit 7, p. 2, *Porterfield Report* ("Lisa's paternal and maternal sides of her family have a significant history of psychiatric and neurologic impairments that place them at increased risk for developing mental disorders . . ."); Exhibit 20, p. 8, *Woods Declaration* ("Medical pediatric, psychiatric, and education records and descriptions by first degree and extended family members document a lengthy history of familial, genetic vulnerability to psychiatric and

but are completely debilitating.  Mrs. Montgomery continues to be psychotic as a result of co-morbid conditions of serious mental illness, neurological impairment, and complex trauma.  These conditions make her incompetent to be executed. Present prison and national Covid conditions impede her ability more fully to present her incompetence.  Nevertheless she has made a necessary preliminary showing.  Executing a person who is not competent, or impeding her ability to prove it, violates the Fifth and Eighth Amendments. *Ford v. Wainwright,* 477 U.S. 399 (1985).

## II.  JURISDICTION

### A.  History of federal custody

The crime in his case occurred in Skidmore, Missouri.  The trial was held in the United Sates District Court for the Western District of Missouri, Kansas City. During pre-trial and trial proceedings, Ms. Montgomery was incarcerated in Leavenworth, Missouri, at the  Corrections Corporation of America ("CCA" [now

---

neurologic impairment"); Exhibit 23, p. 3-4, *Nadkarni Report* ("Mrs. Montgomery's biological family history is replete with psychiatric and neurologic impairments, including: mood disorders, intellectual disability, posttraumatic stress disorder, and schizophrenia. Mrs. Montgomery's paternal family is remarkable for alcoholism, depression, and significant neurological impairment of her paternal aunt. Her maternal family history is replete with symptoms and behaviors indicative of undiagnosed mental illness, including mood disorders and psychosis; the family history also evidences neurological defects.")

3

named CoreCivic]), a privately owned and operated federal prison.  Since being

sentenced in this case, Ms. Montgomery has been incarcerated at the Federal

Medical Center, Carswell, a United States federal prison in Fort Worth, Texas for

female inmates with special mental health needs.

     Ms. Montgomery is scheduled to be executed January 12, 2021, at the

United States Penitentiary, Terre Haute, Indiana, which is located within the

jurisdiction of the United States District Court for Southern, Indiana, in

Indianapolis.  The warden of Terre Haute has Ms. Montgomery in his custody; it is

his responsibility (which he is exercising) to secure her presence for execution,

and it is his intended execution of Ms. Montgomery in this district that forms the

bases for the claims here presented.

     **B.**    **Jurisdiction under 28 U.S.C. § 2241**.

     Mrs. Montgomery is a federal prisoner in the custody of the Federal Bureau

of Prisons. Unlike state prisoners who must pursue challenges to both the

imposition and execution of their sentences pursuant to 28 U.S.C. § 2254, federal

prisoners have two separate statutory mechanisms available to adjudicate

constitutional claims: 28 U.S.C. § 2255, and 28 U.S.C. § 2241. "28 U.S.C. § 2255,

the habeas corpus substitute for federal prisoners, is properly used only for

challenges to convictions and sentences, while § 2241 is used for other challenges

to the fact or duration of confinement." *Walker v. O'Brien*, 216 F.3d 626, 629 (7th Cir. 2000); *accord Fulks v. Krueger*, 2019 WL 4600210, at *8 (S.D. Ind. Sept. 20, 2019) ("A motion seeking relief on grounds concerning the execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241."); *Singleton v. Norris*, 319 F.3d 1018, 1022–23 (8th Cir. 2003) ("[A] federal prisoner may challenge the manner of execution of his sentence by bringing his petition under § 2241 rather than § 2255.").

Ms. Montgomery challenges her presently scheduled execution because she is not competent for execution under *Ford v. Wainwright,* 477 U.S. 399 (1985). Because they are not ripe until an execution date is imminent, *Ford* claims are notably not subject to any "second or successive" restrictions on federal habeas actions. *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007); *Stewart v. Martinez-Villareal*, 523 U.S. 637, 639, (1998).  A claim that a petitioner is not competent to be executed under *Ford* fits into a small category of claims falling under the "savings clause" of § 2255 and thereby allowing adjudication pursuant to § 2241. *Ellis v. United States*, 593 F.App'x 894, 897 (11th Cir. 2014) (savings clause and § 2241 apply for small category of claims including *Ford* claims that are "squarely foreclosed" from being raised on direct appeal or in the original § 2255

5

proceeding); *see also Bourgeois v. Watson*, 977 F.3d 620, 637-38 (7th Cir. 2020).

Mrs. Montgomery's *Ford* claim—that her incompetency would render her

execution unconstitutional under the Fifth and Eighth Amendments to the United

States Constitution – does not challenge the validity of her conviction or sentence

but only the execution and administration of her sentence.  Thus, 28 U.S.C. §

2241, which provides that a district court may grant a writ of habeas corpus on

behalf of a federal prisoner who is in custody in violation of the Constitution of

laws or treaties of the United States, is the appropriate vehicle for Mrs.

Montgomery to raise her *Ford*  claim. *See Barr v. Purkey*, 140 S.Ct. 2594, 2597-98

(2020) (Sotomayor, J., dissenting)(federal government did not dispute that § 2241

was the proper avenue for litigation of a *Ford* competency claim raised by a

federal prisoner).

### III.  PROCEDURAL HISTORY

On December 18, 2004, Lisa Marie Montgomery was arrested for

kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1).  In October

2007, a jury in the United States District Court for the Western District of

Missouri convicted Mrs. Montgomery of first degree murder and sentenced her to

death. *See United States v. Montgomery*, 2008 WL 6124691 (W.D. Mo. Apr. 4,

2008).

6

Mrs. Montgomery filed a timely direct appeal, which was denied on April 5, 2011. *United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011). Mrs. Montgomery's requests for rehearing and for rehearing en banc were denied on June 15, 2011. *See id.* Mrs. Montgomery filed a petition for writ of certiorari in the United States Supreme Court which was denied on March 19, 2012. *Montgomery v. United States*, 565 U.S. 1263 (2012).

Mrs. Montgomery initiated post-conviction proceedings pursuant to 28 U.S.C. § 2255 on March 22, 2012. W.D. Mo. Case No. 4:12-cv-8001-GAF. On December 21, 2015, the district court denied relief on specified claims and granted an evidentiary hearing. *Id*. at Dkt. 173. An evidentiary hearing was held in 2016. *Id*. at Dkt. 201-09. On March 3, 2017, the district court denied relief on the remaining claims and denied a certificate of appealability ("COA") on all claims in Mrs. Montgomery's Amended Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. § 2255.  *Id*. at Dkt. 212.

Mrs. Montgomery filed a timely notice of appeal and an application for certificate of appealability with the United States Court of Appeals for the Eighth Circuit. *See id.* at Dkt. 214. On January 25, 2019 a panel of the Eighth Circuit denied a certificate of appealability. On April 10, 2019, the United States Court of Appeals for the Eighth Circuit denied a timely petition for panel rehearing and

rehearing en banc, and the Court issued its mandate on April 19, 2019. *Id*. at Dkt. 227-28.

On June 18, 2019, the Supreme Court extended the time in which to file a petition for writ of certiorari, and the writ of certiorari was filed on September 9, 2019. The United States Supreme Court denied Mrs. Montgomery's petition for writ of certiorari on May 26, 2020, *Montgomery v. United States*, 140 S.Ct. 2820 (May 26, 2020) (Mem.), and denied her petition for rehearing on August 3, 2020, *Montgomery v. United States*, 141 S.Ct. 199 (Mem) (Aug. 3, 2020).

## IV.  *FORD*: SUBSTANCE AND PROCESS

### A.  Substance

Lisa Montgomery's is mentally ill.   Presently her mental condition results in her inability rationally to understand she will be executed, why she will be executed, or even where she is.  Under such circumstances, her execution would violate the Eighth Amendment.  *Madison v. Alabama*, 139 S.Ct. 718 (2019); *Panetti v. Quarterman,* 551 U.S. 930 (2007);  *Ford v. Wainwright,* 477 U.S. 399 (1985).

The Eighth Amendment prohibits the execution of persons who, due to mental illness, do not understand the basis for their executions.  *Ford,* at 409-10 (the Eighth Amendment prohibits execution of person who lacks "capacity to

8

come to grips with his own conscience or deity," both to "protect the condemned

from the fear and pain without comfort of understanding" and to "protect the

dignity of society itself from the barbarity of exacting mindless vengeance");

*Panetti,* 551 U.S. at 957 ("The Eighth Amendment prohibits a State from carrying

out a sentence of death upon a prisoner who is insane").[4]  "The critical question is

whether a 'prisoner's mental state is so distorted by a mental illness' that [s]he

lacks a 'rational understanding' of 'the State's rationale for [her] execution.'  Or

similarly put, the issue is whether a 'prisoner's concept of reality' is 'so

---

[4]As the Court explained in *Madison*:

Surveying both the common law and state statutes, the Court [in
*Ford*] found a uniform practice against taking the life of such a
prisoner. *See id*., at 406-409, 106 S.Ct. 2595. Among the reasons for
that time-honored bar, the Court explained, was a moral "intuition"
that "killing one who has no capacity" to understand his crime or
punishment "simply offends humanity." *Id.*, at 407, 409, 106 S.Ct.
2595; see *id.*, at 409, 106 S.Ct. 2595 (citing the "natural abhorrence
civilized societies feel" at performing such an act). Another rationale
rested on the lack of "retributive value" in executing a person who
has no comprehension of the meaning of the community's judgment.
*Id.*; see *id*., at 421, 106 S.Ct. 2595 (Powell, J., concurring in part and
concurring in judgment) (stating that the death penalty's "retributive
force[] depends on the defendant's awareness of the penalty's
existence and purpose"). The resulting rule, now stated as a matter of
constitutional law, held "a category of defendants defined by their
mental state" incompetent to be executed. *Id.*, at 419, 106 S.Ct. 2595.

139 S.Ct at 722-23.

impair[ed]' that [s]he cannot grasp the execution's 'meaning and purpose' or the 'link between [her] crime and its punishment.'" *Madison*, 139 S.Ct at 723 (cites to *Panetti* omitted).

It does not matter whether a person has "any particular mental illness;" what matters is whether she has a "rational understanding" of the reasons for her death sentence. *Id.* at 727. The question is "whether a mental disorder has had a particular effect; an inability to understand why the State is seeking execution." *Id.* at 728. "Psychosis or dementia, delusions or overall cognitive decline are all the same under *Panetti,* so long as they produce the lack of comprehension." *Id.* "[M]ental illness," or "mental disorder," or "psychological dysfunction" qualify because the *Ford* standard is "utterly indifferent to a person's specific mental illness." *Id.* (cites to *Panetti* omitted.)

The fact that a defendant can recite why she is being executed does not make her competent under *Ford.* According to the expert in *Panetti*, "although petitioner claims to understand 'that the state is saying that [it wishes] to execute him for [his] murders,' he believes in earnest that the stated reason is a 'sham' and the State in truth wants to execute him 'to stop him from preaching.'" *Panetti,* 551 U.S. at 955 (citations omitted). The Fifth Circuit Court of Appeals found that Scott Panetti's "awareness" that he was to be executed and that he had been convicted of

10

murder was sufficient to support a finding that he was competent to be executed, even if his awareness fell short of a "rational understanding." *Id.* at 956. The Supreme Court rejected this position.

> The Court of Appeals' standard treats a prisoner's delusional belief system as irrelevant if the prisoner knows that the State has identified his crimes as the reason for his execution. *See* 401 F. Supp. 2d, at 712 (indicating that under Circuit precedent "a petitioner's delusional beliefs -- even those which may result in a fundamental failure to appreciate the connection between the petitioner's crime and his execution -- do not bear on the question of whether the petitioner 'knows the reason for his[/her] execution' for the purposes of the *Eighth Amendment*"); *see also id.*, at 711-712. Yet the *Ford* opinions nowhere indicate that delusions are irrelevant to "comprehen[sion]" or "aware[ness]" if they so impair the prisoner's concept of reality that [s]he cannot reach a rational understanding of the reason for the execution. If anything, the *Ford* majority suggests the opposite.

*Id.* at 958.  "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Id.* at 959.  There is "no support in *Ford*, including in its discussions of the common law and the state standards, for the proposition that a prisoner is automatically foreclosed from demonstrating incompetency once a court has found [s]he can identify the stated reason for [her] execution" *Id.*

11

## B.  Procedural requirements for a constitutional determination of competence

The Supreme Court insists

> upon *unfettered presentation of relevant information*, before the final
> fact antecedent to execution has been found....[C]onsistent with the
> heightened concern for fairness and accuracy that has characterized
> our review of the process requisite to the taking of a human life, we
> believe that *any procedure that precludes the prisoner or his counsel
> from presenting material relevant to his sanity or bars consideration
> of that material by the factfinder is necessarily inadequate.* "[T]he
> minimum assurance that the life-and-death guess will be a truly
> informed guess requires respect for the basic ingredient of due
> process, namely, an opportunity to be allowed to substantiate a claim
> before it is rejected."

*Ford*, 477 U.S. at 414 (citation omitted)(emphasis added).  Axiomatic, then, is the

right to counsel to assist in presenting material relevant to incompetence.  "When

the factfinder loses the benefit of potentially probative information ...[t]he result is

a much greater likelihood of an erroneous decision." *Id.* [5]

---

[5]"[I]f the Constitution renders the fact or timing of his[/her] execution
contingent upon establishment of a further fact, then *that fact must be determined
with the high regard for truth that befits a decision affecting the life or death of a
human being. Thus, the ascertainment of a prisoner's sanity as a predicate to
lawful execution calls for no less stringent standards than those demanded in any
other aspect of a capital proceeding.* Indeed, a particularly acute need for
guarding against error inheres in a determination that "in the present state of the
mental sciences is at best a hazardous guess however conscientious." That need is
greater still because the ultimate decision will turn on the finding of a single fact,
not on a range of equitable considerations." *Ford*, 477 U.S. at 411-12 (citations
omitted)(emphasis added).

Also axiomatic is the need for defense experts to be allowed fully to evaluate Mrs.. Montgomery.  "If there is one 'fundamental requisite" of due process it is that an individual is entitled to "an opportunity to be heard."  *Id*, at 430 (Powell, J., concurring)(citations omitted.)  A mentally ill person cannot present her own case; only counsel, via experts, can do so.

And the ability to test the government's experts' opinions is equally important.  It

> would contribute markedly to the process of seeking truth in sanity disputes by bringing to light the bases for each expert's beliefs, the precise factors underlying those beliefs, any history of error or caprice of the examiner, any personal bias with respect to the issue of capital punishment, the expert's degree of certainty about his or her own conclusions, and the precise meaning of ambiguous words used in the report. Without some questioning of the experts concerning their technical conclusions, a factfinder simply cannot be expected to evaluate the various opinions, particularly when they are themselves inconsistent.

*Id*. at 415.[6]

---

[6]     [T]he lodestar of any effort to devise a procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the factfinding determination. The stakes are high, and the "evidence" will always be imprecise. It is all the more important that the adversary presentation of relevant information be as unrestricted as possible. Also essential is that the manner of selecting and using the experts responsible for producing that "evidence" be conducive to the formation of neutral, sound, and

## V.  MRS. MONTGOMERY'S MENTAL ILLNESSES AND DEFECTS

### A.  Pre-trial and incarceration, treatment and diagnoses by Respondent's employees, and other expert opinions

Mrs.. Montgomery has "serious mental illnesses and brain damage,"  Order at 85 (App. A), resulting in her becoming detached from reality.[7]  Her illnesses have been diagnosed since at least 2002 when New Haven Behavioral Health found that she had depressive disorder and was largely dysfunctional.[8]  Two years later, on December 17, 2994, she  was arrested for the crime in this case and incarcerated at the Corrections Corporation of America ("CCA") at Leavenworth

---

professional judgments as to the prisoner's ability to comprehend the nature of the penalty. Fidelity to these principles is the solemn obligation of a civilized society.

*Id* at 411-12.

[7]Mrs.. Montgomery has a long history of dissociation or dissociating. Dissociation is a disruption in the usually integrated functions of consciousness, memory, identity, or perception.  DSM IV-TR at 519.  Dissociative symptoms are included in the criteria for PTSD.  *Id*., *see also id*. at 465 ( PTSD resulting from sexual or physical abuse has associated "dissociative symptoms.").  Persons with PTSD have increased rates of Major Depressive Disorder and Bipolar Disorder. This describes Mr. Montgomery.

[8]A Dr. Wilkinson found Mrs. Montgomery to be very impaired – and that her functioning was on the decline.  App B, *Wilkinson Declaration* ("I believed that Mrs. Montgomery's depressive symptoms had a significant impact on her ability to function in everyday life . . . It would not surprise me to learn that Mrs. Montgomery suffered from complex trauma and bipolar disorder at the time I was treating her").

14

to await trial.

While in pre-trial and trial proceedings–spanning 38 months–she required extensive mental health treatment.  She first saw a the staff psychiatrist, Dr. McCandless, four days after her arrest.  Dr. McCandless initially diagnosed Mrs. Montgomery with the metal illnesses bipolar disorder "most recent episode depressed with a history of rapid dysthymic disorder."  TT, 200-71 (Trial testimony is contained in Appendix D, file with this petition).[9]  Dr. McCandless ultimately diagnosed her with delusional cycling psychosis.   Dr. McCandless also suspected "brief psychotic episodes." TT 2074.   "Dr. McCandless testified [at trial] to Movant being placed on suicide watch [and] Movant's intense mood swings, bipolar disorder, and severe depression, as well as Dr. McCandless' eye toward wanting to evaluate Movant for suffering from psychotic episodes." Order at 30, App. A.  Mrs. Montgomery was on suicide watch when Dr. McCandless first saw her.

_____

[9]*See* APA, Diagnostic Maunal of Mental Disorders, Fourth Edition ("DSM-IV") at 350-363, 345-349.  Symptoms included "periods of going without sleep for days at a time" with her "energy increased" followed by "depressive episodes" when "she would, quote, stare out the window; didn't want to shower; had no motivation, would isolate."  TT. 2071-72.   These are symptoms of bipolar disorder.  Dysthymic disorder involves "chronicity of depression" (TT at 2073), i.e., "depressed mood for most of the day, for more days than not...for at last two years." DSM IV at 349.

Dr. McCandless prescribed her Trazedone, a sleeping medication.  TT 2078.

Mrs. Montgomery was taken off suicide watch January 17, 2005, but was returned

to suicide watch under suspicion of "a suicidal plan by dehydration and storing the

Trazedone." TT 2078.  Dr. McCandless visited with Mrs. Montgomery 62 times in

2005 and a total of 105 times over three years.  She ultimately concluded Mrs.

Montgomery's "symptoms reflected a diagnosis...[o]f psychosis."  TT. 2144.  *See*

*also* Order at 38, App. A (Dr. McCandless diagnosed "bipolar disorder and

psychosis.")(App.A).   Mrs. Montgomery "took prescribed psychotropic drugs

throughout the [trial] proceedings."  *Id.* at 96.[10]

Dr. William Logan, a psychiatrist, saw Mrs. Montgomery on March 6, 2005,

after the reported suicide plan of dehydration and storing Trazedone.  He reported

that "she has been experiencing intrusive recollections of a traumatic event.  She

also reports auditory and visual hallucinations.  Some of the auditory

---

[10]Ms Montgomery was prescribed –by prison employees--Elavil,
Wellburton, and Depakkote while in pre-trial custody and throughout trial.  *See*
Report of Dr. Dianne Bradford, Exhibit 154, 2255 proceedings, at 3.  ("Mrs.
Montgomery has DSM IV, Axis I disorder (APA, 2000) of Bipolar Disorder with
Psychotic Features.  At the time of the trial, two formulations of valproic acid
[Depokote] in three divided daily doses, were prescribed for her *bipolar disorder,
manic phase.* She was also receiving bupropion [Welbutrin], a second-generation
antidepressant, for her depression. Amitriptyline (Elavil), an older tricyclic
antidepressant was given for relief of neuropathic pain, and ranitidine (Zantac), as
a stomach acid reducer (started October 18, 2007 and continued throughout trial)."

hallucinations are derogatory in nature." Letter to defense counsel, March 7, 2005,

at 1.  App. B.  He wrote her "symptoms are consistent with a Major Depressive

Disorder with psychotic features" and with "[h]er psychotic thoughts," and he

recommended hospitalization, "the usual and customary treatment for those with a

Major Depressive Disorder with psychotic features and those who are at

significant risk for suicidal behavior."  *Id* at 2; *see also* TT at 2419.  Dr. Logan

testified that Mrs. Montgomery's "ability to deal with reality is somewhat plastic

and changeable."  TT at 2407.

Mental health experts on both sides at trial agreed that Mrs. Montgomery

suffered from a major mental illness – though they categorized her symptomology

in varying ways.  Dr. Logan termed it major depressive disorder which "at times

included psychotic features such as hallucinations" and indicated that he had not

ruled out bipolar disorder.[11]  Dr. McCandless termed the illness "bipolar disorder

not otherwise specified, most recent episode depressed with a history of rapid

dysthymic disorder"[12] and indicated that Mrs. Montgomery suffered from

"delusional cycling psychosis."  Dr. McCandless testified she had been medicating

Mrs. Montgomery for bipolar disorder since 2004 and had witnessed Mrs.

---

[11]Exhibit 40, p. 30, *5/15/2007 Logan Report*

[12]TT. Vol. 10, p. 2094, *McCandless Testimony*

17

Montgomery cycle from one phase of the disorder to another.[13] Though government expert Dr. Dietz was "skeptical" of Mrs. Montgomery's psychosis[14] he agreed Mrs. Montgomery either had depression or bipolar disorder.[15] Government expert Dr. Martell diagnosed depression,[16] as did Dr. Dietz,[17] Dr. McCandless,[18] and Dr. Kuncel.[19]

In addition, Drs. Logan[20] and Kuncel[21] diagnosed Mrs. Montgomery with PTSD, which was confirmed by government experts Martell[22] and Dietz.[23]

---

[13] TT. Vol. 10, p. 2071, 2080, 2081, 2128, *McCandless Testimony*

[14] TT. Vol. 12, p. 2564, *Dietz Testimony.*

[15] TT. Vol. 12, p. 2565, *Dietz Testimony*

[16] TT. Vol. 11, p. 2462, *Martell Testimony.*

[17] TT. Vol. 12, p. 2565, *Dietz Testimony*

[18] TT. Vol. 10, p. 2071, *Dr. McCandless Testimony.*

[19] TT. Vol. 14, p. 3029, *Kuncel Testimony*

[20] TT. Vol. 11, p. 2405, *Logan Testimony*; *see also* Vol. 4, p. 950, *Logan Testimony* ("I gave several diagnoses . . . one was posttraumatic stress disorder, chronic, that began back in her adolescence with sexual abuse and physical abuse by her step father. I think what now carries the name in some circles of complex PTSD")

[21] TT. Vol. 14, p. 3027, *Kuncel Testimony*

[22] TT. Vol. 11, p. 2461, *Martell Testimony.*

[23] TT. Vol. 12, p. 2566, *Dietz Testimony*

18

**B.  Medications and diagnoses in prison**.

Mrs. Montgomery was sentenced in March, 2008.  She was transferred to Carswell in April 2008, and upon her arrival Dr. C. Kempke prescribed Amitriptyline (Elavil, normally prescribed for Major Depressive Disorder and Bipolar Disorder), Volporic Acid (Depokote, normally for Bipolar Disorder manic phase), and Respiradone (an anti-psychotic for schizophrenia and Bipolar Disorder).[24]

On May 14, 2008, a "Restrictive Housing Mental Health Evaluation, Initial Review" was prepared by Carswell personnel.  The purpose was to identify "inmates' mental health diagnosis and treatment needs while in a restricted housing setting."[25]  Mrs. Montgomery had had suicide risk assessment, was diagnosed with PTSD, and was treated with psychotropic medication in the last six months, with prescribed medications Resperidone, Prozac, and Elavil.[26]  She had cognitive impairment, mental illness, or suicide.[27]

---

[24]*See* Appendix E-002 through E-004, submitted with this petition.

[25]Appendix, Restrictive Housing Mental Health Evaluation, p.1.  The report refers to "the PSR" and a "PDS," apparently prison memos or forms about background and social history.  *Id*. at 2.

[26]*Id*. at 2.

[27]*Id*. at 3.

"[S]ignificant issues in childhood" included exposure to mental illness, sexual abuse, emotional abuse, neglect, physical abuse, exposure to criminality, and exposure to substance abuse.[28]  Notes say "Mrs. Montgomery was sexually abused as a child, as well as experienced emotional and physical abuse....[And] she reported she has cousins diagnosed with Schizophrenia."[29]  She "reported a history of head trauma for which she had a PET scan and an MRI.  She reported a history of five concussions from physical abuse, two car wrecks, and a trampoline accident as a child."[30]  She reported being diagnosed with PTSD, and had depression, trouble sleeping, nightmares and anxiety/tension, for which she took psychotropic medications.[31]

"Ms. Montgomery reported a history of two suicide attempts by overdose since her incarceration and history of suicide attempts by overdose when she was sixteen years old."  She was described as "a CARE -2-MH and is seen by her primary clinician per CARE-2-MH assignment."[32]

---

[28]*Id.* at 6.

[29]*Id.*

[30]*Id.* at 7.

[31]*Id.* at 8.

[32]*Id.* at 10.

Dr. Camille Kempke testified during 2255 proceedings.  She was a retired psychiatrist and had been employed at the Federal Medical Center at Carswell Bureau of Prisons from 2008-2010.[33]  She was Mrs. Montgomery's treating psychiatrist in the mental health unit.[34] When she first met Mrs. Montgomery "she carried a mental health diagnosis, bipolar disorder ...[and] she was not doing particularly well psychiatrically. ...She was disheveled, not taking care of her hygiene.  She was difficult to get to respond to questions or come to the door to talk."[35] "She's had that presentation a couple of times while I was there."[36] During this time Mrs. Montgomery was being medicated for bipolar disorder with psychotic features, and Dr. COMx observed her in a psychotic state–she was dirty and slovenly, would not talk with Dr. Kempke, and "was no longer being able to hear the radio properly."[37]  "Anyone with bipolar disorder who is psychotic is deserving of [antipsychotic medication].  She was already on a mood stabilizer,

---

[33]2255 testimony of Dr. Kempke, at 1247.

[34]*Id.* at 1249.

[35]*Id.* at 1250.

[36]*Id.* at 1252-52.

[37]*Id.* at 1251.

Depekene, and that was not holding her."[38]   Dr. Kempke prescribed Risperdal.

### C.  Social history, ACE Factors, and Complex Post traumatic stress disorder

### 1.  Unparallel, unspeakable, abuse, and complex PTSD

As illustrated in note 2, *supra*, "caretakers" for Mrs. Montgomery, the child, raped and defiled her with animal abandon.  In addition to the damnable adult gang-rapes, the craven forced sodomy, and the humiliating, urinating on the  body of this helpless girl, these caretakers isolated Lisa for their personal, private,  use, and sold sex with her to visiting handymen.  She was an unwilling, trafficked, child, sex slave.

For example, stepfather Jack began to sexually molest Lisa when she was very young.  Then he caged her:

> He threatened to hurt her if she told anyone.  After the pattern of
> molestation had been established, Jack moved the family to a trailer
> in an isolated area near Sperry Oklahoma. To further isolate Lisa from
> her sisters and the rest of the family, Jack built a small room onto the
> side of the trailer over the water pump. While the construction of this
> special room ostensibly acknowledged Lisa's maturation, the room
> actually provided Jack unimpeded access to Lisa without the
> possibility of detection as it was not accessible from the inside of the
> trailer. In this room, Jack told Lisa that he was teaching her how to be

---

[38]*Id.* at 1254.

a good wife. And then he raped and sodomized  her until she bled.[39]

Lisa was completely isolated.  As one neighbor put it: "Jack had them out in the

country kind of in his own little kingdom. They were isolated. They could have

screamed and the neighbors probably wouldn't have heard them."[40]

Judy sold Lisa to handymen beginning at around age 11.  Judy "had

servicemen come to the trailer. Her son, Teddy, recalls that there were three or

four that would come and all the children would be sent outside and that only Lisa

and Judy would remain in the house."[41] Mrs. Vogelsang explained that "Judy was

---

[39]Exhibit 1, 2255 hearing, Declaration of Mrs. Jan Vogelsang, Biopyschosocial History of Lisa Montgomery,  p. 181-82. *See also id.* at 175 ("Jack Kleiner forced Lisa as a small girl, to strip naked in front of him as a prelude to his savage beatings. As she advanced into puberty, he began forcibly fondling her genitalia and tiny breasts. Ultimately, Jack Kleiner slammed her head against a concrete floor until she saw stars and was nauseated from the concussions as he raped her vaginally and sodomized her.")   The government did not contest the information contained in this biopsychosocial history.  *See* 2255 Transcript, Vol. 4, p.1490 ("we're not contesting the information").

[40]2255 Exhibit 14, Baker Declaration.

[41]Vol. 6, p. 1512, Vogelsang testimony; *see also* testimony of Dr. George Woods, Vol 7. at 1784 ("[H]er mother betrayed her. Parents are there to train their children and children will be trained regardless. Particularly young children will run to slaps as well as hugs, and what we see – when we really talk about trafficking, we're talking about Judy Shaughnessy . . .who trafficked her child out to the plumber, to the electrician, who told her it was necessary for her to do this in order to get the services. So she developed a mindset of coping mechanisms that had already been groomed by her stepdad.")

trading Lisa for those services."[42] Mrs. Vogelsang described this sexually

trafficking as a "family secret,"[43] but others knew–her bother,[44] and the adult male

rapists.  As Lisa explained to Dr. Porterfield years later, "when I told [people]

before no one did anything" and that "no one knows how involved my mom was

in all of it . . . that's how they paid for the new living room."[45]

## 2.  Diagnoses of mental illness

Dr. Porterfield testified in 2255 proceedings that her expert opinions and

testimony were based on her clinical training and experience and her review of

relevant psychological literature, including the Adverse Childhood Experiences

Study(ACE), *i.e.* "the neurobiological research that underpins our understanding

of what happens to kids who get abused"; "my own clinical knowledge from work

for the past 18 years with traumatized people, and of course the clinical

---

[42]*Id.*

[43]*Id.* at 1512, 1520.

[44]As a teenager Teddy inadvertently watched one of the videos Carl made while raping Lisa. "It was a home video and it showed Carl raping and beating my sister. It was violent and like a scene out of a horror movie. My sister was crying and in pain. I felt sick watching the video. I didn't know what to do or how to talk to my sister about it."  2255 Hearing, Exhibit 31 (Teddy Kleiner declaration).

[45]2255 hearing, Exhibit 8, p.3, Porterfield supplemental declaration.

literature."[46]  Dr. Porterfield described normal childhood development as "learning to recognize his or herself, his bodily functions, her senses, her perceptions of the world, her feelings, her interactions, meaning the child is grown to learn how to manage being an organism in the world."[47]  The interactions the child has is the foundation of what are these actually literally trillions, trillions of neurochemical connections that start to get made for that child about what it means to cry, what it means to be lying there feeling cold . .. there's actually in the neurochemical wiring of the baby's brain this incredible opportunity that happens over the course of the child's life to make connections, and each of those connections happens as the child interacts with the environment."[48]

Dr. Porterfield presented her professional opinion of Mrs. Montgomery's development:

> So my clinical evaluation of Mrs. Montgomery really yielded a conclusion that *her environment was throughout her childhood one of coercion, violence, humiliation, degradation, exploitation*. I mean, it was a very horrible childhood. That's going to lead to an adaption that children make that is often called in our field 'survival coping,' and it's kind of what it sounds like . . . it's basically a description that the child is going to adapt. That's the thing about the human organism. We adapt. So when a child's environment is frightening,

---

[46]2255 hearing, Vol. 7, 1641, Porterfield testimony.

[47]*Id.* 1642.

[48]*Id.*

the child will adapt to managing fear by having physiological fear protection mechanisms that take place.[49]

Dr. Porterfield described that "survival coping," while a natural response to trauma, causes disruption in development and creates on-going difficulty for the survivor of trauma.[50]

Dr. Porterfield described the effect of severe trauma on a child's development. Traumatized children experience neurochemical, neuroendocrinal, and neuroanatomical changes in their brains.[51]

> [C]hildren have trillions of synapse connectivity moments, meaning moments when things are firing as they are developing, which is kind of an incredible idea, and those – what we've shown is that the chemicals that go across the synapses that create the connectivity between our nerves and our brains have shown alteration, if you study stressed, traumatized kids, and the alterations are that they have overactivation of some . . . neurotransmitters. There's overactivation of some of them, there's underactivation of others. You see impairments, frankly, in the quantity of the chemicals that are in the child's brain and how [those chemicals] are interacting.[52]

Dr. Porterfield explained that "When children are put under severe stress and strain and fear, their neuroendocrine system has now been shown scientifically

---

[49]*Id*. at 1645-46.

[50]Vol. 7, 1646, Exhibit 155 at slide 8.

[51]Vol. 7 at 1647, Exhibit 155 slide 9-11.

[52]Vol. 7, p. 1648-49.

to have alteration."[53] She gave an example of the change in cortisol in traumatized children, explaining that these cortisol changes affect the structure of the brain, specifically the corpus callosum resulting in traumatized children "have less connectivity between left and right parts of their brain."[54]  Dr. Porterfield related the trauma/cortisol/corpus callosum/connectivity to the finding that Mrs. Montgomery's perceptual IQ is significantly higher than her verbal IQ.[55]

Dr. Porterfield testified that a traumatized brain functions differently than a brain which has developed more normally:

> One of those things that sometimes get used in my field is [the adage] "what fires together, wires together." The idea there is if a child's brain is required to be in a certain state, let's say a state of fear and threat detection, I have to protect myself, I'm under threat, the parts of the brain that handle fear and threat detection are firing, right? That's trillions of connections. And then they become wired. They become permanently connected. So that child's brain is now what we think of as "survival brain." It's a brain ready for fear. It's ready for threat. It's not a brain really ready to do sort of the normal things that kids have to do. That's how it becomes problematic.[56]

---

[53]*Id.*

[54]*Id.* at 1649-50.

[55]Vol. 7, p, 1651, *Porterfield Testimony; see also,* Vol. 4, p. 874-76, *Fucetola Testimony* (there is an exceptionally rare 29 point differential between Mrs. Montgomery's performance and verbal IQ).

[56]Vol 7, 1651.

The timing of the abuse affects which area of the brain is compromised. The limbic system "handles emotions," and "one of the critical developmental periods of the limbic development is early childhood."[57]  "What we find with teenagers who are abused is that they suffer more of those cognitive impairments that come from frontal lobe damage. So, trouble planning, trouble thinking things through, trouble with their reasoning capacity and handling emotion and reasoning together . . . making a good decision, essentially."[58]

Dr. Porterfield testified that the duration of the abuse Mrs. Montgomery endured compromised multiple parts of her brain:

> Well, what's sad about it, frankly, in this case is that the critical periods of development for, let's say the limbic system. That limbic system, by the way, again is the emotional responses of the child. One of the crucial developmental periods of the limbic development is early childhood. So what we found is that if children are abused, maltreated, frightened during their younger years, sometimes they're going to demonstrate later what we call affective problems, problems with their feelings, handling them, what we call emotional dysregulation. So we've got Mrs. Montgomery certainly experienced in early childhood– while that limbic system was formulating itself and growing, she experienced great abuse, fear abandonment, neglect . . . So then we've got Ms. Montgomery abused severely as an adolescent, and we see in Mrs. Montgomery's clinical condition the detrimental effect of that, which is terrible, terrible function in planning, impulse control, and reasoning. So sadly you see the critical

---

[57]*Id.*

[58]*Id.* at 1652.

periods for her because the abuse took place across her childhood, in her adolescence many of the critical periods [were] times she was under severe traumatic stress and, therefore, her functioning became impaired."[59]

Dr. Porterfield explained the science behind why some children are able to overcome maltreatment where other children experience significant impairments. Scientific studies have revealed that "dose matters."[60] "If you are talking about multiple, six, seven, eight adverse childhood events, again, we're not even talking about looking at the length of these events in the child's life but if you are talking at that level of adversity, you're going to be looking at worse and worse functioning afterwards."[61] Dr. Porterfield then related the science to Mrs. Montgomery's functioning, "With Mrs. Montgomery, for instance, if we just do a

---

[59] *Id.* at 1653.

[60] Exhibit 155, Porterfield powerpoint slide 34-36.

[61] Vol. 7, p, 1657, *Porterfield Testimony*. As explained by Dr. Porterfield's testimony and PowerPoint, the ACE study assessed the effects of basic categories of adverse childhood experiences: emotional abuse, physical abuse, sexual abuse, parental substance abuse, parental mental illness, mother treated violently, parental separation or divorce, emotional neglect, physical neglect (Exhibit 155, *Porterfield PowerPoint* at Slide 15). The risk of each negative outcome studied (including: mental health disturbances, somatic disturbances, substance use and abuse, sexual dysfunction, impaired memory, and high stress/anger issues) increased in a graded fashion as the number of ACE factors increased *(Id.* at 14). Dr. Porterfield also provided an extensive bibliography of sources, including multiple publications by the Department of Justice, regarding the ACE study and the scientific knowledge derived therefrom. Exhibit 155, *Porterfield PowerPoint, slide* at Slide 41-44.

broad-base look at her as a subject of the ACE evaluation, you see that she has

nine out of ten ACE events in her childhood. *That is an astonishing load of*

*adversity.*"[62] Dr. Porterfield explained that such pervasive trauma creates Complex

Posttraumatic Stress Disorder (CPTSD):[63]

> [T]here's a different sort of presentation and set of problems that
> emerges in people who have had to have a lifelong or chronic
> condition of fear, trauma, and being overwhelmed; and the sort of
> model of that is called complex posttraumatic stress, and that – we've
> learned this through war survivors, kids growing up in war zones,
> kidnap survivors, children who have been chronically abused. These
> are the populations who have a posttraumatic condition, but we look
> at it as having more impairments, more pervasive problems in the
> functioning, and it's sort of best understood, I think as a captivity
> condition, meaning the person's trauma came out of a situation they
> could not get out of, sometimes called learned helplessness, meaning–
> excuse me – the captivity sometimes is described as learned
> helplessness which is a condition in which the person realizes there is
> nothing they can do to escape.[64]

Dr. Porterfield explained that Complex Posttraumatic Stress Disorder

(CPSTD) involves the symptoms of PTSD (re-experiencing, avoidance, and

inappropriate/hyper sense of threat) combined with additional symptoms of

disrupted self-organization.[65]  PTSD, as opposed to CPTSD,  is more an anxiety

---

[62]Vol.7, p.1657.

[63]*Id.*, *see also* exhibit 155, Porterfield Powerpoint at slide 34-36

[64]*Id.* at 1664.

[65]Exhibit 155 side 22.

disorder; "what we've actually learned in the last 30 years or so is that really posttraumatic stress disorder is a disorder coming out of our memory functioning in the brain and our arousal system or what I will call our fear network, and what we find is that people who have posttraumatic stress [have] a dysfunctional linkage between their memory of the event and their reaction in their body and that makes people really suffer . . . the dysfunction of PTSD is that we understand now that the part of the brain that encodes memory is the hippocampus, the larger system than that but the hippocampus is the main structure. If laying down that memory as the amygdala, the part of the brain we talked about [in] the limbic system, is sending fear. So later the memory of the trauma activates the fear, and so the terrible thing about posttraumatic stress is that for people who have been traumatized, remembering is actually being afraid."[66]

In addition to reliving the experience of fear, chronically abused children who are abused by caregivers "not only get that disorder arousal system that we talked about, right, their fear and threat detection is quite offkilter, but they also develop a disordered sense of self and a disordered sense of other people and detachment, and that's from the perpetrator being trusted adults or people who are

---

[66]Vol. 7, p. 1659.

supposed to [protect] them."[67]

Dr. Porterfield diagnosed Mrs. Montgomery with complex post-traumatic stress disorder (CPTSD) and explained how that diagnosis is a description of Mrs. Montgomery's life-long impairments.  Mrs. Montgomery experiences emotional dysregulation, a distorted sense of self, distorted perception of interpersonal relationships and dissociation.[68] "Lisa Montgomery's experiences of being groomed by Jack Kleiner starting at approximately age 11, if not earlier, with fondling, nudity, physical punishment being coupled with the nudity, being forced to bend over a bathtub with her bare bottom exposed and growing into at age 13 an experience frank rape by him is just an astonishing amount of abuse for a child to absorb. It is very, very severe. When you then add to what has emerged is that she was also trafficked by her mother, [her] other caretaker, who is supposed to protect [her], traffics [her] to other adult men who multiply raped her, beat her, and urinated on her, it is almost incomprehensible the kind of stress this child's body and mind suffered; and, frankly, her disorder behavior shows the cost in terms of how severely disturbed she is."[69]

---

[67]*Id.* at 1657.

[68]Ex. 55, Porterfield slide at 34-36.

[69]Vol 7 at 1671.

Dr. Porterfield discussed, in turn, how each of the ACE risk factors for poor outcomes as an adult were present in Lisa's history and upbringing: sexual abuse, physical abuse, emotional abuse as shown above, neglect, parental loss and separation, violence in the home, substance abuse, mentally ill parent, and multigenerational patterns of child objectification, abduction, and abandonment.[70] First addressing sexual abuse, Dr. Porterfield explained how Ms. Diane Mattingly's experiences of abuse at the hands of Judy Shaughnessey (then Hedberg) and her rapists also harmed little Lisa. "We're going to start with [3 or 4 year old Lisa's witnessing the rape of seven or eight year old Diane by an adult male] -- a starting point of sexual abuse because for a four-year-old child to be lying in that situation would be unbelievably frightening and would be a condition of sexual abuse."[71]

Dr. Porterfield discussed Mrs. Montgomery's trauma response of learned helplessness. "Mr. Kleiner by all accounts was just an unbelievably frightening man, and he threatened Lisa that he would rape her sister if she told. So Lisa now has the double bind, I have to submit to the rape because if I don't, my

---

[70]Exhibit 155, Porterfield Powerpoint, slide 23-33.  Testimony Vol. 7 at 1669-80.

[71]Vol. 7p. 1670.

sister gets it. He also threatened, though to kill the family if she told. This was a very important point to me because it led to a real feeling of, I believe, learned helplessness that I talked about earlier in Lisa. He's saying, I will kill your family.  Dr. Porterfield discussed the pervasive physical violence in the home,[72] including Jack Kleiner obligating Lisa and sister Patty to beat each other with two-by fours and Mrs. Shaughnessy killing the family dog with a shovel in front of the children.[73]

Dr. Porterfield also found the emotional cruelty toward Lisa by her mother to be significant abuse – and to reflect the mother's mental instability. "I believe Mrs. Kleiner was very mentally ill because her – the things she was capable of doing to her children are really astonishing in their cruelty."[74] Dr.

---

[72]Dr. Porterfield noted this threat was confirmed by divorce proceedings:

If you want to sort of think about part of questioning was evaluating her, [determining] what was the believability of that threat? What I found in the records was that Judy Kleiner herself in her divorce proceeding says, Part of why I didn't want to leave or kick him out, rather, was I believed he was going to kill us. So there you've got a grown woman saying this man is capable of hurting/ killing his family. So when a little child, 11, 12, 13, 14 feels it that to me is quite credible.

Vol. 7, p, 1674, *Porterfield Testimony.*

[73]*Id.* at 1677.

[74]*Id*. at 1674.

Porterfield again referred to Mrs. Mattingly's testimony saying, "There is just a tone across this family of disparagement and sort of vicious language being used toward children. There is -- the experience of Ms. Mattingly as a child being told, you are going to be removed from the home because you're bad, you're not ours. Again, this now – that's an emotionally abusive situation for Ms. Montgomery as well because she's a little child watching her big sister, beloved, being threatened with abandonment. This is so frightening for children. Watching Diane Mattingly being put on the porch naked. This is emotionally abusive to Lisa Montgomery, of course as well as to Ms. Mattingly."[75]

Dr. Porterfield outlined the proof of the other ACE factors present in Lisa's development. "Parental loss and abandonment is shown as a severe risk factor for many, many years in the literature, and we know Lisa Montgomery, it's quite clear her father both takes her away from the mother for this sort of bizarre period of time that's unclear what that was but appears to abscond with her, but then he really just disappears and abandons her, and that's a risk factor for kids to lose a parent."[76] With regard to substance abuse in the home, Dr.

---

[75]*Id*. at 1673.

[76]*Id.* at 1678.

Porterfield testified that many adults in Mrs. Montgomery's family – in addition to her mother and biological and step-fathers – have both substance abuse issues and diagnosed mental health disorders.[77]

Dr. Porterfield discussed the family's history of child objectification and abduction as a non-ACE-study risk factor. She explained that the family's history of taking one another's children as rare, but that she flagged that factor "because it is so pronounced in terms of a pattern that existed in this family of seeing children as objects to be used in battles with one another, literally people take threatening to get rid of kids, getting rid of kids, threatening to steal kids . . . from Lisa's childhood she saw this disturbing pattern that children were objects and it, I believe, was absorbed into her very disturbed sense of self."[78] Particularly harmful to Lisa's developing sense of self, was her mother's forcible cutting of Lisa's hair as a sign of she was "bad and dirty"[79] and Mrs. Shaughnessy's blaming of Lisa for her own victimization. As Dr. Porterfield discussed, "[After this extensive years of sexual abuse was discovered, Mrs. Kleiner blamed Lisa for the abuse, said that [Lisa] had done it, [Lisa] had stolen

---

[77]*Id.* at 1680.

[78]*Id.* at 1681.

[79]*Id.* at. 1674.

[Mrs. Kleiner's] husband, said [Lisa] had broken up the family. [Mrs. Kleiner]

said that [Lisa] had made it so we don't have money now. It's very difficult to

try to capture how damaging that message is to a child who suffered sexual

abuse."[80] Dr. Porterfield attempted to detail the harm: "[This idea of Mrs.

Kleiner saying to Lisa, This is your fault, is really just a staggering kind of

damage to do to a child."[81]  Dr. Porterfield said this harm was amplified by

Mrs. Kleiner's publically repeating her blame of Lisa: ""when you think of an

adolescent, this is a time of deep sort of self-consciousness and awareness of

who am I in the world, how do people think of me, and you have this woman

saying to people all around, This child did this on purpose, she brought it on

herself, she was having sex with my husband, that is deeply deeply disturbed

behavior by Kleiner – Mrs. Kleiner and very damaging as you see in Lisa, or as

I saw, frankly, in my evaluation."[82]

        Dr. Porterfield discussed the symptoms she saw during her examination of

Mrs. Montgomery, including physical manifestations of trauma.

        In the current interview, Lisa reported experiences consistent with
        dissociation and posttraumatic symptomatology. For example, Lisa

---

[80]*Id.* at 1675.

[81]*Id.*

[82]*Id.* at 1676.

reported that when these men were sexually assaulting her *she began to "go away" in her mind. She stated that she would "build houses" in her mind and in that way it would be as if what was happening wasn't really happening to her*. Lisa described having frequent nightmares of the abuse as a child. She also described having severe headaches . . . I observed Lisa to have an involuntary gag reflex. I also noticed tearfulness and trembling. She bit her lip repeatedly. I observed her hands and body shaking. I noticed her neck and face flush red. Lisa reported feeling "sick to her stomach" and feeling "tight inside" during the interview when discussing the rapes.[83]

As Dr. Porterfield described, "Mrs. Montgomery became very anxious and agitated [during discussion of sexual abuse and trafficking]. At time shifting in her seat, crying, getting hot, and having to sort of, you know, shake her clothing to release air. She became – she gagged several times, literally had sort of a physical gag reflex when talking about [the] sexual abuse."[84] Dr. Porterfield also focused on Mrs. Montgomery's emotional dysregulation and dissociation:

There is extensive evidence that Mrs. Montgomery was a profoundly dysregulated young woman. So starting – I think, it really, really began to emerge in her teen years when she was being raped and then going into her very disturbed adulthood. This would be – you know, examples of this are her incredible volatility, her inability to handle emotions, retreating in her bed for days, sort of losing it on her kids, I think mistreating her children excessively drinking, being engaged in promiscuous behavior. These are all signs of a person who is not able to manage or regulate the emotions and experiences that are going on

---

[83]Exhibit 8, p. 4-5, Porterfield Supplemental Declaration (emphasis added).

[84]Vol 7, at 1704-05.

in their body.[85]

Mrs. Montgomery's sense of self – the foundation for all other basic

mental and emotional tasks – was markedly distorted by her experiences:

> [H]er ability to be herself is almost not – she's almost incapable of
> feeling a sense of self; and what I mean by that is when she feels
> sense of self, she's confused by that. When she has a feeling, she
> doesn't really know if the feeling is coming from within her or
> outside of her. That's very, very disturbing . . . What we know
> clinically [is that] if that child is being abused by a loved figure:
> mom, dad, a beloved person in their life, they then have to make sense
> why is this happening. It must be that I'm making it happen. I am
> bringing this on. That then leads to an entire cascade of beliefs about
> oneself as dirty, disgusting, you know, warped, did it to myself, and
> that's where that really toxic self-blame happens in sexual abuse
> survivors, and Mrs. Montgomery is deeply disturbed with that."[86]

Mrs. Montgomery's distorted sense of self is compounded by her distorted

perception of relationships: "a very, very troubled part of Mrs. Montgomery …

is her perception of other people; and what I mean by this – and this happens to

severe abuse survivors – Mrs. Montgomery grew in a context of experiencing

people as a source of physical pain, emotional pain and neglect. She then

internalize that that is what human interaction is. People are going to hurt you.

They're going to violate you. And what emerged as she grew into an adult was

---

[85]*Id.* at 1602.

[86]*Id.* at 1684-85.

a difficulty perceiving people as anything except a threat or an object, because people to her were the source of such deep, disturbing violence as a kid."[87] Dr. Porterfield explained that Mrs. Montgomery's emotional dysregulation, disrupted sense of self, and distorted perceptions of relationships are further exacerbated by (and likely caused by) Mrs. Montgomery's severely dissociate symptomatology.[88]

*This is "one of the most severe cases of dissociation [Dr. Porterfield] has ever seen . . .* it's pervasively part of who [Mrs. Montgomery] is."[89]  Dr. Porterfield explained that dissociation is a physiological response to overwhelming trauma: "if a child is experiencing something that is physically hurting them or just horrifying them, it's overwhelming them, one of the things that happens physiologically is that the brain actually release into the body chemicals that are – we call them endogenous opioids. It's just like it sounds. Endogenous [which means] from within, coming from within us. Opioids like you might think of with – that you need during surgery or during, you know, pain."[90]  Dr. Porterfield

---

[87]*Id.* at 1687.

[88]*Id.* at 1692.

[89]*Id.*

[90]*Id.* at 1688.

explained that endogenous opioids are protective during trauma because they decrease and detach the pain.[91] When a child is a victim of sexual assault, those opioids allow them to survive:

> So a child who is being raped, the child – let's say, if we're going to use Mrs. Montgomery, that's obviously why we are here, a young child, 13, physically not developed, who's being raped by an adult male is going to have a whole cascade of physical discomfort, pain, and horror from that. So they're going to have smells and sounds of an adult male having sex. They're going to have the physical pain in their genital area of an adult male penetrating them, and all of that is going to lead that body to need to, as we talked earlier, survive, cope. What's going to happen is the body releases chemicals that will anesthetize. That decreases the pain the child feels. It decreases the sensory experiences, I'm not really feeling it. It decreases the consciousness. Rape survivors will tell you it was like I left my body and [was] looking down . . .Those endogenous opiates that I talked about, those things that make you not feel the pain, the good thing is they make you not feel the pain, but the other side of it is they also disconnect us then as that memory of the event is being laid down. That's why after a trauma we often don't have great . . . linear memories. We have fragmented memories. So as that opiate is decreasing pain and decreasing consciousness, it's also decreasing memory and connection.[92]

Dr. Porterfield explained that Mrs. Montgomery's dissociation (and resulting lack of reliable contact with reality) is severe – even when compared with survivors of war and state sanctioned torture:

---

[91]*Id.* at 1689 (emphasis added).

[92]*Id.* at 1689-90.

I've seen survivors of very severe rape and torture who had an okay enough childhood that, yes, they have severe dissociation. When you start reminding them about the kidnaping, for instance, they dissociate. They disconnect. I'm not feeling myself anymore. I can't do this. I'm not in my body. The world's not real, but they have a fundamental sense of self that is intact. Mrs. Montgomery doesn't have that. Mrs. Montgomery's entire development took place in a context of stress, humiliation, degradation, and so her dissociation is woven deeply into her personality. There is no ground for her to stand on. So her dissociation is not the sort of episodic blips. Her dissociation is completely pervasive part of who she is. She lives in a dissociated state much of the time.[93]

. . .

Mrs. Montgomery has very severe derealization an depersonalization, and that means *she is very vulnerable to not knowing if she's real, if her environment's real, if the interaction is real*. It all, like I said, becomes sort of like quicksand for her, and I believe that is because her neurobiological response to early stress was such a heavy load of anesthetizing, altering neurochemicals that she now just daily functionally lives in that kind of – in that kind of operating stance, which is the world does not feel real to her.[94]

Dr. Porterfield testified that "Psychologists learn what posttraumtic stress is and what complex posttramatic stress is and what dissociation is. These are not – you know, these are not esoteric concepts in psychology. CPTSD is internationally recognized in the International Classification of Diseases (11th edition) and was a generally accepted clinical diagnosis.[95]

---

[93]*Id.* at 1690.

[94]*Id.* at 1694 (emphasis added).

[95]Vol. 7, p. 1710-11.

### 3. **Brain damage**: **Drs. Nadkarni, Woods, and Gur**

*Dr. Nadkarni*, a medical doctor who is board certified in neurology, psychiatry, behavior neurology, epilepsy, and clinical neurophysiology, testified in the 2255 proceedings that Mrs. Montgomery's brain is significantly impaired. Dr. Nadkarni, who teaches at NYU Medical School, is the clinical director of the NYU Medical center's neuroscience curriculum for psychiatry residents, and diagnoses and treats patients in the epilepsy division of the Medical Center, an expert in the fields of epilepsy, neurology and neuropsychiatry and traumatic brain injury.[96] Dr. Nadkarni found that Mrs. Montgomery "has deficits that lead me to think that she has both epilepsy and a significant front lobe syndrome, as well as parietal lobe and temporal lobe dysfunction."[97] Dr. Nadkarni testified that his opinions were based on a full neurological examination of Mrs. Montgomery in combination with her reported history and symptoms as well as the extensive social history compiled by Dr. Jan Vogelsang.[98] Dr. Nadkarni interviewed Mrs. Montgomery as to her medical history and asked her pertinent questions regarding symptomology, but also compared the information she provided with the historical

---

[96]Vol 7,1714.

[97]*Id*. at 1715.

[98]*Id.*

43

data from her prior psychiatric and medical records.[99] Dr. Nadkarni's neurological examination of Mrs. Montgomery "look[ed] at different parts of the nervous system as they manifest in somebody's comportment and neurological exam, how they function sensory-wise, coordination-wise, mental status wise, all of those things."[100] The physical examination he performed on Mrs. Montgomery was precisely what he performs at NYU on his patients there on a regular basis, including use of the Montreal Cognitive Assessment, a screening tool for cognitive impairment.[101]

He reports "I was sitting in the room with her and I checked her cranial nerves, checked eye movements, and I checked the symmetry of her facial movements, her hearing, the different nerves of her head and face; and then you do a motor examination which involves testing muscle tone and bulk and strength, sensory examination testing basic sensory modalities, coordination examination and a cognitive assessment as well.[102]  The Montreal Cognitive Assessment is "a good way to measure certain functions that are seen in the way the brain works in

---

[99]*Id.*

[100]*Id.* at 1716.

[101]*Id.* at 1717.

[102]*Id.* at 1742.

terms of cognition. So it involves things like language assessment, side shifting, organization, memory. Very specific cognitive functions are screened on that test."[103]

Dr. Nadkarni summarized his findings: "I think the three main areas that are affected in Ms. Montgomery are the frontal lobe, the parietal lobe, and the temporal or, slash, limbic lobe, and the right hemisphere I think is more affected than the left."[104] He continued, "In Ms. Montgomery's case these limbic structures, parietal structures, and inferior frontal structures are all – have all been shown to be abnormal . . . [her pattern of brain damage] actually follows kind of a classic pattern, very classic pattern for comportment difficulties."[105] Dr. Nadkarni explained that "comportment" in the neurological setting means essentially its vernacular meaning, but signifies a host of neurological abilities: "comportment is comprised by several things that help us enact behaviors in the world, right? So it involves insight, judgment, self-awareness, social adaptation, and empathy, and it lets us behave appropriately in the world we live in and assess when something will have

---

[103]*Id*. at 1717.

[104]*Id.* at 1727.

[105]*Id*. at 1726

negative consequences or positive consequences and helps us make judgments, basically."[106]

Mrs. Montgomery's brain dysfunction is a "classic" presentation. He explained that this brain problem reflects "relatively lower metabolism in the left hemisphere compared to the right hemisphere and relative atrophy in the right hemisphere compared to the left."[107] A Mrs. Montgomery's parietal lobe, which synthesizes information and stimuli "tagging it appropriately" allowing for critical, often pre-conscious decision-making as to "what's important, what's not important, what would be bad for me, what would be good for me," has "significant abnormalities."[108]

Mrs. Montgomery's limbic lobes, which are important for generating emotional "tags and physical experiences that go along with emotional states" is also abnormal.[109] Dr. Nadkarni explained that Mrs. Montgomery has damage or dysfunction of her frontal lobes.  The type of dysfunction he detected could result from Mrs. Montgomery's history of having her head banged on the floor during

---

[106]*Id*.

[107]*Id.*

[108]*Id*. at 1727

[109]*Id*. at 1828.

rape.[110] "99 percent of her problems that are involving the frontal lobe and her temporal and parietal lobe are from repeated traumatic injury. She also had a prenatal toxic history [maternal consumption of alcohol] so that probably didn't help."[111] He explained that the sorts of injury she suffered caused both brain damage and epileptic activity: "developmentally and then post-birth, severe traumatic head injuries she's had repeatedly will give you this kind of a picture, and classically those patients present with comportment problems, these frontal lobe syndrome kind of issues. And epilepsy – you have posttraumatic epilepsy also, which I think is what happened with her."[112]

_____

[110]Lisa suffered many head injuries, for example when her stepfather banged her head on the concrete floor while raping her. Also, her husband Mike got into a fight with her, "got mad and without considering the consequences threw a size D Energizer battery at her head as hard as he could. Because of his baseball throwing skills, the battery hit Lisa square in the back of the head. She went down like a crushed rag doll. She was bleeding from the back of the head. He honestly thought that he had killed her and was horrified at what he had done. They took Lisa to the emergency room."  Exhibit 1 at 658.  Lisa had another significant head injury in a car accident January 26, 1988, when she hit another vehicle from the rear and sustained a concussion. *Id.* at 95.  On June 20, 1999, Lisa was hit by a child's knee on a trampoline. Lisa did not lose consciousness but became repetitive, confused and disoriented. At the ER, she was somewhat disoriented as to time and place, and was not able to relate her phone number or do simple calculations. .... A few days later Lisa returned to the hospital for her headache....She had a severe headache with photophobia, nausea and vomiting. She was given Compazine orally. *Id.* at 130.

[111]*Id*. at 1744.

[112]*Id*. at 1745.

Mrs. Montgomery also suffers from frontal temporal lobe epilepsy, according to Dr. Nadkarni. Epilepsy is a seizure disorder. Seizures "are any king of behavioral change or experience that somebody can have that's related to abnormal firing of certain parts of the brain."[113] Dr. Nadkarni explained that "seizures are pleomorphic" which means having "different presentations, different symptoms."[114] "[I]n a frontal temporal epilepsy, which is I think what Lisa Montgomery suffers from, people can have – the five most common symptoms are auras, which you retain awareness but you might smell something strange, and the trick is that isn't stereotyped. So the smell is the same every time because the same part of the brain is firing so you get the same kind of sensation . . . out-of-body experiences or dissociative experience in general is a common feature of temporal lobe epilepsy. People can lose time very commonly. So all of the sudden they find themselves doing something and they can't account for the last few minutes, five minutes, ten minutes. And if those symptoms progress enough, you have alteration in your awareness and you might blank out, you might stare, you might have what we call behavioral

---

[113] *Id*. at 1729.

[114] *Id.*

48

arrest where you just stop what you are doing."[115] Dr. Nadkarni explained that there are many types of seizure activity in the brain which do not produce external, visible manifestations: "You would never know by looking at somebody."[116] He explained that invisible seizures are "more common than convulsions in temporal lobe epilepsy."[117] This kind of brain misfiring can disrupt thought and consciousness, without necessarily disrupting external behavior, "so people can go through their lives and do whatever they're doing. They might just have an intense déjà vu or an intense smell or something and they can just work through it and nobody else would know."[118] If, however, "it spreads more, you might have problems speaking. You might be unaware of what's going on around you. You might not be able to understand what people are saying . . . there's all these things that can happen once the seizure spreads." Temporal lobe seizures compromise memory, because they start in the hippocampus (or next to hippocampus in the amygdala) which is one of the

---

[115]*Id*. at 1730-31.

[116]*Id.* at 1724.

[117]*Id*. at 1731.

[118]*Id*.

structures in the temporal lobe which is responsible for memory.[119]

Mrs. Montgomery "gives a classic history for symptoms of temporal lobe epilepsy over many, many, many years, going back to even her childhood, she's had experiences that go along with temporal lobe epilepsy."[120] He recounted her symptoms: "episodes of lost time;" "olfactory hallucinations but they were very stereotyped;" "discrete episodes that were brief in duration where she would be doing something and all of the sudden she didn't know how she was doing it." Her neurological exam was also consistent with the diagnosis: "when I examined her physically, she has weakness in her left hand, weakness in coordination in her left hand. That points to sort of brain abnormalities in both the frontal lobe and temporal lobe circuits." Dr. Nadkarni explained that these physical findings are not something a patient can fake.

Dr. Nadkarni testified that his initial assessment and report were independent of any information from Dr. Gur's assessment of Mrs. Montgomery.  *See* Gur, *infra*.  However, once counsel provided him Dr. Gur's data, including both a PET scan and MRI data, Dr. Nadkarni found that Dr. Gur's

---

[119]*Id*. at 1732.

[120]*Id*. at 1733.

information corroborated his own findings.[121] Dr. Nadkarni's findings on the neurologic examination pointed to frontal lobe dysfunction, "and the PET scan and the MRI also point to those areas as being abnormal along with limbic dysfunction, which is temporal lobe dysfunction, which maps perfectly onto her history of probable epilepsy and the seizures."[122] He also indicated that his testing reflected the findings on the imaging studies of a "right hemisphere problem."[123]

*Dr. George Woods* practices clinical psychiatry in Oakland, California. He testified during 2255 proceedings. Vol. 7, p. 1755, (Court declares Dr. Woods an expert in neuropsychiatry). Dr. Woods' testimony highlighted the importance of the biopsychosocial history and evaluation for a mental health expert. "I must start out by saying that the biopsychosocial history is the most scientific component of any medical examination."[124] The biopsychosocial history provides context for that which the expert sees in the person evaluated:[125] "you want to be able to look at documents across the life span, educational records, social service records. You

---

[121]*Id*. at 1718.

[122]*Id*. at 1735.

[123]*Id*. at 1736.

[124]*Id*. at 1789.

[125]*Id*. at 1759.

51

certainly want to take into consideration other mental health evaluations."[126]  Dr. Woods explained that critical genetic information is reflected in the biopsychosocial history: "genetics are part of your biopsychosocial history because in this case we know that family members share genetic disorders, family members share mood disorders, and that's important to know."[127]

Dr. Woods offered an example of the type of consistency he looks for in the social history of the client's functioning in the real world and the client's presenting history. In Mrs. Montgomery's case, the social history reflected social services records from 2003 – before the offense – that noted that Mrs. Montgomery might be delusional and might suffer from bipolar disorder.[128] Dr. Woods termed this sort of consistency between current, observed clinical symptoms and a subject's life history documentation "ecological validity."[129] The biopsychosocial history provided Dr. Woods with mental health symptoms noted consistently across Mrs. Montgomery's lifetime.[130]

---

[126]*Id.* at 1769.

[127]*Id*. at 1759.

[128]*Id*. at 1761.

[129]Woods' Powerpoint, Ex.159 slide 27.

[130]Vol. 7 at 1787.

Dr. Woods focused particularly on the history of Mrs. Montgomery's loss of contact with reality.[131] Dr. Woods explained that by loss of contact with reality, he intended to convey "someone who can't maintain good contact with what's occurring around them. It doesn't mean they go off into their own world necessarily, but it means that they – it's like hearing something far away and not being able to quite catch it."[132] He noted, "that's exactly how people describe Ms. Montgomery outside of the forensic setting, growing up, in marriage, as a parent, as a sister. They consistently describe her as not being able to stay connected."[133] Dr. Woods discussed that psychosis was manifest across Mrs. Montgomery's lifetime. "[H]er sister said, you know, she's crazy but I don't think she's crazy like schizophrenia. The social worker in 2003 said, Wow, I'm wondering if she may be somewhat delusional. Dr. Kuncel said, you know, again, she sounds delusional. Dr. Hutchinson says, I think you need to look at her thought disorder. You know, [Dr.] Vogelsang says, Wow, she's psychotic. And then what do we see? We see the antipsychotic being the treatment that makes the

---

[131]*Id*. at 1789

[132]*Id*. at 1790.

[133]*Id.*

most difference."[134]

Dr. Woods highlighted that the biopsychosocial report reflected a maternal and paternal history of neglect, abandonment, and sexual dysfunction.[135] "For any clinician that should be a clue in your differential as to whether there is a mood disorder in the family. Mood disorders manifest themselves with these kinds of behaviors."[136] He pointed to information in the social history that family members had been diagnosed with mood disorders, "this is what's call[ed] an affectively la[den] family . . . when you see mood disorders early in life, there's a greater chance of those mood disorders have a strong genetic component, but what we do know is that mood disorders run in families."[137]

Dr. Woods also indicated that Dr. Vogelsang's documentation of cognitive impairments through several generations of Mrs. Montgomery's family history was significant to him. "This is what really kind of threw me at first is we see cognitive impairments, intellectual disability, other autism, other types of brain-based impairments not only before Ms. Montgomery, but we're

---

[134]*Id.*

[135]*Id.* at 1787.

[136]*Id.*

[137]*Id.*

now seeing these impairments in the children as well and the children of her children."[138] The generational component of this information provided further verification of Dr. Woods' assessment.

Dr. Vogelsang's social history also provided information on the trauma Mrs. Montgomery experienced during the developmental period which allowed for deeper insight into Mrs. Montgomery's symptomology. Dr. Woods explained that the biopsychosocial informed the clinical interviews and – particularly the information from David Kidwell – "allowed us to move the ball further in terms of understanding what really had occurred to her."[139]

Doctor Woods explained he worked in an interdisciplinary team with Dr. Porterfield, a trauma specialist, Dr. Nadkarni, an epilepsy specialist, and Dr. Vogelsang, the social historian and social worker.[140] For Dr. Woods, "[T]he reports of other mental health evaluators are very important. The clinical interviews are very important. The neurological, neuropsychological, and neuroimaging are very important in understanding the evolution of the science of

_____

[138]*Id*. at 1789.

[139]*Id*. at 1782.

[140]*Id*. at 1760.

trauma, and neurobiology is very important."[141]

Dr. Woods placed significant importance on the observations of Mrs. Montgomery's treating psychiatrists, Drs. McCandless and Kempke. As he noted, those doctors "attempts to change medications and to add medications, to really try to gain some control over these symptoms, that's very, very important, because it's outside of the forensic setting."[142]

Dr. Woods also looked to Dr. Nadkarni's assessment for confirmation of his own neurological findings: "Dr. Nadkarni did some neurological testing I didn't do. He did a smell test [resulting in a finding of] evidence of a frontal lobe dysfunction."[143] Dr. Woods noted that Dr. Nadkarni documented multiple neurological symptoms.[144]  Mrs. Montgomery had "olfactory hallucination of bad small (evidence of frontal lobe dysfunction; episodes of lost time; memory of experiences that she is not sure really occurred; word finding problems; sustained periods when things do not seem real; altered states of consciousness; episodes of

---

[141]*Id.*

[142]*Id.* at 1761.

[143]*Id.* at 1820.

[144]*Id.* at 1761

losing time."[145]

Inherent in Dr. Wood's assessment of Mrs. Montgomery's neurological functioning was an assessment of her ability to accomplish the tasks of normal life.[146] From the social history, Dr. Woods learned "[Mrs. Montgomery] had difficulty performing simple tasks. She had difficulty finishing tasks. She had real difficulty, as I talk about, sequencing, being able to really take stock and say, okay, I need a loaf of bread. I also need some milk. I've got four kids. I [have] got to do this, that, and the other. She had difficulty budgeting. She had problems braiding and brushing her hair. I put that there specifically because braiding and brushing is a sequential phenomenon . . . These are all cognitive tasks that we tend to do fairly easily, but with someone that has the trauma history and the brain impairments that [Mrs. Montgomery] has would be problematic."[147]

Dr. Wood's neurological examination also yielded significant symptoms of brain impairment. Dr. Woods cited three indicators which were of particular

---

[145]Ex. 159, Woods' Powerpoint slide 64-65.

[146]*Id*. slide 28.

[147]Vol 7 at 1891.

interest: skipping, tandem walking, and the Luria test.[148] Mrs. Montgomery

cannot skip.[149]"[S]kipping is actually a neurological function. It requires the

cerebellum."[150] The tandem walking task also implicates cerebellar

functioning.[151] The Luria test, which Dr. Woods testified is similar to some of

the testing Dr. Nadkarni performed (and on which he obtained similar results)

tests frontal lobe functioning.[152] "And she could not do this. So what we really see

are neurological functions that are impaired. Impaired motor control,

impaired cognitive functions. She had problems with attention and language,

and she had problems regulating fears as well as pleasure."[153]

        Dr. Woods explained the implications of Mrs. Montgomery's cerebellar

and frontal lobe dysfunction. With regard to cerebellar dysfunction "these are

the symptoms that one sees; distractibility . . . hyperactivity, impulsivity,

disinhibition, not being able to control one's anxiety, irritability, rumination,

---

[148]*Id*. at 1792.

[149]*Id.*

[150]*Id.*

[151]*Id*. at 1792-93.

[152]*Id*. at 1792.

[153]*Id*. at 1792-93.

thinking things over and over and over, not being able to let go, over and over, obsessive behaviors, and dysphoria."[154] Dr. Woods explained that the dysphoria accompanying cerebellar dysfunction equates to "depression, again, tactical defensiveness. You can't stand being touched. You have problems being touched. Sensory overload, which is also called the gating mechanism, too much overwhelms you. [Mrs. Montgomery] talked consistently about having to be away from her kids because – although any of us who have kids think this, but sometimes you just can't be there. You just can't be with them. But that's not the same as not being able to take care of their lives et cetera, apathy and childlike behavior."[155] Dr. Woods explained that the cerebellar dysfunction implicates frontal lobe disorders as well: "We now know that the cerebellum has connections to the frontal lobe, and the frontal lobe is kind of the gross executive functioning, but the cerebellum is kind of the fine tuning of the executive functioning. And clearly she has difficulty. And these are the kinds of dysfunctions that one would see in someone with a history of . . . their mother drinking [while pregnant]."[156]

---

[154]*Id*. at 1792.

[155]*Id.*

[156]*Id*. at 1794.

Dr. Woods also performed the Barkley Deficits in Executive Functioning Scaled Interview.[157] This test confirmed the picture presented by Mrs. Montgomery's social history: "She was markedly deficient in her time organization, time management. She was markedly deficient in her organization. She was markedly deficient in her ability to restrain. She was markedly deficient in her motivation. She told actually a story about leaving jobs without even picking up a check."[158]

Dr. Woods testified that to a reasonable degree of medical certainty Mrs. Montgomery's brain is significantly impaired. He explained that her impairments are lifelong and "[h]er brain impairment is merely what we call multifocal. It's in multiple areas. Certainly it's in the back of the brain, the cerebellum. It's certainly in the right side of the brain, the right parietal lobe, the right temporal – frontal lobe"[159]  Mrs. Montgomery's behaviors were symptoms of her brain impairments and trauma. He gave examples of concrete tasks Mrs.Montgomery was unable to perform which demonstrated brain dysfunction like making a bed, completing projects, and effectively treating her

---

[157]*Id.*

[158]*Id*. at 1800.

[159]*Id.* at 1763.

children's lice infestation.[160] He described her inabilities as "sequencing issues."[161] "These are not just someone who gets frustrated and just throws things away. These are problems with the way that her brain works in terms of if I do this, then I should do that and then I should do that."[162] Dr. Woods reflected that Mrs. Montgomery's social history supported his diagnosis, because her friends and family were aware of her inabilities – though they lacked the expertise to describe the problem in clinical ways.[163]

Dr. Woods also opined upon trauma and dissociation.  He testified that Mrs. Montgomery's history of trauma has caused her to dissociate as a coping mechanism.[164] Dr. Woods explained that dissociation is purposeful in the sense that "it serves a purpose, but not every time someone dissociates is in fact intentional."[165] Dr. Woods saw symptoms of dissociation when he attempted to interview Mrs. Montgomery about the sexual abuse Mr. Kidwell disclosed.  While

---

[160]*Id*. at 1764-65.

[161]*Id.* at 1765.

[162]*Id*.

[163]*Id*. at 1794.

[164]*Id*. at 1795.

[165]*Id.*

Mrs. Montgomery was able to confirm to Dr. Woods that Mr. Kidwell provided accurate and truthful information, "she physically flushed. Her cheeks became red. Her answers became delayed . . . she was unable to elaborate. This is one of the things that Dr. Nadkarni talks about when he talks about her finding it difficult to initiate a conversation, and she becomes dissociative. In fact, she would not talk about it .. . She would not talk about it, and I was like What would happen if we talked about it? And she said, I just can't. I just can't I don't know I don't know."[166]

Mrs. Montgomery suffered from comorbid psychiatric illness which combined synergistically to compromise her functioning. Dr. Woods found that Mrs. Montgomery suffers from bipolar disorder, and that in combination with her PTSD, the dual diagnosis causes severe dysfunction:

> It's difficult to determine to really – and there's not reason to, to determine which of these symptoms are mood based, bipolar based, and which are trauma based because they're comorbidly interactive and they're bipolar and PTSD . . . when you talk about a comorbid disorder, we're talking about disorders that mix and become something that often is even greater and more severe. These brain impairments don't go away when we talk about comorbidity. The traumatic experiences undermine her perception of the reality consistently, even more so than the bipolar disorder.[167]

---

[166]*Id.* at 1796.

[167]*Id.* at 1768.

*Dr. Ruben Gur*, a tenured professor at Penn Perelman School of Medicine, testified at the 2255 hearing.   His primary appointment is in the department of psychiatry, though he has secondary appointments in departments of neurology and radiology and is a member of the committee that awards Ph.D.s in neuroscience.[168] Dr. Gur works at the Brain Behavior Laboratory at the Department of Psychiatry at Penn, which he established around 1982 and which is dedicated to using neuroimaging to understand brain and behavior.[169]  Dr. Gur's CV and reports were accepted by the Court as Exhibits and the Court accepted Dr. Gur as an expert in the field of neuropsychology and neuroimaging.[170]

Dr. Gur explained his "behavioral image" of Mrs. Montgomery's brain.  As part of his research, he had previously enlisted four top neuropsychologists in the country – "giants of the field" of neuropsychology[171] – to rate neuropsychological test results of unknown individuals that indicate the brain region corresponding to the test result.[172] The experts put together a table of weights for the brain regions

---

[168]Vol. 8, 2028.

[169]*Id*. at 2029.

[170]Dr. Gur's credentials are lengthy and impressive. Exhibit 156, *Gur CV.*; Vol. 8, p. 2028-41, *Gur Testimony*.

[171]Vol. 8 at 2043.

[172]*Id*. at 2041.

implicated if there was deficit in the region.[173]  He wanted to obtain "reliable ways

of relating cognitive performance to brain regions, to the functioning of brain

systems."[174] The behavioral image was designed to be a graphic representation

(like a scan) of the information gleaned from neuropsychological testing.[175]  He

works with Christos Davatzikos and Andrew Newberg. Dr. Gur testified that Dr.

Davatzikos is "world-renowned expert in imaging analysis, especially magnetic

resonance images."[176] Dr. Newberg is "probably the most skilled person I know in

reading PET scans," according to Dr. Gur.[177]

The representation of Mrs. Montgomery's neuropsychological deficits on

Dr. Gur's behavioral image tracked the relative strengths and weaknesses of her

brain. Dr. Gur testified that "[l]ooking at variability within the individual is the

way to find out if there is brain dysfunction."[178] He elaborated that if a genius

has a car wreck and damages his brain, he will still score higher on many tests

than the general population – the damage to his brain is reflected in the relative

---

[173]*Id*. at 2042

[174]*Id*. at 2043.

[175]*Id*. at 2044.

[176]*Id*. at 2048.

[177]*Id*. at 2049.

[178]*Id*. at 2055.

weaknesses of the affected areas.[179]  Dr. Gur testified that the behavioral image primarily reflects areas of the brain in relation to the other areas of the brain, though he does get a general gauge of where the subject stands in relation to the rest of the population.[180] Dr. Gur indicated that Dr. Fucetola's detection of the 29 point differential between Mrs. Montgomery's performance and verbal IQs is "exactly the variability I'm talking about."[181] His method contributes "a pictorial depiction of what are the brain systems most likely involved in the deficits shown on the neuropsychological testing."[182] In Mrs. Montgomery, that image indicates deficits that implicate deep gray matter.[183]

"From the behavioral image it looks like the area of damage is in the parietal lobe, which is roughly in the middle of your brain toward the back. Although there are indications of deficits that implicate deep gray matter. Notably the neuropsychological tests do not look at deep gray matter. They're blind to damage there. But when you see – when you see damage in surrounding areas,

---

[179]*Id.*

[180]*Id.* at 2056.

[181]*Id.* at 2058.

[182]*Id.* at 2059.

[183]*Id.* at 2061.

then very often when you do the imaging, there will be damage in those regions that a neuropsychological test do[es] not measure."[184] Dr. Gur summed up his findings with respect to Mrs. Montgomery: "so the main finding you see in this image is that is parietal. I thought it was more severe on the right than on the left."[185]

Dr. Gur testified that his behavioral image was congruent with MRI and PET data. That is, the neuropsychological, and neuroanatomical data were consistent with each other.[186] He concluded that "she suffers from brain dysfunction that affects areas that are important for behavior, and that people with that sort of brain dysfunction would have difficulty in certain aspects of their behavioral functioning."[187] Dr. Brain damage such as is seen in Mrs. Montgomery could be caused by posttraumatic stress.[188] Dr. Gur also posited that the damage could have been caused by en utero exposure to alcohol. Dr. Gur testified that from an MRI study, "One conclusion was clear which is that the

---

[184]*Id.*

[185]*Id.* at 2061.

[186]*Id.* at 2066.

[187]*Id.* at 2067.

[188]*Id.*

ventricles were large."[189] Dr. Gur testified that "[l]arge ventricles it means that there is more fluid in the middle of the brain than there should be . . . if there is tissue loss in the so-called limbic structures, the structures that surround that fluid inside the brain, then every time a nerve cell dies its place is taken up by fluid. So increased ventricles indicate that there was either damage to the brain, either – what we call atrophy. . . or dystrophy which is that the tissue failed to develop and that's why we have larger ventricles."[190] Dr. Gur explained that the limbic system is compromised of the basal forebrain, the hippocampus and the amygdala.[191] "The other [significant finding based on MRI data] was that the parietal lobe seemed to be much smaller than it ought to be relative to the rest of the brain."[192] He indicated that the right parietal seemed to be affected to an even greater extent than the left.[193] He testified that this MRI data was consistent with the neuropsychological findings.[194]

---

[189] *Id*. at 2071.

[190] *Id*. at 2072.

[191] *Id.*

[192] *Id.* at 2073.

[193] *Id.*

[194] *Id*. at 273

## VI:  CLAIMS FOR RELIEF

## CLAIM I: FORD INCOMPETENCE

All other allegations in this pleading are incorporated into this Claim.

As outlined in section IVA, *supra*, the Eighth Amendment prohibits the execution of persons who, due to mental illness, do not understand the basis for their executions.  *Ford,* at 409-10  "The critical question is whether a 'prisoner's mental state is so distorted by a mental illness' that [s]he lacks a 'rational understanding' of  'the State's rationale for [her] execution.'  Or similarly put, the issue is whether a 'prisoner's concept of reality' is 'so impair[ed]' that [s]he cannot grasp the execution's 'meaning and purpose' or the 'link between [her] crime and its punishment.'"  *Madison*, 139 S.Ct at 723 (cites to *Panetti* omitted). "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Panetti* at 959.   Ms. Montgomery meets this standard.

First, she is seriously mentally ill.  The presiding judge at her trial and 2255 proceedings, the employees of BOP–pre-trial, trial and post-trial–and every expert in previous proceedings concede this.  She is constantly medicated for her illnesses; she is on suicide watch today.  And, second, she does not have a rational understanding or awareness of the meaning and purpose of execution.

Dr. Porterfield explains why Mrs. Montgomery is incompetent:

2. Counsel for Lisa Montgomery has asked me to address her current psychological condition, specifically her rational understanding of her planned execution. My opinion, which is based on information obtained from Mrs. Montgomery's attorneys about their daily communication with her, as well as my previous evaluation of Mrs. Montgomery over four days and eighteen hours of face to face interviewing in 2016, and extensive review of Mrs. Montgomery's biopsychosocial history through records and witness interviews, is that as a result of her severe mental illness Mrs. Montgomery is currently unable to rationally understand the basis for her execution. My opinion is also based on my knowledge and experience as a psychologist who has worked with survivors of torture and other trauma for more than two decades, and the United States Supreme Court opinion in *Madison v. Alabama*, 139 S.Ct. 718 (2019).

3. I first evaluated Mrs. Montgomery in 2016. My evaluation and conclusions with respect to Mrs. Montgomery's mental illness are detailed in my April 22, 2016 report and my October 10, 2016 supplemental report. I have also submitted two declarations with respect to my concerns that Mrs. Montgomery's conditions of incarceration were likely to result in a deterioration of her mental health and functioning. Those declarations are dated November 9, 2020 and November 23, 2020. I reaffirm the truthfulness and accuracy of those previous declarations and incorporate them into this declaration by reference.

4. Mrs. Montgomery suffers from complex post-traumatic stress disorder (CPTSD), complex partial seizures and brain impairment, depression, and bipolar disorder. Her CPTSD is characterized by severe dissociative symptoms. In my report dated April 22, 2016, I stated, regarding Mrs. Montgomery's dissociative symptoms:

> "The most pronounced manifestation of Lisa
> Montgomery's extensive trauma history is her
> dissociative symptomatology and manner of managing

69

stress. Dissociation is a process of the human nervous system in which neurochemical reactions to excessive stress lead to alterations in consciousness and perceptions of senses, the environment, and the self. Dissociation represents a lowering of consciousness, sometimes to the point of actual rupture of consciousness and awareness (Lanius, Paulsen & Corrigan, 2014). Clinical models of dissociation demonstrate how humans, like animals, when under severe threat, will sometimes experience the release of neurochemicals that are anesthetic in nature and that therefore lower the organism's experience of pain and fear. When humans experience this peritraumatic ("during the trauma") dissociation however, they are often left with residual difficulties after the trauma, such as amnesia, fragmentation of memory, and other disturbances. If the individual suffers multiple traumatic events that lead to frequent and lengthy periods of peritraumatic dissociation, the after effects will likely be more pervasive and more severe. These can include altered states of consciousness that linger after the traumatic events, such as time distortions, cognitive confusion, bodily symptoms (depersonalization and derealization) and emotional numbing. (Frewen and Lanius, 2014). Dissociative symptoms can reach the level of psychosis, as when an individual suffers hallucinatory phenomena, such as voices talking at him or her in an attacking manner."

Specifically, Mrs. Montgomery's dissociative symptoms are characterized by: confused thought processes, disengagement, depersonalization, derealization, identity confusion, memory disturbance, and emotional constriction. The symptoms that Mrs. Montgomery has demonstrated in the past are severe and they can be highly impairing for her. For example, her depersonalization can lead her to feel that she is not present in her body, an experience that is highly destabilizing for people who suffer it. Her thought processes can become confused, leading her to be unsure about time and the

basic circumstances in which she finds herself. Derealization can lead her to feel that her environment is unreal or distorted in some way. Her emotional constriction can lead her to become detached from her circumstances, unable to gauge or express what she is feeling. Disengagement can lead her to disconnect from people and no longer communicate her actual feelings, thoughts or plans. In the past, these symptoms have led Mrs. Montgomery to become highly disorganized and, at times, suicidal.

5. Her attorneys have been in regular telephone contact with Mrs. Montgomery, but have been unable to visit with her in person since November 2, 2020. I have been unable to evaluate Mrs. Montgomery in person because of the travel restrictions caused by the current global pandemic. Mrs. Montgomery's attorneys have regularly reported to me after their contacts with her. They have described a deteriorating mental condition characterized by symptoms consistent with her diagnoses. Specifically, they have described thoughts and behaviors that are manifestations of dissociation, disturbed thinking and likely psychosis. Among the reported symptoms are: auditory hallucinations with self-attacking content (hearing her abusive mother's voice), sleep disturbances and nightmares of past sexual violence, disruption in bodily functions related to elimination due to her perception of male observation, distorted sense of reality (uncertainty about whether the infant she kidnaped is really her child), religious delusions (believing that God is speaking to her through connect-the-dot puzzles), gaps in consciousness of time passing due to periods of being in a dissociative state, derealization (alterations in perception of the external world), inappropriate affect, irritability, and emotional constriction. Recently, Mrs. Montgomery described an interaction with a male psychologist who is not on her regular service in which she says he stated to her, "Don't you just want to say 'fuck the government and kill yourself?'" I find it highly unlikely that a trained clinician would make such a statement to any patient, let alone a patient at acute risk for suicide and with a history of suicide attempts. Mrs. Montgomery repeatedly focused on this statement being made to her, to a degree that suggests distorted perceptions of what the staff members may be intending and that is indicative of incipient paranoia. All of her symptoms are indicators

71

that Mrs. Montgomery's psychological functioning is highly impaired.

6. It is my professional opinion that I would be able to conduct a more thorough evaluation of Mrs. Montgomery during an in-person meeting but I am unable to travel because of the pandemic. Nevertheless, I am confident to a reasonable degree of psychological certainty that Mrs. Montgomery suffers mental diseases and defects and cannot now rationally form an understanding of the government's rationale for her execution. Her concept of reality is so impaired that she cannot grasp the execution's meaning and purpose or the link between crime and its punishment.

7. Were I able to travel I could conduct a more thorough in-person evaluation. An in-person evaluation would be conducted in a way that minimizes the likelihood of doing harm to Mrs. Montgomery or worsening her mental state. Because her dissociative symptoms are easily triggered, an examination of her functioning must proceed carefully so that, if dissociation occurs, Mrs. Montgomery can be carefully monitored and assisted in regaining an integrated, organized mental state. This requires rapport with Mrs. Montgomery, basic trust, and the clinical ability to recognize and address dissociative symptoms in the moment. If the evaluation were taking place on the phone or by video call, this kind of assessment and intervention would not be possible. This is because dissociative symptoms are difficult to detect when a patient is not physically present with a clinician and these symptoms are difficult to address when not in the room with a patient. Specifically, dissociative symptoms often appear as absences, blank responses, silence, difficulty focusing, fatigue, attentional lapses and distractibility. These symptoms are very difficult to detect without being present with a patient and able to assess eye contact, verbal and physical communication and reactions. Thus, a remote evaluation of Mrs. Montgomery risks triggering her and leaving her in a compromised state that this evaluator would be unable to detect and properly address.

App. F.  Similarly, Dr. Woods affirms:

**Referral Questions**

In 2013 at the request of counsel for Lisa Montgomery, I conducted a neuropsychiatric evaluation of Mrs. Montgomery, taking into account the complex historical, developmental, psycho-social, and psychiatric data accumulated during the course of Mrs. Montgomery's case. At that time, I addressed questions regarding Mrs. Montgomery's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law at the time of her crime, discussed how Mrs. Montgomery's neurobehavioral history was an important component of her social history, and discussed how Mrs. Montgomery's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial as well as how her impairments and medications informed her demeanor at trial. My findings with regard to these referral questions are contained in my 2013 declaration and 2016 addendum.

Counsel have asked that I, now, respond to the following questions based on my clinical observations of Mrs. Montgomery and my knowledge of her life history, brain damage, and reported current level of functioning:

**Based on your knowledge of Mrs. Montgomery's history as well as the reports of counsel regarding her current symptomology, is Mrs. Montgomery able to form a rational understanding of the State's rationale for her execution as required by *Ford v. Wainwright*, 477 U.S. 399 (1986)?**

**• How would an in-person evaluation of Mrs. Montgomery further inform or refine your opinions?**

**Interviews and Summary of Materials Reviewed**

I previously met with Mrs. Montgomery in a private interview room at the BOP Carswell Medical Facility in Fort Worth on January 17, 2013, February 8, 2013, July 19, 2016 and August 31, 2016. My initial evaluation included clinical interviews, an assessment of her

neurological status, and review of her biopsychosocial history and case related materials. I have not conducted additional clinical evaluation because of the strictures of the current COVID pandemic: I am 73 years of age and am considered at high risk of COVID-19 infection and at a much-heightened risk of complications from infection. I also have several underlying conditions in addition to my age which require me to be extra vigilant including that I am currently in treatment for prostate cancer which necessitates on-going immunosuppressant therapy. My doctor has ordered me not to travel due to my health concerns (regardless of the pandemic) for at least 4 months, depending upon potential effects of hormonal, antiandrogen, and immunotherapy.

In answering the current referral questions, I, again, reviewed extensive documents relating to Mrs. Montgomery's childhood, adolescence, and adulthood. These documents included diagnostic data in medical and psychiatric records, the biopsychosocial history, psychiatric, psychological, and neuropsychological assessments—including the up-to-date BOP mental health records, her medication regimen, and other relevant materials. I also considered the reports of Mrs. Montgomery's counsel as to her current functioning. These are the kinds of sources of information relied upon by members of my profession in reaching an accurate assessment and providing answers to referral questions.

**Clinical Formulation**

Mrs. Montgomery has significant neurologic deficits, including but not limited to cerebellar dysfunction, an important control mechanism of executive function, her ability to effectively weigh, deliberate, understand context, and respond to social cues. She also has mild atrophic changes in her brain and symptoms of motor dysfunction. These conditions do not ameliorate, though they may worsen, especially in new, novel, and stressful circumstances. Mrs. Montgomery also suffers from a severe affective mood disorder with psychosis. She demonstrates pervasive and enduring consequences of surviving intentional trauma so severe that it meets the World Health Organization criteria for torture, as well as meeting criteria for

complex posttraumatic stress disorder and disorders of extreme stress (Briere & Spinazzola, 2005; van der Kolk, Roth, Pelcovitz, Sunday, & Spinazzola, 2005). These disorders interact synergistically and account for Mrs. Montgomery's vulnerable mood lability; history of loss of contact with reality; impaired working memory; judgment and insight; affective dysregulaton; defective goal formation; and confusion.

Over time, Mrs. Montgomery's psychotic symptomology has been held at bay due to three interactive factors present in the conditions of her confinement within the BOP Federal Medical Center at Carswell: 1) a highly structured and predictable environment; 2) a stable community wherein she is largely surrounded by supportive female companions and where her exposure to the threat of sexual violence is greatly reduced; and 3) careful titration and monitoring of her regime of antipsychotic medications. Despite the management of her symptoms, her underlying conditions persist and—particularly as her environment changes—appear to have overcome the therapeutic effect of antipsychotic medication in the face of extreme stress. Psychiatric medication is not curative. Rather, psychiatric medication is one arrow in the quiver of possible abatement of symptoms. A person's historical vulnerability as well as the effectiveness of their environmental support are paramount in allowing medications to exert any modicum of control.

• Brain Impairments compromise Mrs. Montgomery's perception of reality.

Mrs. Montgomery's brain is compromised structurally and functionally. My clinical observations are supported by the reports of Drs. Gur and Nadkarni, as well as the neuropsychological data produced by Dr. Fucetola, which I have reviewed. Mrs. Montgomery demonstrates behaviors and symptoms associated with functional impairment of the cerebellum. Schmahman et al have documented the role of the cerebellum in controlling executive skills. Although initially considered a part of the brain controlling balance, with purely motor functions, the last 22 years have demonstrated the cerebellum to be a major cognitive mechanism for the control of nuanced

executive functioning skills, particularly decision making, affective control, understanding context, and effective deliberation. Mrs. Montgomery's cerebellum has been found to be quantitatively and qualitatively impaired, providing significant vulnerability to her cognitive capacity.

Imaging of her brain reflects an overall loss of brain volume as well as a particular loss of tissue around the midline of her brain. *See Gur Report*. Other structures that appear diminished are the basal forebrain, particularly the frontal right side of the frontal/parietal lobes and the superior parietal lobe. PET scans show her brain is hypermetabolic, particularly in the amygdala. *Id*.

Mrs. Montgomery's brain impairment is a condition that cannot improve. Though additional trauma, injury, or aging may further compromise its functioning, the brain does not "repair" or heal from such losses. The portions of Mrs. Montgomery's brain that are impaired are early brain structures, which are fully developed early in a child's life. This is particularly seen in the hypermetabolic functioning of her amygdala—the center of the body's fear and stress responses that is also pivotal in the workings of memory. Erosion or sheering of brain tissue occurred, resulting in a loss of brain volume, particularly in midline of her brain and in the parietal region—which is critical for the processing of sensory information and accurate perceptions of reality. While imaging reveals the quantifiable, structural defects, Mrs. Montgomery's behaviors reflect these brain losses, including her impulsivity and vulnerability to cognitive deterioration and psychotic disorganization.

Mrs. Montgomery's functioning has maintained a baseline in prison despite her brain condition, in large part to the simplification of the demands of daily life created by the structure of the prison environment. Without the requirements to work in the public sector, care for her children, or provide for her necessities, Mrs. Montgomery has eventually, with significant reinforcement and initial titration of both environment and medication, been able to achieve minimal daily functioning —including being able to perform a prison job (doing laundry, floors, emptying trash cans), and to participate in prison

activities (educational and recreation classes, pod-games, craft activities). However, the ameliorative effect of this structure has been vitiated by removing her from her pod and placing her on suicide watch without access to her coping mechanisms (music, hand-crafts, etc.). Further, the stress inherent in her impending execution, combined with the added stress of anticipation of her transport to another facility, appears to have exposed her brain's vulnerability, causing a recurrence of well-documented psychosis and impaired decision-making functioning.

• Complex Post Traumatic Stress Disorder disrupts Mrs. Montgomery's integration of consciousness, self-perception, memory, and actions

Mrs. Montgomery was subjected to chronic, repetitive, and extreme sexual violence, emotional cruelty, and life-threatening physical assault as a child at the hands of those who should have protected her from harm. She has historically exhibited the behaviors and symptoms, including psychosis, learned helplessness, anticipatory anxiety, and dissociation: symptoms of those sufferers of severe sexual and emotional abuse in childhood who subsequently develop complex post-traumatic stress disorder. Because Mrs. Montgomery also suffers from a mood disorder, her symptoms are both part of her bipolar disorder and her impaired brain function, yet are also trauma based. Ultimately it is unnecessary to tease apart the etiology of her psychosis: it is the psychosis itself that is at issue in her competency to be executed.

Historically, Mrs. Montgomery has experienced repeated, discreet episodes of psychotic symptomatology such as visual, tactile, and auditory hallucinations. She has also experienced sustained, chronic loss of contact with reality that is more severe than dissociation associated with post-traumatic stress disorder and is more aligned with the severe impediment associated with Traumatic Psychosis. The Diagnostic and Statistical Manural-5th Edition(DSM5) supports the psychosis secondary to extreme trauma. She has extreme perceptual distortions wherein she is unable to determine if she is experiencing "real" events and situations or if her experiences are unreal and not

occurring. This inability to recognize reality affects her judgment and insight and has, at times, denied her a rational understanding of events around her. She is more vulnerable to this impairment in rational understanding due to her cognitive deficits.

Mrs. Montgomery also experiences well documented symptoms of trauma, including re-experiencing the trauma, avoidance and emotional numbing, and hyper-arousal. She has flashbacks and intrusive memories in which traumatic events are happening all over again, even when she is awake. She re-experiences physical sensations associated with maltreatment such as choking and being unable to breathe or cry. She becomes distressed when she is exposed to cues that symbolize the trauma, such as her fear of men and emotions associated with the trauma like lack of trust. She consciously and unconsciously avoids any thoughts, conversations, and activities that arouse recollections of the trauma. She is often socially withdrawn and detached from events around her. She compulsively relies on hand crafts such as tatting to ward off intrusive thoughts. She is unable to recall important aspects of trauma she survived, consistent with her deficits in amygdala functioning.

The hallmark and core symptom of the extreme trauma Mrs. Montgomery survived is her loss of contact with reality. Her symptoms are much more consistent with torture, and the necessary emotional and cognitive protection a loss of contact with reality provides to those being tortured. She experiences "a disruption in the integration of consciousness, self-perception, memory, and actions." *Istanbul Protocol*, paragraph 244. Such cognitive dissociation is also defined as: "The exclusion from consciousness and the inaccessibility of voluntary recall of mental events, singly, or in clusters, of varying degrees of complexity, such as memories, sensation, feelings or attitudes." Spiegel et al, *Dissociation: Culture, Mind, Body*; American Psychiatric Press, 1994, page 60.

Medication masked many of Mrs. Montgomery's more superficial symptoms of common trauma, but prior to an appropriate medication regimen first initiated at the Federal Medical Center at Carswell (BOP) after her trial, she was irritable and experienced outbursts of

anger, she was unable to concentrate, she was hypervigilant, she suffered generalized anxiety, and she demonstrated physiological signs of distress (shortness of breath, sweating, dry mouth, dizziness, and gastrointestinal distress). Mrs. Montgomery has improved while taking antipsychotic medications. She described the effect of this potent medication as organizing, allowing her to complete tasks and to recall more effectively. She is better able to maintain a reality base. This pharmacologic response is a good indication of antipsychotic response, rendering her more constantly in touch with reality.

Despite Risperdal's success in controlling Mrs. Montgomery's psychotic symptomology while she was in a supportive environment, medication alone cannot be expected to prevent flashbacks, re-experiencing, dissociation, and psychosis in the face of new-and ultimate- trauma, that which she feared for so many years, starting so young. Where Mrs. Montgomery's close association with the women of her pod previously provided support and helped her stay grounded in reality, the loss of that community withdraws the most important additional layer of support, an environment she could trust to be stable, consistent, and caring. From the BOP records of her current conditions of confinement, it is apparent that Mrs. Montgomery is now encountering many of the components of her prior torture, that is, isolation, loss of bodily autonomy, exposure to constant surveillance, and threat of impending death. In the face of such existential stress, medication, alone, does not prevent her from being recapitulated into psychosis.

Given these conditions, Mrs. Montgomery's lawyers unsurprisingly report a reemergence of psychotic symptomology since Mrs. Montgomery's placement on death watch. Mrs. Montgomery has admitted to auditory hallucinations, specifically repeatedly hearing her dead mother's voice. She is having nightmares she cannot recount because they are too terrifying. She endorses extreme dissociative symptomology: multiple episodes of lapses of time, feeling outside herself, and the sensation of existing in a house in her mind like the one to which she went while being raped as a teenager. She believes she has received messages from God in a dot-to-dot drawing that she was provided by the BOP. Finally, Mrs. Montgomery appears to have

lost contact with reality, believing that the BOP psychologist, specifically a Dr. Opesso, suggested that she should kill herself in order to "fuck with the government." Mrs. Montgomery's claim is not supported by Dr. Opesso's clinical notes and certainly is inconsistent with any acceptable clinical practice.

• Affective Mood Disorder further compromises Mrs. Montgomery's rationality

The course of Ms. Montgomery's behavior and symptomology also meets criteria for Bipolar I Disorder, Most Recent Episode Depressed, Severe with Psychotic Features. She has demonstrated mood lability, impulsive judgment, disinhibition, depressive episodes, persecutory delusions, irritability, agitation, euphoria during manic and hypo manic episodes, and visual and auditory hallucinations. As stated, above, she has such a strong propensity for loss of reality, it is her baseline state. Though she carried the diagnosis of bipolar disorder throughout much of her incarceration, the BOP determined that this condition "resolved" on August 14, 2014, following the successful resection of her thyroid. Treatment on mood stabilizers such as Levo-Thyroxine, Amytriptiline (technically used for cardiac stabilization, yet it is a Tricylic antidepressant), and Mirtazepine, was much less successful than on the atypical antipsychotic Risperdal. Mrs. Montgomery's failed antidepressant trial support a diagnosis of Bipolar Disorder. Antidepressants are known to initiate the "manic switch," an elevation of mood with irritability, impaired judgment, and other hypomanic and manic symptoms. Her Thyroid disease and treatment, rather than ameliorating her Bipolar Disorder, as discussed in her 2017 BOP records, actually supports a diagnosis of Bipolar Disorder. Thyroid dysfunction is common in mood disorders and L-thyroxine, a thyroid replacement hormone, is used in the stabilization of mood disorders, especially Bipolar Disorder.

As with the expected effect of her brain impairments and her trauma history, Mrs. Montgomery's symptoms of cognitive impairment and mental illness have resurfaced with the withdrawal of therapeutic supports and in the face of extreme stress.

**Conclusions**

Mrs. Montgomery has a long-standing history of serious brain impairments, exposure to extreme trauma consistent with torture, affective mood disorder, and psychosis. These disorders have interacted synergistically and have historically accounted for Mrs. Montgomery's mood lability; loss of contact with reality, which in its mildest form is dissociation and in its most extreme form is psychosis; and impaired memory, judgment, insight, and cognition. Prior to her incarceration, the interplay and severity of these multiple impairments resulted in her inability to perform basic activities of daily life, to care for herself or her family, and to act rationally and logically. She has dysfunction in her neurological systems, including her motor functioning, significant attentional problems, limbic dysfunction, memory, and visual dysfunction. These symptoms affect her behavior at all times, disrupting her ability to function normally.

Within the prison context, Mrs. Montgomery has found some relief from the most severe symptoms of psychosis. The introduction of the antipsychotic medication, risperidone, in 2009, accounts for some of—but not all—the improvement in her functioning. In addition to finding a medication that addresses some of the symptoms of Mrs. Montgomery's thought disorder, the absence of sexual threat and the presence of a supportive community around Mrs. Montgomery in the admin unit, comprised of a relatively small, set group of women as well as the highly repetitive and unchallenging tasks with which she occupies her time, also have accounted to the greatest degree for her ability to remain largely in contact with reality. The effect of medication and supports on Mrs. Montgomery's function is best conceived as a net providing a safer context that has allowed her to function more successfully, but neither the supportive environment nor the medication has changed her underlying condition.

It is my understanding that Mrs. Montgomery's context changed dramatically on October 16, 2020 with the warden's reading of her execution warrant. The documents provided by the BOP specify that since that time she has been confined almost exclusively (except for showers and, since December 3, 2020, for 5 hours of outdoor

81

recreation a week) to a suicide cell—cut off from her community as well as from hernormal activities (laundry, handicrafts, regular exercise, access to her Mp3 player, etc.). The records reflect a high degree of observation—guards recording her activities on 15-minute interval throughout the day and night, including observation when she showers and toilets. Her sleep has been disrupted, both by the continuous lighting of her cell, and by the withholding of her C-pap machine. Initially her sense of bodily integrity was violated through the withholding of clothing and undergarments

Mrs. Montgomery's environmental support protected her fragile mental state. Medications could not provide the emotional and cognitive underpinnings to maintain her reality-based functioning. Such actions as the involuntary removal of her wedding ring only reinforced the trauma she had suffered, and she is now reexperiencing. Whatever the intended therapeutic or safety purpose of these interventions, their effect on Mrs. Montgomery was to remove the supports that have allowed her to maintain a fragile hold on reality.

Since that time, it appears that Mrs. Montgomery psychotic symptomology has begun to break through. She is experiencing extreme dissociative symptoms as well as hallucinations. Both dissociation and hallucinations undermine perceptions of reality, depriving those who suffer such symptoms of rationality.
My answers to the referral questions are as follows:

•**Based on your knowledge of Mrs. Montgomery's history as well as the reports of counsel regarding her current symptomology, is Mrs. Montgomery able to form a rational understanding of the State'srationale for her execution as required by** *Ford v. Wainwright*, **477 U.S.399 (1986)?**

In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Lisa Montgomery is unable to rationally understand the government's rationale for her execution as required by *Ford v. Wainwright*, 477 U.S.399 (1986). Mrs. Montgomery's grasp of reality has always been tenuous: medication and the stable,

supportive environment of her confinement over the past decade
have allowed her to appear psychologically intact, though her
baseline perceptions of reality are always distorted due to her brain
impairments and trauma history. Mrs.Montgomery's attorney's
observations—limited though they are—indicate that Mrs.
Montgomery is further disconnected from reality, precluding
a"rational understanding" of "the State's rationale for [her]
execution."*Panetti v. Quaterman*, 551 U.S. 930, 958-59 (2007).

**•How would an in-person evaluation of Mrs. Montgomery
further inform or refine your opinions?**

Mrs. Montgomery's impairments cause symptoms that, by their
very nature, are highly individual, based on her history, and require
both clinical experience with psychosis and an in-depth
understanding of the subject. Some psychosis is florid and readily
recognizable even by lay people—however in the past, Mrs.
Montgomery's psychosis has been largely marked by negative
symptomology rather than more overt manifestations. Mrs.
Montgomery's problems with perception frequently manifest as
staring, lengthy pauses, and a distant affect. Whether and when her
baseline dissociation crosses the line into a true disconnect with
reality almost inevitably evades detection by phone and requires a
person-to-person clinical interview, where nuanced physical and
emotional cues can be recognized, probed, and placed in proper
perspective. Zoom interviews are limited in their ability to pick up
all but the most obvious psychiatric symptoms. They also do not
allow a physical examination, which would be helpful in
determining deterioration of executive functioning anatomy. While
the symptoms reported by counsel indicate that Mrs. Montgomery
has decompensated such that she is experiencing positive symptoms
of psychosis (hearing voices and perceiving events not based in
reality), an in-person forensic evaluation of Mrs. Montgomery
would allow me to present a more complete picture of the ways in
which her impairments render her incompetent under *Ford*.

App. F (footnotes omitted)

Executing Mrs. Montgomery would violate the Eighth Amendment.

## CLAIM II: DUE PROCESS

All other allegations in this pleading are incorporated into this Claim.

The Supreme Court insists

upon *unfettered presentation of relevant information*, before the final fact antecedent to execution has been found....[C]onsistent with the heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life, we believe that *any procedure that precludes the prisoner or his counsel from presenting material relevant to his sanity or bars consideration of that material by the factfinder is necessarily inadequate.*

*Ford*, 477 U.S. at 414 (plurality decision)(citation omitted)(emphasis added).

The right to counsel and to experts to assist in gathering and presenting material

relevant to incompetence to be executed claims is indisputable. When

developing evidence about a federal constitutional violation, particularly when

the evidence would at least temporarily stop a person from being executed,

cannot turn on arbitrary considerations.  Unlike other federal constitutional

challenges,[195] a *Ford* claim is not cognizable until "execution is imminent,"

*Panetti*, 551 U.S. at 949, meaning "about to happen."[196]  When an execution

_____

[195]For example, ineffective assistance of counsel (*Strickland v. Washington*, 466 U.S. 668 (1984)) and government suppression of material exculpatory evidence (*Brady v. Maryland*, 373 U.S. 88 (1963)) claims must be brought in a first 2255 proceeding.

[196]*See* Black's Law Dictionary, Ninth Ed., 2009, Garner, B., ed., p. 450 ("imminent danger. (16c)  1.  An immediate, real threat to one's safety that justifies

becomes "immediate," individuals can be at risk of deteriorations in their mental states.  *Cf. Panetti*, 551 U.S. at 943. Thus, now is when mental health experts would need to conduct the most meaningful evaluations of Mrs. Montgomery. *See* Section IVB, *supra*.

Appointed counsel and their experts are unable to evaluate Mr. Montgomery face-to-face--without risking their lives.[197]  Enforcement of the Constitution cannot be suspended because of a deadly virus.[198] Habeas corpus "protects the tights of the detained by affirming the duty of the Judiciary to call

---

the use of force in self-defense.").

[197]Mrs. Montgomery's attorneys Harwell and Henry contracted Covid precisely because they traveled to and met with Lisa Montgomery.  And Dr. Woods is

> 73 years of age and am considered at high risk of COVID-19 infection and at a much-heightened risk of complications from infection. I also have several underlying conditions in addition to my age which require me to be extra vigilant including that I am currently in treatment for prostate cancer which necessitates on-going immunosuppressant therapy. My doctor has ordered me not to travel due to my health concerns (regardless of the pandemic) for at least 4 months, depending upon potential effects of hormonal, antiandrogen, and immunotherapy.

App. F.  Dr. Porterfield also cannot travel.  App. F.

[198]On January 7, 2021, almost 4,100 people died in the United States from Covid.  NYT, 1/8/21, at 1.

the jailer to account...*The Laws and Constitution* ***are designed to survive, and***

***remain in force, in extraordinary times.***"   *Boumediene V. Bush*, 533 S.Ct. 723,

739-40, 743, 754, 798(2008)(emphases added).

Terre Haute USP, where Mrs. Montgomery is scheduled for execution,

recently became the most COVID-19 infected institution in the federal prison

system, with  281 active inmate cases. [199] That number has risen to 344 active

inmate cases.[200] The numbers are likely higher than what the BOP is reporting,

as a result of an ineffective testing campaign by the BOP.[201]  In the entire Terre

Haute campus, the BOP lists 357 inmates and 21 staff members who are

currently positive for COVID-19, with a total of 736 inmates having recovered

from COVID-19, across the campus. [202] At Terre Haute FCI, 13 inmates and 18

---

[199]Lisa Trigg, "COVID-19 soars at Terre Haute federal prison complex; death row inmates infected" Terre Haute, Ind. Tribune-Star, Dec. 22, 2020 (last accessed Dec. 29, 2020).

[200]  https://www.bop.gov/coronavirus/index.jsp (last accessed Jan. 2, 2021).

[201] *See* Trigg, supra, at fn. 13; *See also* CDC*, Mass Testing for SARS-CoV-2 in 16 Prisons and Jails — Six Jurisdictions, United States, April–May 2020*, *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6933a3.htm (accessed Sep. 2, 2020).

[202] https://www.bop.gov/coronavirus/index.jsp (last accessed Jan. 2, 2021).

staff members currently are infected with COVID-19.[203] Nationwide, there are 7,220 federal inmates and 1,714 BOP staff who have confirmed positive test results for COVID-19, with 179 federal inmate deaths and 2 BOP staff member death attributed to COVID-19.[204]

While the BOP has attempted to reduce the spread of the virus, it continues to ravage the federal prison system and the rate of infection is far higher within the BOP compared to the community at large. In addition, while a seemingly low percentage of inmates have contracted COVID-19 in comparison to the total population of inmates, the virus is highly contagious and once an infection occurs in a prison, it is extremely hard to contain.[205]

The federal prison are unable to protect visitors to inmates.  If the Court concludes that an insufficient showing of incompetence under

---

[203] *Id*.  The BOP reported numbers, located on the BOP's COVID-19 historic dashboard, shows a massive spike in cases at Carswell at the beginning of July and then in late July, and 35 current cases. Counsel has reason to believe the numbers are much higher. The Carswell testing data shows no meaningful numbers of testing after the late July spike in cases.

[204] *Id*.

[205] See https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/first-andsecond-waves-of-coronavirus (accessed October 26, 2020)

*Ford/Panetti/Montgomery* has been made, or that access by Mrs. Montgomery to attorneys and experts is axiomatic under the law, then the Court should stay the execution until such time as lawyers and experts can more effectively perform. Counsel has asked the DOJ to withdraw the execution date given all of these impediments to the Courts; DOJ declined.

Under these extraordinary circumstances, it would violate Due Process to execute Mrs. Montgomery.

## VI.  PRAYER FOR RELIEF

Wherefore, in order to prevent Defendants from violating Mrs. Montgomery's rights under the Fifth and Eighth Amendments to the U.S. Constitution as alleged above, Mrs. Montgomery requests that the Court:

1.  Issue a judgment declaring that Mrs. Montgomery is currently incompetent to be executed and that executing her in her present condition violates her rights as guaranteed by the Fifth and Eighth Amendments to the United States Constitution.

2.  Stay her execution in order to conduct a full and fair evidentiary hearing (when one can occur) to determine whether Mrs. Montgomery is currently competent to be executed under the Eighth Amendment to the United States Constitution.

3.  Enter an injunction preventing her execution during any period of incompetency, and lasting until such time as her competency may be restored.

4.    Grant further relief as the Court deems just and proper.

Respectfully submitted,

KELLEY J. HENRY

Supervisory Asst. Federal Public Defender

AMY D. HARWELL

Assistant Chief, Capital Habeas Unit

OFFICE OF FEDERAL PUBLIC DEFENDER, MIDDLE, DISTRICT OF TENNESSEE

810 Broadway, Suite 200 Nashville, TN 37203

(615) 736-5047


LISA G. NOURI

2526 Holmes

Kansas City, MO 64108

(816) 875-0448

BY: /s/ Kelley J. Henry

Counsel for Mrs. Montgomery

## CERTIFICATE OF SERVICE

I, Kelley J. Henry, certify that a true and correct copy of the foregoing was served via email to opposing counsel: Brian P. Casey and Alan Simpson, Assistant United States Attorneys, Western District of Missouri, 400 E. Ninth Street, Room 5510, Kansas City, MO 64106 on this the 9th day of January, 2021.

**By: _/s/ Kelley J. Henry_**