## DECLARATION OF GEORGE W. WOODS, JR., M.D.

I, George W. Woods, Jr., M.D., hereby declare the following:

**Qualifications**

I am a physician licensed to practice in California, with a specialty in neuropsychiatric consultations. My clinical practice consists of treating persons with cognitive impairments, ethno-psychopharmacology, and psychotherapy. For the last twenty-nine years, I have treated clients with developmental disabilities, acquired brain injuries, and cognitive impairments secondary to neuropsychiatric disorders.

I am currently an Adjunct Professor on faculty at Morehouse School of Medicine, Department of Psychiatry, in Atlanta, Georgia, where I teach courses in Clinical Aspects of Forensic Psychiatry and Introduction to Geriatric Psychiatry to third and fourth year residents. I teach a Continuing Legal Education program for Thomson Reuters, "Where Mental Health Meets the Law." I am also a lecturer at Boalt Hall, the University of California-Berkeley, School of Law. I teach Introduction to Mental Health and the Law. I am a Fellow of the American Psychiatric Association, and a member of the California Psychiatric Association and the Northern California Psychiatric Association. I am also a member of the American Neuropsychiatric Association, the American Psychological Association, and the Black Psychiatrists of America. I am a member of the American Association for the Intellectually and Developmentally Disabled (AAIDD), and serve on the Executive Committee of the Challenging Behaviors Special Interest Research Group for the International Association for the Specialized Study of Developmental Disorders (IASSID). I currently serve as Secretary General for the

International Academy of Law and Mental Health, where I am a member of the Scientific and Executive Committees.

I have been qualified and have testified as an expert in numerous civil and criminal cases in state and federal courts. A copy of my *curriculum vitae* is attached hereto.

**Referral Questions**

At the request of counsel for Lisa Montgomery, I conducted a neuropsychiatric evaluation of Ms. Montgomery, taking into account the complex historical, developmental, psycho-social, and psychiatric data accumulated during the course of Ms. Montgomery's case. I was also asked to address the following questions.

- Was Ms. Montgomery's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?
- Was Ms. Montgomery under severe mental or emotional disturbance at the time of the offense?
- Is Ms. Montgomery's neurobehavioral history an important component of her social history?
- Did prior assessments of Ms. Montgomery by trial defense and government experts accurately reflect Ms. Montgomery's neurobehavioral history?
- Must a reliable psychiatric assessment of Ms. Montgomery include consideration of her neurological deficits?
- Did Ms. Montgomery's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?
- Did her impairments and medications inform her demeanor at trial?

**Interviews and Summary of Materials Reviewed**

I met with Ms. Montgomery in a private interview room at the BOP Carswell Medical Facility in Fort Worth on January 17, 2013 and February 8, 2012. My evaluation included clinical interviews, an assessment of her neurological status, and review of her biopsychosocial history and case related materials.

I reviewed extensive documents relating to Ms. Montgomery's childhood, adolescence, and adulthood. These documents included diagnostic data in medical and psychiatric records, the biopsychosocial history prepared by Jan Vogelsang, M.S.W., and which I incorporate into my findings in this declaration, excerpts of prior legal proceedings, prior psychiatric, psychological, and neuropsychological assessments, including video recordings and raw data, and other relevant material. I reviewed documents chronicling the lives of Ms. Montgomery's family members, including vital records, medical, school, employment, military, social service, law enforcement, correctional, and civil and criminal records. I reviewed sworn declarations submitted by relatives and other individuals who observed Ms. Montgomery and family members over the course of their lives.

These are the kinds of materials routinely relied upon by members of my profession in reaching an accurate assessment and providing answers to referral questions.

**Clinical Formulation**

A mosaic of mental impairments affects every domain of Ms. Montgomery's life, behavior, and mental functioning. She has significant neurologic deficits, including but not limited to cerebellar dysfunction that is likely the result of exposure to high levels of alcohol in utero. She also has mild atrophic changes in her brain, an unusual finding, given her relatively young age. She has symptoms of motor dysfunction.

Ms. Montgomery suffers from a significant affective mood disorder with psychosis that severely compromises her ability to function without careful medication titration and monitoring. She demonstrates pervasive and enduring consequences of surviving intentional trauma so severe that it meets the definition of torture, and she meets criteria for complex posttraumatic stress disorder and disorders of extreme stress (Briere & Spinazzola, 2005; van der Kolk, Roth, Pelcovitz, Sunday, & Spinazzola, 2005). These disorders interact synergistically and account for Ms. Montgomery's mood lability; loss of contact with reality categorized as a perceptual disorder which in its mildest form is dissociation and in its most extreme form is psychosis; impaired working memory; judgment and insight; affective dysregulaton; defective goal formation; and confusion.

The day to day expression of these multiple impairments reduced Ms. Montgomery's functioning to child like dependence and was present long before she was arrested for the current offense. She was unable to effectively or consistently care for herself, her children, her pets, and her husband; could not effectively perform activities of daily living such as bathing and showering, dressing, grooming, shopping, and homemaking; and could not accurately perceive events and circumstances in her life.[1] She had no control of her unpredictable mood shifts, severe bouts of irritability, and ever present mental confusion. She was mentally absent out of contact with reality – for most of her waking hours. She often had no memory of her daily activities, like shopping for groceries, and depended on hurriedly scribbled notes on day calendars to tell her what she had done in the past. She developed a restricted and isolated

[1] Lisa Montgomery, Department of Human Services, State of Oklahoma. Child protective services investigated Ms. Montgomery following complaints that she and her children were homeless, squatted in an abandoned house that was unsafe for habitation, were hungry, and unclean. One neighbor reported she was drunk and begged him to take her children so her husband would not gain custody of them. The social service agency did not find child abuse but found child neglect

routine to minimize being overwhelmed by day to day responsibilities, but even a restricted routine overwhelmed her.

**Cerebellar and other Brain Impairments**

Ms. Montgomery has cerebellar dysfunction, along with other brain impairments. The cerebellum is a region of the brain that plays an important role in motor control and some cognitive functions such as attention and language and in regulating fear and pleasure. Ms. Montgomery demonstrates behaviors and symptoms associated with functional impairment of the cerebellum, including distractibility, hyperactivity, impulsiveness, disinhibition, anxiety, irritability, ruminative and obsessive behaviors, dysphoria, and depression, tactile defensiveness and sensory overload, apathy, and childlike behavior.[2] Impaired cerebellar function is well recognized as a consequence of exposure to alcohol during fetal development. By all accounts, Ms. Montgomery's mother drank excessively and frequently during her pregnancy.

Robert Fucetola, Ph.D., ABPP-CN, administered neuropsychological testing to Ms. Montgomery on July 26 and 27, 2006. Ms. Montgomery reported to Dr. Fucetola that she did not get a job after high school because "She did not know how." (Fucetola report, page 3). Dr. Fucetola documented her "spur of the moment" behaviors and noted she had a history of multiple low grade concussions. He reported Ms. Montgomery had three motor vehicle accidents in June 1993, January 1998, and September 1998 in which she hit her head. In June 1993, she was involved in an MVA as an unrestrained front seat passenger of a car that struck two others. Her head struck the windshield and rearview mirror, breaking the latter. She subsequently sought treatment for headache and neck pain. In January 1998, she sustained head trauma as the

---

[2] Schmahmann, J. D. (2010). The role of the cerebellum in cognition and emotion: Personal reflections since 1982 on the dysmetria of thought hypothesis, and its historical evolution from theory to therapy. *Neuropsychological Review, 20,* 236-260.

unrestrained driver of a car that went under a truck on the front driver's side. Her head struck the windshield and cracked the windshield. She was not sure if there was a loss of consciousness, but her fist recollections were of noticing blood coming from her head while still in the car and her oldest daughter holding her youngest daughter outside the car. She had persistent headache after the accident. In September 1998, she was in another MVA when she was struck head-on by another vehicle; she struck her head on the windshield. Although she did not recall losing consciousness after the September 1998 motor vehicle accident, she does not recall some of the treatment she received. She subsequently hit her head on a trampoline in 1999. Her husband described her as "confused," after the trampoline incident. Fucetola also documented a history of headaches, although he did not discuss the quality of her headaches.

At least three additional, early sources of head injuries were not included in Dr. Fucetola's report. First, Ms. Montgomery sustained repeated head injuries during her step father's frequent sexual assaults of her during her teenage years. The step father routinely grabbed fistfuls of Ms. Montgomery's hair and banged her head on the concrete floor, where the assaults often occurred. She saw stars and was nauseated. Second, Ms. Montgomery's half brother reported that he threw a size D battery at her that struck her "square in the back of the head. She went down like a crushed rag doll."[3] She was taken to the emergency room for treatment. Third, Ms. Montgomery's mother and step father subjected her to repeated blows on her head with their bare hands, fists, and objects during her childhood.

Dr. Fucetola reported that Ms. Montgomery "almost felt safer in CCA" because there was a locked door. She also reported other evidence of trauma, including nightmares, isolation, and a fear of being touched while she was sleeping.

---

[3] Declaration of Ann Walker-King.

Dr. Fucetola's limited battery did not evaluate those areas of brain function that impaired Ms. Montgomery's day to day functioning. His test of executive function was limited to two tests, the Trails Making Test and the Wisconsin Card Sorting Test. Both of these tests are limited by poor ecological validity, i.e., the translation of testing to actual behavior in the real world (Barkley, 2012).

Dr. Fucetola's limited executive functioning battery and limited investigation into right parietal lobe function precludes a thorough understanding of Ms. Montgomery's brain function through his neuropsychological testing. Right parietal lobe function can be impaired in extreme stress, particularly when the trauma occurs early in life (De Ridder, Van Laere, Dupont, Menovsky, & Van de Heyning, 2007).

Ms. Montgomery's scores on IQ testing reveal a startling twenty-nine point spread between her verbal and performance scores, which is statistically significant. Dr. Fucetola reported that this level of discrepancy occurs in only 1.7% of the persons with IQs over 120. This discrepancy indicates possible brain dysfunction. It is important that her scores were higher in performance than verbal, which is unusual for women. Ironically, her highest score was in visual attention. This is consistent with her hypervigilance, secondary to her profound trauma and anticipatory anxiety. Her lowest scores were in processing speed, impaired for someone with her potential brain functioning. Dr. Fucetola noted,

> Attentional working memory as measured by overall indices on the WAIS-III (but not WMS-III) was below expectation given Ms. Montgomery's nonverbal (but not verbal) intellectual function.

Fucetola report at page 7.

Dr. Fucetola recommended further consideration of the significant verbal IQ/non verbal IQ, and believed it to be neurodevelopmental in origin. He recommended neuroimaging as one

way to better understand the implications of the unusual neurological finding. However, a more comprehensive neuropsychological battery may point to the clear neurobehavioral problems documented by family members and others historically.

Ms. Montgomery's ability to discriminate facial affect is impaired and indicates right prefrontal, anterior temporal, limbic, and amygdala dysfunction. Ms. Montgomery's memory is also discrepant to her IQ scores. These deficits offer insight into her problems with impulse control, judgment, and inhibition. However, a comprehensive neuropsychological battery may illuminate the obvious cognitive deficits found in my neurological examination.

The emotional damage and neurological effects of chronic physical and psychological trauma suffered by Ms. Montgomery are profound. She was born into a family of multi-generational mental illness that was largely undiagnosed and untreated (Deborah A. Perlick et al., 2004; Thomas G. Schulze, Donald Hedeker, Peter Zandi, Marcella Rietschel, & Francis J. McMahon, 2006). Multiple members of her family, as described in Jan Vogelsang's biopsychosocial history, appear to have suffered from neurocognitive and psychiatric impairments. Medical, pediatric, psychiatric, and education records and descriptions by first degree and extended family members document a lengthy history of familial genetic vulnerability to psychiatric and neurologic impairment.

Ms. Montgomery's biological father, his half brother and half brother's daughter (who also has cognitive impairments), his sister and her daughter, and his half sister and her daughter all report histories of mood disorder. Ms. Montgomery's father has posttraumatic stress disorder from military service in Vietnam during combat. Her paternal grandmother had intense emotionality, outbursts of anger and irritability, and died from end stage dementia and failure to thrive. Her paternal aunt has adult onset epilepsy and surgery for an arteriovenous malformation

(AVM). Her paternal half sister has been diagnosed with bipolar mood disorder and posttraumatic stress disorder.

There is also a significant history of genetic vulnerability to psychiatric and neurologic disease in Ms. Montgomery's maternal family reaching as far back as a great aunt who died in a mental institution and an uncle with mental retardation. Two of her cousins and two of their children have been diagnosed and hospitalized for treatment of bipolar mood disorder. Her half brother has been treated with antipsychotic medication and is currently imprisoned. Drug and alcohol use is prevalent among her half siblings, mother, and father. Two of Ms. Montgomery's grandchildren have been diagnosed with autism and pervasive developmental disorder.

Widespread and untreated mental health problems, coupled with substance abuse, have contributed to familial patterns of behavior that are pathological (Thomas G. Schulze et al., 2006). Both paternal and maternal families kidnap children within the family for significant periods of time. They engage in ongoing custody battles in court over grandchildren and threaten judicial civil and criminal action frequently. Alcohol and drug use is pervasive, and the family appears to have an extensive history of physical and sexual assault by family members against family members.

The degree of Ms. Montgomery's neurological impairment in and of itself would have severe enough impact on her development. Taken together the cumulative impact of the other psychiatric and psychosocial dysfunction she suffered, it has had a profound and debilitating impact on her social, cognitive, emotional, and behavioral development and functioning (Kim, Miklowitz, Biuckians, & Mullen, 2007). Neurological deficits are apparent independent of neuroimaging and the neuropsychological testing conducted pretrial, as that neuropsychological testing was so limited. The cognitive impairments are ecologically valid, meaning they are found

in real life circumstances (Barkley, 2012). Neurological deficits are found in her neurobehavioral history. Prior to trial, mental health experts were not provided with a complete neurobehavioral history, did not identify her neurobehavioral deficits and therefore were unable to relate her behavior to those deficits and psychosocial outcomes.

Ms. Montgomery described not being able to perform simple tasks. The disabilities she described have neurological and psychiatric bases and indications. Ms. Montgomery began projects but was not able to finish them. She could not figure out how to take stock and determine what groceries were needed, keep track of groceries, and shop for needed groceries. She was unable to figure out how to dress her children appropriately and became confused when attempting to lay out clothes. Similarly, she could not braid or figure out how to brush and comb their hair, plan enough in advance to prepare breakfast before school, or plan for extracurricular activities. She attempted to keep a day journal of tasks but could not figure out what to write as tasks.

Lack of impulse control and poor judgment is evidenced by her several short lived relationships with men and her unplanned and frequent moves from one home to the next – frequently to substandard homes from safer and healthier structures. She moved to isolated and rural locations in an attempt to live a simpler life with fewer demands for scheduling activities and interacting with others. She did not seek more challenging employment or positions with better pay and benefits, because she recognized her limitations and feared failing the training for a new position.

**Complex Post Traumatic Stress Disorder**

Ms. Montgomery was subjected to chronic and extreme sexual violence, emotional cruelty, and life threatening physical assault as a child at the hands of those who should have

protected and buffered her from harm. She exhibits the behaviors and symptoms, including psychosis, of those who have been exposed to severe sexual and emotional abuse in childhood and subsequently develop complex post traumatic stress disorder. Impairments in her adaptive functioning are most likely related to the presence of psychotic and traumatic symptoms as well as cognitive deficits. The relationship between psychosis, trauma, and adaptive functioning is explained by Gapen et al.:

> . . .[T]here is robust evidence that trauma, and early childhood trauma particularly, heightens the risk of developing psychotic symptoms. Read et al.[4] proposed a traumagenic neurodevelopmental model which integrates the findings of PTSD research with those of psychosis research and highlights the role of psychosocial factors in the genesis of psychosis. . . .The traumagenic neurodevelopmental model postulates that childhood stressful events activate the HPA axis, which in turn releases glucocorticoids. In the long-term, this may damage the regulation of the HPA axis and increase vulnerability to psychosis.[5]

Ms. Montgomery survived extreme and intentional trauma like that recognized as torture by the United Nations.[6] The following methods of torture were used against her by her mother and step father beginning in early childhood and continuing into adolescence:

- forced silence by duct taped mouth;
- blunt trauma of punches, kicks, slaps, whipping;
- positional torture of prolonged constraint of movement;
- asphyxiation by smothering and choking;
- sexual violence;
- exposure to extreme cold water and cold temperature;

---

[4] Read, J., et al. Child Maltreatment and Psychosis. A Return to a Genuinely integrated bio-psycho-social model. Clinical Schizophrenia and Related Psychoses, 2(3), 235-254.
[5]Gapen, Mark, et al., PTSD, Psychosis and Adaptive Functioning in a Highly Traumatized Urban Community Sample.The Trauma Center at JRI, Psychiatry and Behavioral Sciences, Emory University.
[6]United Nations (1999). Istanbul Protocol, Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Review of Torture Methods, section 144 – 145, page 29.

- humiliation by verbal abuse and forced wearing of urine soaked underwear of others;
- threats of sexual assault of other family members;
- psychological techniques to break down will, including forced betrayals;
- accentuating feelings of helplessness:
- exposure to contradictory messages;
- behavioral coercion;
- forced to harm her sister;
- forced to witness atrocities being inflicted on her sister;
- and threats to kill (mock execution).

Additional categories of torture were inflicted on Ms. Montgomery by her first and/or second husbands, including: positional torture, using suspension, stretching limbs apart, and forced positioning; burns with hot wax; sexual violence and sexual violence by instrumentation (glass bottles); coerced sterilization; blunt trauma; whipping; and threats to kill (knife at throat).

Ms. Montgomery's half siblings and step siblings witnessed extreme acts of cruelty by her mother against Ms. Montgomery and, to a lesser extent, against other children in the home. As a small child, Ms. Montgomery's mouth was duct taped shut to prevent her from talking and in punishment for talking. She was forced to stand without moving for hours in a corner of the room, could not scratch her nose, and could not sit or lean against the wall. She was not allowed to talk, cry or make noise. She was stripped naked, beaten, and forced to stand under a cold shower for lengthy periods of time. She was forced to take a board and hit her younger sister until she bled. Her mother gave custody of Ms. Montgomery's older half sister upon whom Ms. Montgomery depended for protection and care to the state. Her mother choked and beat Ms. Montgomery and encouraged a step father to beat her for insignificant or fabricated wrong

doings. She was forced to confess falsely to protect her younger siblings. Her step father frequently sexually assaulted her in a room he built for that purpose, pounded her head against the concrete floor, and whipped her naked with a belt. He often held a pillow over her face when he sexually assaulted her. A younger half brother described a time when Ms. Montgomery's mother "held a knife to Jerri Jo's tongue [a half sister] and said she was going to cut Jerri Jo's tongue out."[7] He prayed that his parents "wouldn't kill my sisters."[8] A friend of his father's (Ms. Montgomery's step father) sexually molested the half brother and Ms. Montgomery.

As the United Nations Istanbul Protocol points out "torture is an extraordinary life experience capable of causing a wide range of physical and psychological suffering."[9] It is important to understand that Ms. Montgomery experienced torture frequently and routinely at the hands of her mother and others who were charged with caring and protecting her in her early childhood. The effects of torture on a child are not the same as the effects of torture on an adult. Torture and chronic trauma affect the developing brain of children, the child's psychological make-up, and the child's ability to recover. The sequelae to torture "occur in the context of personal attribution of meaning, personality development and social, political and cultural factors. For this reason, it cannot be assumed that all forms of torture have the same outcome."[10] However, some forms of torture and maltreatment in childhood are more likely to contribute to psychosis than others.

Studies indicate childhood sexual trauma may be an important contributing factor in development of psychosis for some individuals who are at high risk for psychotic disorders. It also appears that previous experiences of sexual trauma are related to the severity of psychotic

---

[7] Declaration of Teddy J. Kleiner, January 30, 2013
[8] Id.
[9] Istanbul Protocol, paragraph 234.
[10] Istanbul Protocol, paragraph 234.

symptoms and have a negative impact on outcome and course of psychotic disorders. There are a number of theories for why trauma may cause psychosis:

> Biological modes of how trauma might impact on psychosis include heightened sensitivity to stress through aberrant activation of the Hypothalamic-Pituitary Adrenal (HPA) axis stress-diathesis model. Dysregulation of the HPA axis may contribute to or interact with the dopaminergic abnormalities that are thought to be important in psychotic disorders. [11]

Whatever the relationship between psychosis and sexual abuse, Ms. Montgomery has experienced discreet episodes of psychotic symptomatology such as visual, tactile, and auditory hallucinations. She has also experienced sustained, chronic loss of contact with reality that is more severe than dissociation associated with post-traumatic stress disorder and is more aligned with the severe impediment associated with psychosis. She has extreme perceptual distortions wherein she is unable to determine if she is experiencing "real" events and situations or if her experiences are unreal and not occurring. This inability to recognize reality affects her judgment and insight and denies her a rational understanding of the world in which she lives.

The severity, chronic nature, and young age at which torture and maltreatment occurred have profound significance on Ms. Montgomery's neurologic and psychiatric diseases, as does the quality of the relationship between Ms. Montgomery and her mother. Her mother inflicted extreme acts of torture that broke Ms. Montgomery's will and ability to function independently. She encouraged others to harm the child, kept tally of alleged wrongdoing to increase punishment, and participated directly in life threatening physical assaults:

> Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD

[11] Sexual Trauma Increases the Risk of Developing Psychosis in an Ultra High-Risk "Prodromal" Population. Schizophrenia Bulletin, 10.1093/schbul/sbt032.

> secondary to child abuse had more profound physiological dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults. In addition, interpersonal traumas are likely to have more profound effects than personal ones . . . Particularly early in life, the social context plays a critical role in buffering an individual against stressful situations, and in building the psychological and biological capacities to deal with further stresses. The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing, feeding, comforting, touching, looking, cleaning, resting-in short, by teaching them skills that will gradually help them modulate their own arousal... In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage.[12]

The cumulative impact of mother-imposed and sanctioned torture and maltreatment starting at such an early age caused long term damage to Ms. Montgomery's brain:

> The organization and functional capacity of the human brain depends upon an extraordinary set and sequence of developmental and environmental experiences that influence the expression of the genome . . . Unfortunately, this elegant sequence is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences . . . Now, converging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences cause enduring brain dysfunction that, in turn, affects health and quality of life throughout the lifespan. An expanding body of evidence from rodent, primate, and human research suggests that early stressors cause long term changes in multiple brain circuits and systems.[13]

Ms. Montgomery experienced complex psychological trauma resulting from exposure to severe stressors that (1) were repetitive and prolonged, (2) involved harm and abandonment by caregivers and other ostensibly responsible adults, and (3) occurred at developmentally vulnerable times in her life during critical periods of rapid brain development. Long term

---

[12] Bessel Van Der Kolk, Traumatic Stress: The Effects of Overwhelming Experience on Mind, Body, and Society, Guilford Press, New York, London, 1996, page 184-184.

[13] Anda, R., V. Felitti, et al. (2006) "The enduring effects of abuse and related adverse experiences in childhood." European Archives of Psychiatry and Clinical Neuroscience 256:174-186.

consequences are evident in changes in Ms. Montgomery's mind, emotions, body, and relationships.[14]

Ms. Montgomery also experiences common psychological responses to trauma, including re-experiencing the trauma, avoidance and emotional numbing, and hyper-arousal. She has flashbacks and intrusive memories in which traumatic events are happening all over again, even when she is awake. She re-experiences physical sensations associated with maltreatment such as choking and being unable to breathe or cry. She becomes distressed when she is exposed to cues that symbolize the trauma, such as her fear of men and emotions associated with the trauma like lack of trust. She consciously and unconsciously avoids any thoughts, conversations, and activities that arouse recollections of the trauma. She is socially withdrawn and detached from events around her. She compulsively relies on hand crafts such as tatting to ward off intrusive thoughts. She is unable to recall important aspects of trauma she survived.

Ms. Montgomery experiences hyperarousal due to chronic and severe trauma. Medication has relieved many of her most troubling symptoms, but prior to an appropriate medication regimen first initiated at the Federal Medical Center at Carswell (run by the Bureau of Prisons) after her trial, she was irritable and experienced outbursts of anger, she was unable to concentrate, she was hypervigilant, she suffered generalized anxiety, and she demonstrated physiological signs of distress (shortness of breath, sweating, dry mouth, dizziness, and gastrointestinal distress). Ms. Montgomery has done well while taking antipsychotic medications. She describes the effect of this potent medication as organizing, allowing her to complete tasks and to recall more effectively. She is better able to maintain a reality base. This

---

[14] Ford, et al., Treating Complex Traumatic Stress Disorders; an evidence-based guide; Guiliford Press, 2009, p. 13.

pharmacologic response is a good indication of antipsychotic response, rendering her more constantly in touch with reality.

The hallmark of the extreme trauma Ms. Montgomery survived is her loss of contact with reality that is greater than brief, mild dissociative episodes that only manifest slight changes in perception or out of body experiences alone. She experiences dissociation, which is "a disruption in the integration of consciousness, self-perception, memory, and actions,"[15] Dissociation is also defined as "The exclusion from consciousness and the inaccessibility of voluntary recall of mental events, singly, or in clusters, of varying degrees of complexity, such as memories, sensation, feelings or attitudes."[16]

In addition to disassociation, Ms. Montgomery also suffered from psychosis until placed on antipsychotic medication. She suffered delusions; auditory and visual hallucinations; perceptual distortions; paranoia and delusions of persecution; and mood disorders with psychotic features. The persuasive evidence that Ms. Montgomery has psychotic symptoms is contained in the psychiatric and medication records from her pretrial incarceration at CCA and her post trial commitment to FMC Carswell, a BOP facility.

Ms. Montgomery was diagnosed with depression and bipolar mood disorder with psychotic features by psychiatric staff at CCA and was treated with a regimen of mood stabilizers and anti depressants. The medication tamped down some symptoms but was unsuccessful in controlling her delusions, hallucinations, and loss of contact with reality. Staff attempted to titrate the regimen to control some symptoms but was unsuccessful. Upon arrival at Carswell, a BOP facility, psychiatric staff reviewed and changed Ms. Montgomery's medication

---

[15] Istanbul Protocol, paragraph 244.
[16] Spiegel et al, Dissociation: Culture, Mind, Body; American Psychiatric Press, 1994, page 60.

regimen from a commonly used combination of mood stabilizer and anti depressant to Risperdal, a medication used for its antipsychotic properties. Ms. Montgomery responded favorably and has been receiving Risperdal continuously since her arrival. Her psychotic symptoms have diminished considerably and she reported a remarkable change in her ability to recognize what is real and what is not real, to plan, organize and carry out activities, to read and remember what she has read, and to focus, pay attention, and concentrate. She is also better able to disclose some details of the traumatic and shameful treatment she received as a child, but still has considerable cognitive and psychiatric symptoms that compromise her ability to recall past traumatic events.

Family members and friends uniformly report that from childhood until her arrest Ms. Montgomery was frequently mentally absent, in her own world, and out of contact with events around her. Her first husband, Carl Bomen, reported she "was not emotionally present. She was in her own world and distant from everything . . . Lisa went somewhere else mentally. She just wasn't present . . . She shut down and went in her own world . . . She was spaced out a lot of the time and getting worse."[17] Her son noticed that his mother "was much more detached" and "was in another world."[18] Ms. Montgomery's youngest daughter believes that her "strongest memory about growing up, as well as one of the saddest parts of my life is the fact that my mom was not present." Ms. Montgomery "wasn't able to be either mentally or emotionally present in my life."[19] One of Lisa's four step fathers observed that "Lisa seemed to be in a world of her own" and "just stared off and wasn't engaged with the conversation around her."[20] Her husband at the time of the offense remembered that she "got a blank look on her face and didn't respond" when

---

[17] Declaration of Carl James Boman, February 13, 2013.
[18] Declaration of Carl James Boman, II, February 13, 2013.
[19] Declaration of Kayla Deanne Boman, February 21, 2013.
[20] Declaration of Richard Leroy Boman, January 8, 2013.

he tried to talk with her about difficult subjects . . . [I]t was like she wasn't even there . . . She was in her own world that we couldn't see."[21]

Ms. Montgomery's loss of contact with reality was long standing. One of her step sisters who babysat her as a small child reported that Ms. Montgomery "got lost in her books or stared into space so that she was not really with it. You had to yell to get her attention. She'd eventually come back to and respond."[22] One of her half brothers recollected that she "went into her own little world a lot. She often spaced out, stared into space or lost herself in a book."[23] A classmate from high school described it as "daydreaming a lot in class."[24]

During puberty Ms. Montgomery began to drink alcohol in response to repeated rapes by her step father. Her designated room in the trailer was a partially finished add-on to the trailer that had no lock, a concrete floor, and no heat. Her mother and step father used the room to store homemade liquor and wine. In junior high and high school Ms. Montgomery drank the wine to quell her fear and dread of the oral, vaginal, and anal rapes she endured more than weekly. As a young mother, Ms. Montgomery drank to excess and "started each day with a cup of coffee laced with Jack Daniels." The high prevalence of the comorbidity of substance use disorders and post traumatic stress disorder (PTSD) has been reported in a number of studies. In civilian populations with PTSD, estimates of lifetime prevalence of substance use disorder range from 22% to 43%, far higher than estimates for substance abuse disorders in the general population.

**Affective Mood Disorder**

The course of Ms. Montgomery's behavior and symptomology meets criteria for Bipolar I Disorder, Most Recent Episode Depressed, Severe with Psychotic Features, but additional

---

[21] Declaration of Kevin Montgomery, February 5, 2013.
[22] Declaration of Penny Craig, February 27, 2013.
[23] Declaration of Teddy J. Kleiner, January 30, 2013.
[24] Declaration of Susan Barrow Swartz, March 1, 2013.

information may be forthcoming from BOP medical, psychiatric, and medication records. Analysis of these records, in conjunction with appropriate diagnostic tests, is necessary to determine if the diagnosis of Bipolar I is the core diagnosis for her severe illness. She demonstrates mood lability, impulsive judgment, disinhibition, depressive episodes, persecutory delusions, irritability, agitation, euphoria during manic and hypo manic episodes, and visual and auditory hallucinations. She has a propensity for dissociation.

Rapid, unpredictable mood changes were a prominent feature commented on by Ms. Montgomery's husbands and children. Her ex husband recollected that she "was sad or unhappy for days at a time and then she suddenly had a plan or an idea and nothing could stop her . . . Lisa could not stay in one place for any length of time . . . and moved from house to trailer to apartment and back again in the same town or different towns and states without any plan."[25] He also noticed that "her personality changed from quiet and passive to being exuberant at times" when she reached her twenties."[26] Ms. Montgomery's youngest daughter has learned to recognize symptoms of bipolar when "moods go from very high to low," and thinks one of her sisters "is most like our mom" with mood swings.[27]

Episodes of depression kept her in bed for days. She "spent a lot of time in bed," according to her half brother who didn't know "if it was because of her headaches or what the cause was. She would spend days in bed and just lay there in silence."[28] Her first husband compared times when "she got bursts of energy" to "[o]ther times, she stayed in bed for days . . . .Between all her mood changes, moves to and from places, and separations and reunions, it wore

---

[25] Declaration of Carl James Boman, February 13, 2013.
[26] Id.
[27] Declaration of Kayla Boman, February 21, 2013.
[28] Id.

me out."[29] In contrast to depressive episodes, her husband found it "almost impossible to keep up with her at times."[30] Her irritation and agitation presented terrible problems for her children as "[h]er fuse got shorter and shorter; she was really quick to go off yelling . . . Her outbursts were over nothing really."[31]

Ms. Montgomery's social interactions were often inappropriate, and co workers and family commented on them. This impaired understanding of social context is both a feature of frontal lobe dysfunction and bipolar disorder (Zubieta, Huguelet, O'Neil, & Giordani, 2001). Her first husband said she "went from not talking to talking non-stop even to strangers . . . [S]he even approached people she did not know and started talking to them. It was a total change. She didn't notice if you talked to her or asked her any questions. Once she started talking she kept talking."[32] A co-worker reported that Ms. Montgomery "was constantly talking" and "told the same stories over and over again."[33] Another co-worker's husband opined he "did not like her after they met because he thought she talked too much."[34] One of her half brothers advised that "[t]he best thing to do is ignore it because it [talking] will drive you crazy . . . She can talk for hours and hours."[35]

Ms. Montgomery's hygiene deteriorated significantly as an adult. She "generally smelled of body odor and rarely bathed. She wore dirty clothes a lot of the time."[36] Her home and cars

---

[29] Declaration of Carl James Boman, February 13, 2013.
[30] Declaration of Kevin Montgomery, February5, 2013.
[31] Declaration of Chelsea Boman Veal, February 10, 2013.
[32] Id.
[33] Declaration of Jenny Hays, February 12, 2003.
[34] Declaration of Cheryl Fine, February 10, 2013.
[35] Declaration of Tommy Kleiner, February 8, 2013.
[36] Id.

were filthy. In her twenties, "she quit bathing and being clean" and "smelled bad."[37] She "smelled so bad that people commented on it" when she worked at Wendy's.[38]

Ms. Montgomery's behavior embarrassed her children. She acted on impulse, started projects, and didn't complete them. Her half brother reported "she would get really interested in something and spend a lot of time on it and then she wouldn't be interested anymore."[39] She disappeared for days with "no notice or warning."[40] At times in public, she "acted like a young child. She twirled around in the Wendy's and sang out loud. She swung her arms like a child does when they are skipping along . . . [N]ot only was it bizarre behavior, but it was very embarrassing for me as her daughter."[41]

**Migraine Headaches**

Ms. Montgomery suffered migraine headaches that incapacitated her for days. The headaches were "so painful that she would cry."[42] Her husband described them as so severe "[t]hey knocked her to the floor. She could not do anything – anything at all. She could not get out of bed, talk, eat, or read. . .She was almost paralyzed by them and stayed in bed for days."[43] Migraine headaches occur in a high percentage of persons with bipolar disorder and are a well-recognized symptom of brain dysfunction. (Arnold, 2003; Will Boggs, 2006). Other types of headaches may rise from structural defects like cluster headaches or tension headaches. Migraines are impairments in brain function, a sign of cognitive disarray (Arnold, 2003).

---

[37] Declaration of Carl James Boman, February 13, 2013.
[38] Declaration of Chelsea Veal, February 10, 2013
[39] Id.
[40] Id.
[41] Declaration of Chelsea Boman Veal, February 10, 2013.
[42] Id.
[43] Declaration of Kevin Montgmery, February 5, 2013.

## Mental Status Examination

Lisa Montgomery is a white female who looks older than her chronological age of 45. She has asymmetric facial features with pull to the right, wide set eyes, and recessed chin. She was dressed appropriately, in prison issued attire. She is positive for a thyroidectomy and is treated for hypothyroidism. Thyroid dysfunction is well known to co-exist with mood disorders (Kilzieh & Akiskal, 1999). Her contact with reality during the interview was interrupted by perceptual distortions and extreme dissociation, particularly when pressed on details of trauma.[44] Her mood was euphoric. She expressed paranoid ideation. She was anxious. She consistently wrung her hands, cast her eyes down, spoke in a soft, barely audible voice, and looked confused. She had moments when she was able to answer my questions, but the more common response was a mumbled answer that she did not know. She was unable to answer many of my questions because she has no recollection of significant events. She is unable to tell if an event happened, "if it was real," or if "was not real" and had not happened. She could not remember her children's developmental milestones. She described a post partum period after her fourth and last child was born when she did not know if the birth had occurred, if it "was real," or if it was "not real." This does not appear to be a retrieval of memory problem, rather it is a sustained loss of contact with reality and severe perceptual distortion. Her speech was tangential. She perseverated on how her childrearing practices were different from her mothers, that she loves her children, and that she was a good mother.

Cognition was significantly impaired by her dissociative experiences. Much of her inability to answer questions was secondary to her impaired working memory. As her memory

---

[44] Even though Risperdal has been effective in reducing some of the psychotic symptomology, Ms. Montgomery continues to experience significant episodes of dissociation and loss of contact with reality.

had not firmly recorded the event or her traumatic response, it was difficult for her to bring forth the memory.

Affective range was restricted, although she could laugh occasionally. She was most often anxious, and her anticipatory anxiety, which she acknowledged, was palpable. Constructional ability was impaired. She was asked to draw the face of a clock. She drew a circle and placed the numbers outside the circle. The clock drawing is a screening instrument for right parietal functioning.

She showed significant evidence of compromised cerebellum dysfunction. She cannot walk in tandem with heel toe. She was unsteady, almost fell, and required assistance to regain her balance when asked to perform tandem gait. She was unable to skip and reported that she had never been able to skip as a child.

**Conclusions**

Ms. Montgomery has a long standing history of serious brain impairments, exposure to extreme trauma, affective mood disorder, and psychosis. These disorders interact synergistically and account for Ms. Montgomery's mood lability; loss of contact with reality, which in its mildest form is dissociation and in its most extreme form is psychosis; and impaired memory, judgment, insight, and cognition. The interplay and severity of these multiple impairments resulted in her inability to perform basic activities of daily life, to care for herself or her family, and to act rationally and logically. She has dysfunction in her neurological systems, including her motor functioning, significant attentional problems, limbic dysfunction, memory, and visual dysfunction.

These symptoms affect her behavior at all times, disrupting her ability to function normally.

My answers to the referral questions are provided below:

- Was Ms. Montgomery's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Lisa Montgomery suffered from a complex mosaic of medical and neurobehavioral disorders that interacted with the effects of lifelong trauma that produced both brain damage and psychiatric disorders. These disorders substantially impaired her capacity to conform her conduct to the requirements of the law.

- Was Ms. Montgomery under severe mental or emotional disturbance at the time of the offense?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, she was under severe mental and emotional disturbance at the time of the offense.

- Is Ms. Montgomery's neurobehavioral history an important component of her social history?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Ms. Montgomery's neurobehavioral history contained in the biopsychosocial evaluation documents the manner in which her brain damage adversely affected her life course. It is a critical component of any social history that purports to describe the factors that shaped and influenced her functioning.

- Did prior assessments of Ms. Montgomery by trial defense and government experts accurately reflect Ms. Montgomery's neurobehavioral history?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, there was limited neuropsychological testing of those parts of the brain that are most relevant. Dr. Fucetola recognized the limitations of his battery, especially given the extreme discrepancy between performance and verbal IQ. He administered only neuropsychological testing, and it lacked a comprehensive frontal lobe and parietal lobe examination. In spite of a rich familial/genetic history that warranted further examination, neither the government experts nor defense experts investigated the relationship between her significantly impaired every day functioning, which cannot be explained by bipolar disorder and complex trauma alone, and her behavior surrounding the offense.

- Must a reliable psychiatric assessment of Ms. Montgomery include consideration of her neurological deficits?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, a reliable psychiatric or psychological assessment of Ms. Montgomery must include consideration of her neurological deficits; Ms. Montgomery manifests symptoms of frontal lobe dysfunction, including poor social understanding and context, difficulty weighing and deliberating, poor sequencing ability, irritability, and asocial behavior. She was often unable to organize herself, her children, and her home in any meaningful way, while believing she was a good mother.

Ms. Montgomery has a discrepancy between her verbal and nonverbal IQ that captures her strengths, language usage, and her weaknesses, day to day organizing and daily functioning.

It is important to understand the weight of each of her impairments-her complex trauma, her mood disorder, and her cognitive deficits-in order to adequately understand her level of impairment.

- Did Ms. Montgomery's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?

In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Ms. Montgomery's ability to rationally aid and assist her counsel was severely compromised due to two factors: 1) she did not receive appropriate medication for her symptom complex, and 2) she was unable to disclose to counsel the details of the extreme abuse due to predictable trauma sequelae.

- Did her impairments and medications inform her demeanor at trial?

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that the combination of Ms. Montgomery's cognitive and psychiatric impairments and medications caused and explained her disengaged appearance, flat and absent affect, and inability to show emotion at trial.

I declare under penalty of perjury that the above is true and correct this __17th_____ day of March, 2013.

George W. Woods, Jr., M.D.

**References**


Arnold, L. M. (2003). Gender differences in bipolar disorder. *The Psychiatric clinics of North America, 26*(3), 595-620.

Barkley. (2012). *Executive Functions: What They Are, How They Work, and Why They Evolved.* New York: The Guilford Press.

Briere, J., & Spinazzola, J. (2005). Phenomenology and psychological assessment of complex posttraumatic states. *Journal of traumatic stress, 18*(5), 401-412. doi: 10.1002/jts.20048

De Ridder, D., Van Laere, K., Dupont, P., Menovsky, T., & Van de Heyning, P. (2007). Visualizing out-of-body experience in the brain. *The New England Journal of Medicine, 357*(18), 1829-1833. doi: 10.1056/NEJMoa070010

Deborah A. Perlick, P. D., Robert A. Rosenheck, M. D., John F. Clarkin, P. D., Paul K. Maciejewski, P. D., JoAnne Sirey, P. D., Elmer Struening, P. D., & Bruce G. Link, P. D. (2004). Impact of Family Burden and Affective Response on Clinical Outcome Among Patients With Bipolar Disorder. *Psychiatric services, 55*(9).

Kilzieh, N., & Akiskal, H. S. (1999). Rapid-cycling bipolar disorder. An overview of research and clinical experience. *The Psychiatric clinics of North America, 22*(3), 585-607.

Kim, E. Y., Miklowitz, D. J., Biuckians, A., & Mullen, K. (2007). Life stress and the course of early-onset bipolar disorder. *Journal of affective disorders, 99*(1-3), 37-44. doi: 10.1016/j.jad.2006.08.022

Thomas G. Schulze, M., Donald Hedeker, P., Peter Zandi, P., Marcella Rietschel, M., & Francis J. McMahon, M. (2006). What Is Familial About Familial Bipolar Disorder? *ARCH GEN PSYCHIATRY, 63*.

van der Kolk, B. A., Roth, S., Pelcovitz, D., Sunday, S., & Spinazzola, J. (2005). Disorders of extreme stress: The empirical foundation of a complex adaptation to trauma. *Journal of traumatic stress, 18*(5), 389-399. doi: 10.1002/jts.20047

Will Boggs, M. (2006). Migraine Headache Commonly Complicates Bipolar Disorder. *Reuters Health.*

Zubieta, J. K., Huguelet, P., O'Neil, R. L., & Giordani, B. J. (2001). Cognitive function in euthymic bipolar I disorder. *Psychiatry research, 102*(1), 9-20.

Comprehensive EpilepsyCenter
NYU Medical Center

**Siddhartha Nadkarni, MD**
Assistant Professor of Neurology and Psychiatry
Program Director Clinical Neurophysiology Fellowship
Program Director Combined Residency in Neurology and Psychiatry
Director Epilepsy Clinic NYU Langone Medical Center
Director Neuroscience Curriculum Psychiatry Residency
NYU School of Medicine, NYU Langone Medical Center

223 East 34th Street, New York, NY 10016
646-558-0807 (phone) 646-385-7166 (fax)

Kelly Henry, Esq.
Amy Harwell, Esq.
810 Broadway
Suite 200
Nashvill, TN 37203

Re: **Montgomery**, Lisa

September 27, 2013

Dear Ms. Henry and Ms. Harwell,

I am writing at the request of your office to provide preliminary findings of my independent medical examination of Lisa Montgomery and record review. This examination does not establish a doctor-patient relationship and its purpose is to help provide information for her ongoing legal case.

In preparing this report I have reviewed:

1. 12.10.12 Gemini Medical Group (Consultation records for Caden C. Veal)
2. 5.18.93 Jane Phillips Hospital records for Ms. Montgomery
3. 7.15.93 Jane Phillips Hospital records for Ms. Montgomery
4. 3.2.92 Jane Phillips Hospital records for Ms. Montgomery
5. 9.24.93 Jane Phillips Hospital records for Ms. Montgomery
6. 5.21.09 SSI Evaluation (Kenneth Alexander)
7. 3.9.12 Multidisciplinary Evaluation and Eligibility Group Summary (Landon Veal)
8. 3.9.12 IEP School records (Landon Veal)
9. 9.13.05 Certified Records from Northside Independent School District (Lisa Hedberg's school records from 1980)
10. 10.17.90 Post Birth Record (Kayla Boman's Birth)
11. 5.25.77 Scoliosis of the spine report (Lisa Hedberg)
12. Sperry School Records 8th, 9th, 10th, and 11th grades

13. 10.1.11 St. Francis Hospital records
14. 9.14.98 St. Francis Hospital records (motor vehicle accident)
15. 6.20.99 Stormont Vail Regional Medical Center (trampoline Injury)
16. Tulsa Public Schools 1st through 6th grades with educational measurement testing scores
17. 1.30.09 Laurel Ridge Treatment Center (Wendy Treibs Discharge Summary)
18. 3.17.13 Affidavit/Report of George Woods, M.D.
19. 3.17.13 Affidavit/Report of Jan Vogelsang, M.S.W.

I conducted an independent Interview and Neurologic Examination of Ms. Montgomery on July 11, 2013 at FMC Carswell Federal Prison in Fort Worth, Texas. What follows is an accounting of that meeting and my initial findings based on it and the documents I reviewed.

**Interview and Examination**

Identifying Information: Lisa Montgomery is a 45 year old right handed mother of four grown children, who now resides in a Federal Prison.

**History of Present Illness:** In October 2007 Ms. Montgomery was convicted of first degree capital murder and sentenced to death for the murder of Bobbie Jo Stinnett in Missouri in December 2004.

Ms. Montgomery has a history of several neurological symptoms including:

1. Spells of a "bad smell," and episodes of lost time. She has the memory of experiences that she is not sure really occurred. The olfactory hallucination is not smelled by others and is stereotyped in nature and difficult to describe. She has bought things for her children and then shortly thereafter not remembered having bought them. She has other episodes, where she suddenly comes to and does not realize what has happened. Another example is going to fill up gas, filling up the tank and not having any memory of doing it. These are emblematic of many instances she has difficulty delineating individually. There are also sustained periods of times during which things do not seem real to her. Significant events, such as the birth of her fourth child, have occurred during these altered states of consciousness.

2. Multiple violent head injuries:

a. She was the victim of repeated sexual and violent assaults whereby her head was slammed into a concrete floor of a small room that was built by her step father for the purpose of raping her. She lost consciousness with several of these head injuries. Though the precise number of times she sustained injury to her head is unknown, the rapes occurred regularly from the age of 13 years old to 16 years old.
b. At the age of 19 years old, she was in a car accident, lost consciousness, and does not remember the details. She was a passenger and the driver was apparently badly injured.
c. In 1993 she was in a car accident where her head hit the rear view mirror when the car in which she was traveling hit two cows in the roadway at 60-65 miles per hour.
d. In 1998 she was in a car accident in New Mexico where her head hit the windshield.
e. Also in 1998 she was in another car accident that was a head-on collision with her head striking the windshield. After the collision she experienced alteration in awareness.
f. A trampoline accident occurred in June 1999 resulting in Mrs. Montgomery receiving a head injury with attendant confusion.

3. Attacks of trauma induced stress and fear that occur out of sleep with shortness of breath and chest discomfort.

Regarding the particulars of the crime, she has only very spotty memory. She has snapshot memories by her report. She remembers sitting in the corner of the room on the floor, the baby lying in front of the mother that was unresponsive. She does not remember how the baby was removed or removing her.

**Past Medical History:**
Hypercholesterolemia, Asthma, Four Documented Gravida, Migraines

**Past Surgical History:**
Cholecystectomy, Partial Thyroidectomy, Hysterectomy

**Family History:**
Mrs. Montgomery's biological family history is replete with psychiatric and neurologic impairments, including: mood disorders, intellectual disability, post-traumatic stress disorder, and schizophrenia. Mrs. Montgomery's paternal family

is remarkable for alcoholism, depression, and significant neurological impairment of her paternal aunt. Her maternal family history is replete with symptoms and behaviors indicative of undiagnosed mental illness, including mood disorders and psychosis; the family history also evidences neurological defects. Maternal family members have been diagnosed – and even committed – for severe bipolar disorder with psychosis. Several members of her maternal family experience hallucinations. Mrs. Montgomery's grandchildren, likewise, evidence significant neurological impairment.

**Past Psychiatric History:**

1. Upon Mrs. Montgomery's committal to the Bureau of Prisons (hereafter BOP) psychiatric staff (Camille Kempke, M.D.) diagnosed her with bi-polar disorder and prescribed Depakote 250mg (morning) and 350mg (night); Zoloft (50mg/day); Amitripeyline (50/night).
2. Since 2008, BOP has treated Mrs. Montgomery's diagnosed bipolar disorder, anxiety, depression, and psychotic symptoms with Lithium, Zoloft, Ativan, Effexor, Elavil, Risperdal, Lithium, Depakote, and Trileptal.
3. Since July of 2009, Mrs. Montgomery has been on Risperdal and has responded well to that medication, finding an increased ability to organize her thoughts and have more consistent contact with reality. She finds she does not question reality or her perceptions of it as much. Since beginning Risperdal she has had periods of increased goal directed activity such as knitting and construction of a large elaborate doll house.
4. She carries diagnoses of Bipolar Disorder and Psychosis, and hears the voice of her mother at times saying mean things to her.
5. She has sustained multiple incidents of Traumatic Brain Injury as described above.
6. She has Word Finding problems and feels her thinking is not sharp.
7. She has had several suicide attempts:
   a. In August 2010, Mrs. Montgomery took approximately 50 aspirin for severe back pain hoping to end the pain by dying of overdose.
   b. In August 2011 she was hospitalized for an overdose of Tylenol. Though she originally denied that this was a suicide attempt, she now recognizes it as such.
   c. In June 2012 she took around 70 Tylenol and was hospitalized with liver failure.
   d. Mrs. Montgomery reports that she has deliberately cut herself on multiple occasions.

**Developmental/Social History:**

Ms. Montgomery was born in Washington but moved around a lot as a child. She was abandoned by her father when she was only three years old. She suffered extreme, chronic, and systematic abuse by her mother and, later, stepfather. Starting around her twelfth year, her step father escalated the abuse to violent episodes of rape – oral, vaginal, and anal – continuing until her sixteenth year when her mother witnessed the rape. Despite his rape of her child, Mrs. Montgomery's mother remained with the step-father following this event. Unsurprisingly Mrs. Montgomery describes her childhood as "horrible."

Despite her chaotic upbringing, Mrs. Montgomery finished High School, performing relatively well until her junior year. She married shortly before graduation and gave birth to four children in three years. Following the birth of the fourth child, Mrs. Montgomery underwent a tubal fulguration. Though Mrs. Montgomery takes apparent pride in having raised four "good kids," the child protective services records of her children's early lives document her inability to attend, excessive drinking, poor hygiene, and neglect of her children's safety. During this period, Mrs. Montgomery tried cocaine, LSD, and THC experimentally.

Divorced from her first husband, Mrs. Montgomery married her second husband and attempted a settled life in Kansas. Again her mood disorder and lack of contact with reality compromised her functioning. She undertook tasks that were unrealistic given her limitations/experience (farming, raising dogs) and failed. She neglected her children and was unable to attend (children would call her name to no avail). She lost contact with reality in small ways (finding she had no memory of putting gas in the car) and large ways (believing that she had given birth when she had not).

Mrs. Montgomery has been incarcerated since the offense for which she is condemned. Her four grown children accept her phone calls and have visited her in custody. She is estranged from her mother, but has reestablished a relationship with her father after he was located by her defense counsel. She maintains a relationship with her husband, but confesses relief that she is no longer expected to have sex.

**Allergies:** Abilify; also she had a marked reaction to magnesium when pregnant, resulting in altered consciousness.

**Medications:** Risperidone 1 mg. at bedtime – bipolar
Ibuprofen 800 mg. x 2 daily – pain
Amitriptyline 50 mg. at bedtime - neuropathic pain
LevoThyroxine Sodium 25 mg. x 1 daily – hypothyroidism
Omeprazole 20 mg. x 2 daily – reflux

**Neurologic Examination:**

Mental Status Examination: Ms. Montgomery was well groomed in prison attire, though guarded and somewhat fearful, she was eventually forthright, cooperative, and well related. Her speech was normal in cadence and rate: her eye contact was fair. She was psychomotor neutral.

Mood: "o.k."

Affect: largely euthymic, full range, appropriate, congruent

Thought Content: No active suicidal ideation (some passive), No homicidal or aggressive ideation. No obsessions, compulsions, hallucinations at the time of the examination. No delusions at the time of the examination other than a continued persistent belief that she experienced pregnancy after her tubal fulguration. Mrs. Montgomery is avoidant of talk of pregnancies/births/babies.

Thought Process: linear.

Cognition: Notable for abulia (difficulty initiating thoughts), marked decrease attention, Montreal Cognitive Assessment (MOCA) score was 28 out of 30, missing on attention measure and one point on recall, but could only name 12 "f" words in one minute.

Insight: poor.

Judgment: poor.

Cranial Nerves: II through XII intact, but there is sustained right lateral gaze horizontal nystagmus more than left.

Motor: 5/5 throughout on confrontation, but there are significantly diminished fine finger movements in the left hand. Bulk and Tone are normal. Reflexes are largely symmetric.

Sensation: Cortical and segmental modalities of vibration/l.t./p.p./position are intact.

Coordination: Decreased coordination in left hand with Dysdiadochokinesia.

Romberg: negative

Toes are down-going to plantar stimulation.

**Impression:**

Ms. Montgomery suffers from a number of neurological complaints including migraines, cognitive problems, and episodes that are suspicious for complex partial seizures. Her cognitive problems include executive dysfunction, inattention, impulsivity, and an effective apraxia for doing several things. There is evidence on her neurologic examination of cerebellar, frontal, and possibly temporal dysfunction.

Her neuropsychological testing has confirmed a marked split in her performance and verbal intelligences with her performance

IQ markedly higher than her verbal IQ. This disparity points to central nervous system dysfunction.

It is my opinion, to a reasonable degree of medical certainty, that Mrs. Montgomery's neurological complaints are the result of marked and repetitive head trauma and brain injury. Mrs. Montgomery's brain is compromised not only by traumatic brain injury, but also by psychiatric symptoms for which she was genetically predisposed and which also are known to result from trauma.

It is very likely that complex partial seizures and neurophysiologic dysfunction better explain episodes of her behavior that have incorrectly been labeled as solely dissociative in the past. A persistent postictal psychotic state is more likely than other theories to offer insight into her behavior surrounding the offense and during other times in her life when she was unable to mediate her emotions and control her behavior.

It is my opinion that her history and symptoms at the time of the offense and subsequent legal proceedings demanded neurological examination to rule out focal cerebral dysfunction and seizures.

Sincerely,

Siddhartha S. Nadkarni, M.D.

**DECLARATION OF L. DIANNE BRADFORD, PHD, DIPS. PHARM. MED**

I, L. DiAnne Bradford, Ph.D., hereby declare the following:

## I. Qualifications

I am Professor Emeritus at Morehouse School of Medicine (SOM) (Atlanta, GA), having retired in 2013, while still maintaining my endeavors in consulting, advising and in testifying in cases appropriate to my expertise. During my 15-year tenure at Morehouse School of Medicine, my primary appointment was in the Department of Clinical Psychiatry and Behavioral Biology, where I was the Director of the Minority Mental Health Research Group in the Department of Psychiatry. During 14 of those years, the research group was funded by four National Institute of Health (NIH) grants, of which I was Principal Investigator. In addition to research, I also was Director and taught several medical school and residents' courses in *Psychopharmacology*, *Pharmacogenetics and genetic etiology of mental disorders, Evidence-based Medicine, Essentials in Clinical Research and Culturally Competent Research Diagnoses.*

For almost 40 years, my *psychopharmacological* research spanned the range from drug discovery (*in vitro* and animal models studies) used to discover putative efficacy and safety of new chemical entities (Section Head, Central Nervous System Pharmacology, 1982-1985), and later, clinical research studies to assess efficacy, effectiveness, safety and adverse events (Senior Clinical Research Director, 1986-1995, Solvay Pharmaceuticals) of new drugs for psychiatric disorders. While at Morehouse SOM I designed, directed and conducted a program of research centering on depression, resiliency, burden of illness and possible racial-ethnic differences in reporting symptoms. Throughout my research career, I have been bolstered by my graduate and post-graduate training in the *experimental analysis of behavior* (including verbal behavior) which gives the foundation for a standard and systematic method of measuring and evaluating verbal behavior, the main dependent variable in psychiatric clinical research.

I was awarded, as Principal Investigator, one of first pharmacogenetic clinical studies funded by NIH in order determine the underlying genetic variations that contribute to differences in drug response. A natural progression to my research was then to study the genetic etiology of mental disorders in order to contribute to the development of more effective treatments. I was Principle Investigator for the Georgia site in a six states research grant, the largest ever

awarded by National Institute of Mental Health at that time. This was a gene-linkage study of African Americans with schizophrenia and their families to try to discover more about the genes underlying schizophrenia, and the heritability of cognitive effects associated with that disorder by using a standardized, computerized neurocognitive battery.

I have consulted and advised on both criminal and civil cases, including four in the Federal District Court system (Central California, Western Louisiana, Arizona and Middle Tennessee). I have been qualified and testified as an Expert Witness in the scientific area of psychopharmacology in the Federal District Court for Central California. A copy of my *curriculum vitae* is attached.

## II. Referral Questions

a) Did Ms. Montgomery's regimen of prescription drugs, at the time of the trial, affect her outward behavior (manner, appearance) or interfere with her ability to respond appropriately to her external environment?
b) How can genetics and stressful life events have played a role in her disorders?
c) Based on her consensus diagnosis (Dr. McCandless, Dr. Woods) was she receiving appropriate medications for her diagnosis and presenting symptoms at the time of the trial?

## III. Summary of materials reviewed

I have reviewed Ms. Montgomery's medical records from CCA (Leavenworth, KS), which include her mental health visits, clinical comments and pharmacy records, as well as those from Carswell (Ft. Worth, TX). I have also reviewed reports by Dr. George Woods, Janet Vogelsang, MSW, and Dr. Siddhartha Nadkarni, which included summaries of her trauma-related and psychiatric symptoms, diagnosis, psychosocial history and neurological disorders. I have also reviewed the extensive documents of family and friends' statements and other medical records that have been used in the aforementioned summary reports.

## IV. Psychotropic and a non-psychotropic drugs taken during the trial

| Drug | Daily dose | Indication |
|---|---|---|
| Valproic acid | 625 mg | Bipolar Disorder (mania) |
| Bupropion | 225 mg | depression |
| Amitriptyline | 25 mgs | neuropathy |
| Ranitidine | 150 mg | Stomach acid reducer |

Ms. Montgomery has DSM IV, Axis I disorder (APA, 2000 [1] ) of Bipolar Disorder with Psychotic Features. At the time of the trial, two formulations of valproic acid in three divided daily doses, were prescribed for her *bipolar disorder, manic phase*. She was also receiving bupropion, a second-generation antidepressant, for her depression. Amitriptyline (Elavil®), an older tricyclic antidepressant was given for relief of neuropathic pain, and ranitidine (Zantac®), as a stomach acid reducer (started October 18, 2007 and continued throughout trial).

### *a. Sedation and Somnolence as adverse events*

Sedation and somnolence are frequent adverse events (side effects) associated with psychotropic drugs (Hardman et al. 1996; Stahl, 2008). Impaired cognitive functioning, decreased memory and attention characterize *sedation*. In addition to these mental functions, sedation is also related to physical manifestations such as coordination and psychomotor activity, e.g., recognition and response time. *Somnolence* represents sleepiness, drowsiness and a tendency to need to sleep during the day. Both contribute to an overall functional impairment in the individual.




There are distinct pharmacological events that are responsible for not only efficacy, but side effects, as well. These adverse events are specifically associated with various receptor sites, and thus their corresponding neurotransmitter. *Sedation* is associated with M1 (anticholinergic effect), H1

[1] At the time of the trial, the DSM IV-TR was the most recent manual. Since 2013, the DSM-V has

(antihistaminic effect) and alpha-adrenergic effects. Somnolence is associated with antihistaminic (H1) and alpha-adrenergic effects. (Stahl, 2008).

The original antipsychotics, phenothiazines (e.g., chlorpromazine), first widespread use clinically was in Europe and later the US in the 1950's. Both the phenothiazines and the thioxanthenes, among others, have a *tricyclic* chemical structure. The "first generation" antidepressants (e.g., amitriptyline [Elavil®], imipramine [Tofranil®]) are, by definition, *tricyclic* chemical compound structures (Hardman et al., 1996).

As research progressed on the mechanisms of action, safety and clinical profiles of both the tricyclic antipsychotics and tricyclic antidepressants, it was discovered that both classes of compounds share a side-effects profile: sedation, sleepiness, and cardiac effects that were correlated with the antihistaminic (H1), anticholinergic (M1) and (noradrenaline) α-adrenergic neurotransmitter receptor sides. Antihistaminic effects result in *drowsiness* and weight gain, anticholinergic effects are *sedation*, constipation, blurred vision, dry mouth and confusion, especially in the elderly; Alpha-adrenergic effects produce *somnolence,* orthostatic hypotension and at high doses, possibly fatal cardiac response. As new drug development progressed, in order to avoid these troublesome side effects, which seem to be inextricably linked to the structure, the focus in drug development became *non*-tricyclic structures.

### b. ***Amitriptyline***

Amitriptyline (Elavil®) was one of the first tricyclic antidepressants used widely clinically for depression. The mechanism of action for its efficacy in depression is by blocking the re-uptake of noradrenaline and, to a much lesser extent, serotonin. The pharmacological basis for its side effects of sedation and somnolence are based on its antihistaminic (H1) and anticholinergic (M1) effects. After many years in clinical testing, it was determined that amitriptyline showed the most pronounced adverse events profile of

| | Sedation | Anticholinergic | Cardiac effects |
|---|---|---|---|
| Amitriptyline (Elavil) | +++ | +++ | +++ |
| Doxepine (Sinequan) | +++ | ++ | ++ |
| Imipramine (Tofranil) | ++ | ++ | +++ |
| Clormimpramine (Anafril) | ++ | +++ | +++ |
| Trimipramine (Surmontil) | +++ | +++ | +++ |

+ = Mild; ++ = moderate; +++ = Moderately severe

From Hardman et al., 1996

these drugs, especially regarding sedation and somnolence. (Hardman et al.,1996). Amitriptyline reduces reaction time, accuracy and impairs driving performance (Bye et al., 1978). Unlike many other tricyclic antidepressants, these adverse events did not decrease upon repeated doses, i.e., tolerance (Spring et al. 1992). Over the years, clinicians discovered that amitriptyline, probably unique among the tricyclic antidepressants, was effective in treating various types of pain (e.g., sciatica, neuropathy, fibromyalgia) and insomnia (FDA, 2016), the latter because of its pronounced sedation and somnolence. Dosing recommendations for neuropathy are 25 mg – 50 mg per day. The dose that Ms. Montgomery was receiving at the time of the trial (25 mg at night) is sufficient to produce both sedation and somnolence during the day.

### c. *Valproic acid*

The hypothesis that mania maybe triggered by a "kindling" effect of sudden over-activity of neurons firing and thus releasing excess amounts of neurotransmitters, similar to epileptic seizures, led to clinical testing of a number of anticonvulsant drugs in bipolar disorder. Some worked, some didn't; even after decades of research and clinical use, the mechanism of action for efficacy and side effects for mood stabilizers is still less well understood than antidepressants used in unipolar disorders. Nevertheless, it is thought that the enhancement of GABA (gamma-aminobutyric acid) neurotransmission (the "universal" inhibitory neurotransmitter) and/or the regulation of a subtype of receptor using channels to allow the flow of ions into and out of cells (e.g., sodium, calcium, glutamate) which regulate the firing of neurons may underlie the mechanism of action of anti-mania drugs (mood stabilizers)(Stahl, 2008).

Valproic acid is widely used in the treatment of acute mania and maintenance to reduce the recurrence of mania (FDA, 2016; Stahl, 2008). The recommended daily dose is 750 mgs in divided doses. Divalproic sodium is compounded from sodium valproate plus valproic acid. These drugs are also known under the trade names of Depokote® and Depakene®, but both have equivalent doses systemically of the active ingredient, the valproic ion (FDA, 2016). Depokote® is available in an Extended Release formulation which may decrease the gastrointestinal side effects (Stahl, 2008). However, when valproic acid oral dose is






B-298

compared with the extended release formulation in placebo-controlled studies, there is no difference in the percentage rates of sedation (FDA, 2010). Patients taking valproic acid cite sedation as one of the adverse events that leads to discontinuation of therapy, thus, it is a clinically significant side effect that interferes with normal functioning (Stahl, 2008). Of interest in this case is the fact that valproic acid interacts pharmacologically with amitriptyline that results in a decrease of plasma clearance of amitriptyline, thus prolonging amitriptyline's side effects of sedation and somnolence.

### d. *Ranitidine*

Ranitidine is the generic for Zantac® and is taken as a gastric acid reducer. Ranitidine is associated with fatigue and drowsiness, probably because of its antihistaminic effects. Ms. Montgomery started taking 150 mg of ranitidine during the course of the trial (10/18/2007) and continued throughout the remainder of the trial.

### e. *Summary and conclusions*

At the time of the trial, Ms. Montgomery was taking 25 mg of amitriptyline, a total of 625 mg of valproic acid and 150 mg of ranitidine, all within the dosing guidelines for each drug. All of these drugs in monotherapy are associated with sedation and or somnolence (FDA, 2016; Stahl, 2008; Hardman et al., 1996). Combination of these drugs in a polypharmaceutical regime results in additive effects of somnolence and sedation. The interaction of amitriptyline with valproic acid leads to the prolongation of the somnolence and sedation from amitriptyline during the following day. Further, side effects such as sedation and somnolence are often exaggerated in people suffering from head trauma, as Ms. Montgomery does (Saddock and Saddock, 2003). Such a degree of sedation and somnolence would likely result in an individual who was not fully aware of the surrounding environment, loss of attention, unable to follow complex procedures or conversations, and unresponsive to emotional (both positive and negative) probes in normal circumstances. A case history could illuminate:

> *Ms LB had been driving a moderately long distance (26 miles one way) to a cancer center numerous times during her cancer treatment over several months. During radiation therapy, she had to drive this route every weekday, which included an elementary school zone, for six weeks for a total of 30 treatments. Radiation therapy causes somnolence which seems to be additive over the weekdays and over the*

*weeks. During week 3, her treatment for peripheral neuropathy (a long-lasting adverse event associated with chemotherapy) was switched from tramadol (50-100 mg/day) to 25 mg of amitriptyline nightly. On the third day of amitriptyline treatment, Ms LB was delayed 1.5 hours at the radiation center due to a malfunction of the unit. Thus, instead of passing through the school zone at 14:00, she drove through that section at 15:30 when the 20-mph speed limit was in force. Being completely unaware of the obvious stimuli (the flashing yellow light, all the other cars in the four-lane divided highway that she passed that had slowed to 20 mph), she drove through the school zone at 45 mph, the normal speed limit for that road. She was stopped by a patrolman and given a warning. She recalled that she had no memory of even turning on that particular road, had no recollection of the flashing light and the slow moving cars, She had not attended to a single stimulus during that part of her journey, and thus, had not reacted.*

In conclusion, the sedation and somnolence Ms Montgomery was experiencing during the trial, resulting in an inability to react to verbal and visual stimuli and respond in an emotionally congruent way, and would have contributed to her lack of showing any emotions which could be observed as a "flat affect".

## V. *Genetic and environmental influences on mental illness*

### a. *genetic components of mental illness*




Mental illnesses have a genetic, i.e., inherited, component. It is now known that mental illnesses, such as bipolar disorder and schizophrenia, are inherited not by a single gene, but multiple gene mutations. However, even if you inherit the necessary mutant genes, you will not always develop the disorder, so we tend to think of *vulnerability* or *risk* for the disorder. For example, in identical twin (monozygotic, i.e., identical genetic structure) studies raised together or apart, if one twin expresses the disorder, the other doesn't always, ranging between 70% and 82% for schizophrenia and bipolar disorder, respectively (Stahl, 2008; Edvardsen et al., 2008). Thus, we know that the environment plays a role in whether or not the disorder will occur. An important component of the determining factors is one's own personal coping skills, which have been developed over the years through interaction between the environment, family and one's own personal characteristics (Richardson, 2002). Often times, it is a major stressor or multiple stresses, which trigger the initial onset of the disorder. For mental disorders, the higher the heritability, the less significant the stressor needs to be. For example, if a person has inherited the schizophrenia vulnerability genes, it might take only starting college in a new location that triggers the initial episode. Bipolar Disorder often occurs earlier in the life cycle, so it could be family-centered events that trigger the onset of the disorder. Mental disorders that have a lower heritability, e.g., depression, often have a major life stressor, e.g., losing a loved one, divorce, losing a job, which triggers the depression. For disorders like Post Traumatic Stress Disorder (PTSD) and acute stress disorder, the triggering factor is clear: catastrophic and/or life-threatening events that are known. However, the specific genes underlying this disorder remain elusive (Almli et al., 2014; Cornelius et al., 2010). Interestingly, two frequently studied candidates regulate the






B-301

dopamine system and the serotonin system that are, respectively, associated with positive and negative symptoms of schizophrenia (Almli et al, 2014; Cornelius et al, 2010). With PTSD, only about 20-30% of people who are exposed to the traumatic event will actually develop PTSD. While it is clear there is a genetic component, based on twin studies, heritability accounts for only 30-40% of the variance (Almli et al., 2014).

There are numerous documented cases of bipolar disorder, bipolar with psychotic features and psychosis in both Ms. Montgomery's maternal and fraternal families, as well as among her half-siblings contributing to her vulnerability: on her paternal side, it's suspected that the grandmother might qualify, plus a half-sibling and an aunt; on her maternal side, her half-brother, two cousins and two of their children meet the criteria for either bipolar disorder or psychosis[2],[3]. Numerous family members suffered from depression[4].

We are still in the early stages of identifying candidate genes as risks for mental disorders; many studies have been completed (e.g., NIMH RO1 multi-site study MH 66006, LD Bradford, PhD, PI, Calkins et al., 2010) in which small pieces of the puzzle have been discovered, but ongoing and future studies are still needed. What we do know so far, besides there are multiple mutant genes contributing to mental disorders, is that many of the identified genes are common in several disorders, e.g., the gene coding for monoamine oxidase (which is important in the life-cycle of important catecholamines such as dopamine, serotonin and epinephrine) is dysfunctional in major depression, bipolar and schizophrenia, and perhaps, PTSD, and likewise, there is symptom overlap in these disorders (Baou et al., 2016; Amirabadi et al., 2015; Liu et al., 2015; Andreou et al., 2014; Peerbooms et al., 2011; Cornelius et al., 2010; Lichtenstein et al., 2009). A common psychotic symptom in both PTSD and schizophrenia is negative connotation voices as auditory hallucinations that are almost identical phenomenologically (McCarthy-Jones and Landgen, 2015).

***b. environmental influences***

As already stated, although a person may carry the necessary risk or vulnerability genes for mental illness, e.g., bipolar disorder, it may not ever be expressed at a clinical level. Likewise, not everyone who is exposed to a catastrophic or life-threatening event will

---

[2] Report by George Woods, 2013, p 8-10

[3] report by Janet Vogelsang, 2013, p 9,10, 24, 25

[4] Ibid

develop PTSD. A crucial factor in the descent of mental health to mental illness is coping mechanisms or resiliency (Richardson, 2002), which is developed through childhood. As reported in the medical histories and submitted summaries by Dr. Woods, Ms. Vogelsang MSW and Dr. Nadkarni, Ms. Montgomery suffered from frequent mental, physical and sexual abuse, much of it from her mother and stepfather - hardly an environment and family dynamics compatible with developing effective coping skills and high resiliency. Childhood trauma and maltreatment not only is associated with poorer outcomes in mental health disorders, they are highly correlated with both positive and negative symptoms of psychosis in PTSD (Kim and Lee, 2016; Agnew-Blais and Danese, 2016; Choi et al., 2015; Longden et al., 2015).

## *VI. Bipolar Disorder and Positive and Negative symptoms of psychosis*

### *a. Symptoms and Diagnoses*

Mental illnesses are mainly defined by *symptoms:* behavior – including verbal and demeanor. In order to meet a DSM diagnosis/criteria (*Diagnostic and Statistical Manual of Mental Disorders, APA, 2000*, not only do you have to meet the criteria for specified symptoms, but also specified criteria of symptoms for a certain *duration*, a certain level of *impairment* (which can also include quality of life), and you still have to *rule out* other causes (e.g., that the symptoms are as a result of another medical disorder, or side effects of drug(s) taken for other medical disorders, etc.). Another criterion for mental illness diagnosis takes into account chronological relationships of symptoms.

Psychotic symptoms include a gross impairment in reality testing (e.g., delusions and hallucinations), and a lack of insight (i.e., the person is not able to recognize the problem).
For example, in order to meet the criteria for a diagnosis of schizophrenia, one must have two of the symptoms, which characterize psychosis: (A) delusions, hallucinations, disorganized speech (e.g., frequent derailment, incoherence), grossly disorganized behavior (poor hygiene, inappropriate or sloppy dressing), and negative symptoms. The other standard criteria are: (B) There has to be significant social/occupation *dysfunction*, and (C) these symptoms must persist for a *duration* of at least six months (further specification given), and (D) other conditions or medical disorders must be ruled out (APA, 2000).

*Positive symptoms* of psychosis include delusions, hallucinations, disorganized speech or behavior; negative symptoms are the *absence* of behavior and reactions and may include flat affect (the lack of emotion, either happy or sad), poverty of speech or avolition (difficulties in initiating and persisting in important activities)(APA, 2000). Negative symptoms of psychosis are far more difficult to ascertain because they are an *absence* of a behavior and occur along a continuum of normal behavior.

### ***b. Bipolar Disorder with Psychotic features***

Bipolar Disorder is characterized by a period of mania or hypomania, in which there is an abnormally and persistent elevated or expansive mood, in addition to three other symptoms, e.g., grandiosity, flights of fancy, pressure of speech, distractibility. If there is a least one episode of *mania,* then the Mood Disorder is diagnosed as Bipolar Disorder (APA, 2000). A manic episode followed by a period of depression, is called a cycle (APA, 2000). Ms. Montgomery's bipolar symptoms can be found in Dr. Woods' report. Bipolar




Disorder also occurs with Psychotic Features during the "active phases" of the disorder (during the hypomanic, manic and depressive phases), as shown in the figure. Dr. Woods describes in his report several *positive* symptoms of psychosis, such as auditory and visual hallucinations, delusions and paranoia and loss of contact with reality[5] experienced by Ms. Montgomery. Other symptoms reported by friends and family members, under different context, could also be considered *negative symptoms of psychosis: flat affect* (she was "frequently mentally absent", "not emotionally present", "got a blank look on her face and didn't respond", and avolition could describe her long history of problems initiating and

[5] George Woods, MD, 2013, p14, 17.

completing routine activities of daily life, such as cleaning and dressing herself and her children, and her inability to do simple household tasks such as grocery shopping.[6]

### *c. Conclusions*

At the time of the trial, Ms Montgomery had a diagnosis of Bipolar Disorder with Psychotic Features. The psychotropic drug she was using, valproic acid, is effective in treating bipolar disorder, manic phase, was used at an appropriate dose, seemed to be well tolerated and used for an appropriate duration. She was taking bupropion for her depressive episodes. Some of her bipolar disorder symptoms were reduced under this regime. However, she had a long history of untreated psychotic behaviors, which were not treated at the time of the trial. She was still exhibiting psychotic behavior during the trial[7]. After starting treatment with a "new" generation antipsychotic in July 2009[8], risperidone (Risperidal®), she showed marked improvement that even she recognized[9]. Risperidone is probably an ideal drug choice for Ms. Montgomery: not only is it licensed by FDA (i.e., "proven efficacy) for the treatment of psychotic disorders, but also bipolar disorder (FDA, 2016). As an "S2D2" drug it interacts directly both with serotonin and dopamine, neurotransmitters known to be involved in the etiology of psychosis and bipolar disorder.

## *VII. Responses to referral questions*

a. Did Ms. Montgomery's regimen of prescription drugs, at the time of the trial, affect her outward behavior (manner, appearance) or interfere with her ability to respond appropriately to her external environment?

In my professional opinion, which I hold to a reasonable degree of scientific certainty, the three drugs she was taking (valproic acid, ranitidine and amitriptyline) all of which have clinically significant side effects of sedation and somnolence, are additive when co-administered and would affect her outward appearance and reduce her ability to react to appropriate external cues. Besides causing a dulling of the senses, increased reaction time, decreased accuracy, unresponsiveness to external stimuli, these kinds of side effects of drugs can also present clinically as *flat affect which are undistinguishable from the flat effect*

---

[6] Ibid, Janet Vogelsang, 2013.
[7] McCanless, L. CCA Health Service Clinic Notes, CCA-2-2-00344,352
Vandersang, J, 2013.
[8] Ibid
[9] Woods, 2012; Vandersang, 2013; C Anthony PhD (staff physician) 8/2009,

*as a symptom of psychosis (APA, 2000).* So, Ms. Montgomery would appear as a seemingly unsympathetic person without feeling during the course of the trial.

b. How can genetics and stressful life events have played a role in her disorders?

In my professional opinion, which I hold to a reasonable degree of scientific certainty, Ms. Montgomery had a moderately high risk genetically to develop Bipolar Disease from both the paternal, and especially the maternal side of the family. As is common in this disorder, it often begins in childhood or adolescence, and her constant chatter and excessive talking early in life (for which she was severely punished) could have been the prodromal phase prior to onset. She had developed no coping skills, and, indeed, had a childhood that probably contributed to her mental illnesses. The severe traumas to which she was exposed are likely to have contributed to her developing psychotic symptoms, which are now clearly associated with PTSD. Indeed, she may have inherited at least some of the underlying altered gene dysfunction related to the etiology of psychosis from family history of psychosis. Thus, both her genetic make-up, plus a traumatic childhood contributed to her mental illness, Bipolar Disorder with Psychotic Features.

c. Based on her consensus diagnosis (Dr. McCandless, Dr. Woods) was she receiving appropriate medications for her diagnosis and presenting symptoms at the time of the trial?

In my professional opinion, which I hold to a reasonable degree of scientific certainty, Ms. Montgomery was not receiving appropriate medications at the time of the trial to control her psychosis. She was receiving therapeutic levels of valproic acid and bupropion for her mania and depression, respectively. Some of her bipolar symptoms were reduced, so the treatment program could be considered a partial response. However, she was still reporting frequent bouts of depression and possibly mania (expressed as irritability).

On the other hand, she was receiving no treatment for her psychotic symptoms. As she was presenting with positive psychotic features during the trial, it is conceivable she was expressing a negative symptom of *flat effect* or seemingly emotionless demeanor presented in the courtroom. On neurocognitive tests, Ms. Montgomery's ability to recognize or

discriminate facial affect [10], which is a neurocognitive aspect of psychosis (Calkins et al., 2010) would mean that she wouldn't be able to respond appropriately to the court, judge and jury's expressions of dismay or horror, disturbing details and unsettling evidence that was presented, making her appear cold-hearted.

I declare under penalty of perjury that the above is true and correct this __23rd______ day of

_June___ 2016.

L DiAnne Bradford, Ph.D

L. DiAnne Bradford, Ph.D., Dip. Pharm. Med.

[10] G Woods, 2013, p 8.

## References


Agnew-Blais J, Danese A., Childhood maltreatment and unfavorable clinical outcomes in bipolar disorder: a systematic review and meta analysis. *Lancet Psychiatry*. 2016, 3(4):342-349.

Almli LM, Nani N, Smith AK, Ressler K. Genetic approaches to understanding post-traumatic stress disorder. *Int J Neuropsychopharmacol. 17(2): 355-370.*

American Psychiatric Association (APA): *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition – Text Revision. Washington, DC, American Psychiatric Association, 2000.

Amirabadi MRE, Esfahani SR, Davari-Ashtiani R, Khademi M, Emamalizadeh B, Movafagh A, Sadr S, Arabgol F, Darvish H, Razjoyan K. Monoamine oxidase *A Gene polymorphisms and Bipolar Disorder in Iranian Population.* Iran Red Crescent Med J. 2015, 17(2):e23095 (online publication).

Andreou D, Söderman E, Axelsson T, Sedvall GC, Terenius L, Agartz I, Jönsson EG. Polymorphisms in genes implicated in dopamine, serotonin and noradrenalin metabolism suggest association with cerebrospinal fluid monoamine metabolite concentrations in psychosis. *Behavioral and Brain Functions*, 2014, 10:26-30.

Bauo M, Boumba VA, Petrikis P, Rallis G, Vougiouklakis T, Mavreas V. A review of genetic alterations in the serotonin pathway and their correlation with psychotic diseases and response to atypical antipsychotics. *Schizophr Res.* 2016, 170(1): 18-29.

Bye E, Cubley M, Peck AW. Drowsiness, impaired performance and tricyclic antidepressant drugs. *Br J clin Pharmac*. 1978, 6:155-161.

Calkins ME, Tepper P, Gur, RC, Ragland JD, Klei L, Wiener HW, Richard, J, Savage RM, Allen TB, O'Jile J, Devlin B, Kwentus, J, Aliyu MH, Bradford, LD, Edwards N, Lyons PD, Nimgaonkar VL, Santos AB, Go RCP, Gur RE. Project Among African Americans to Explore risks for schizophrenia (PAARTNERS): Evidence for impairment and heritability of neurocognitive functioning in families of schizophrenia patients. *Am J Psychiatry,* 2010, 167(4): 459-472.

Choi JY, Choi YM, Kim B, Lee DW, Gim MS, Park SH. The effects of childhood abuse on self-reported psychotic symptoms in severe mental illness: Mediating effects of posttraumatic stress symptoms. *Psychiatry Res*. 2015, 229 (1-2): 389-393.

Cornelius MC, Nugent NR, Amstadter A, Koenen K. Genetics of post-traumatic stress disorder: review and recommendations for genome-wide association studies. *Curr Psychiatry Rep*. 2010, 12(4): 313-326.

Edvardsen J. Torgerssen S, Roysamb E, Lygren S, Skre I, Onstad S et al., Heritability of bipolar spectrum disorders: Unity or heterogeneity? *J Affect Disord*. 2008:106(3): 229-240.

Federal Drug Administration (US FDA). www.fda.gov/ddrugs/scienceresearch/. Downloaded between April – May, 2016, unless otherwise noted.

Goodman's and Gilman's *The Pharmacological Basis of Therapeutics, 9th edition.* JG Hardman and AG Gilman (eds). McGraw-Hill, NY, 1996.

Kaplin & Sadock's Synopsis of Psychiatry: Behavioral Sciences/Clinical Psychiatry, Ninth Edition, BJ Sadock and VA Sadock (eds), Philadelphia, PA, 2003.

Kim JS, Lee SH. Influence of interactions between genes and childhood trauma on refractoriness in psychiatric disorders. *Prog Neuropsychopharmacol Biol Psychiatry,* 2016: (e-pub ahead of print) S0278-58346.

Lichtenstein P, Yip BH, Bjork C, Pawitan Y Cannon TD, Sullivan PF et al. Common genetic determinants of schizophrenia and bipolar disorder in Swedish families: a population-based study. *Lancet*, 2009, 373: 234-239.

Liu Z, Huang L, Lou XJ, LI M. MAOA variants and genetic susceptibility to major psychiatric disorders. *Mol. Neurobiol.* 2015, July: 1-9, e-pub ahead of publication.

Longden E, Sampson M, Read J. Childhood adversity and psychosis: generalised or specific effects? *Epidemiol Psychiatr.* 2015:9:1-11.

McCarthy-Jones S, Longden E. Auditory verbal hallucinations in schizophrenia and post-traumatic stress disorder: Common phenomenology, common cause, common interventions? *Front. Psychol.* 2015, 6: article1071 (p1-7).

Peerbooms OL van OS J, Drukker M, Kenis G, Hoogveld I et al. Meta analysis of MTHFR gene variants in schizophrenia, Bipolar disorder and unipolar depressive disorder: evidence for a common gene vulnerability. *Brain, Behav Immun,* 2011; 25(8):234-239.

Richardson GE. The metatheory of resilience and resiliency. *J Clin Psychol,* 2002, 58(3): 307-321.

Spring B, Gelenberg AJ, Garvin R, Thompson S. *Psychopharmacology.* 1992; 108(3): 327-232.

Stahl, S. *Stahl's Essential Psychopharmacology: Neuroscientific basis and practical applications,* Third Edition, Cambridge Univ. Press, NY, New York, 2008.

**LOGAN & PETERSON, PC**

FORENSIC, ADOLESCENT AND ADULT PSYCHIATRY

WILLIAM S. LOGAN, MD
STEPHEN E. PETERSON, MD

❑ 428 WEST 42ND STREET
KANSAS CITY, MISSOURI 64111
TELEPHONE: (816) 842-2500
FAX: (816) 842-9980

❑ 231 S. BEMISTON
CLAYTON, MISSOURI 63105
TELEPHONE: (314) 236-4914
FAX: (314) 236-4990

3600 BURLINGAME, SUITE 1A
TOPEKA, KANSAS 66611

# PSYCHIATRIC EVALUATION

**Lisa M. Montgomery**
**(Dob: 2/27/68; SSN: 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)**

## INTRODUCTION:

Ms. Montgomery is a 39-year-old woman from Melvern, Kansas who is charged in the U.S. District Court for Western Missouri with the murder of Bobby Jo Stinnett and then kidnapping her child, Victoria Jo Stinnett, after removing the child by cesarean section on December 16, 2004 (Case No. 05-6002-01-CR-SJ-GAF). Ms. Montgomery is represented by David Owen of the Federal Public Defenders Office as well Fred Duchardt and John P. O'Connor. Mr. Duchardt and Mr. O'Connor requested a psychiatric examination of Ms. Montgomery to include an opinion concerning Ms. Montgomery's mental state in relation to her criminal charges and/or mitigation if applicable.

## DESCRIPTION OF EVALUATION:

On March 6, 2005, I examined Mrs. Montgomery at the request of Mr. Owen due to the defense teams concern about her potential for suicide for 1.5 hours. On the advice of the attorneys, Mrs. Montgomery did not discuss any events surrounding her criminal charges. My report dated 3/14/05 details my clinical observations and findings at that time. I had no further contact with Mrs. Montgomery or the defense team until I was contacted by Mr. Duchardt on March 24, 2007. Mrs. Montgomery subsequently received a 6.25 hour examination on April 10, 2007 and a 2.34 hour examination on 5/11/07 for a total of 8.59 hours. All evaluations were conducted at Corrections Corporation of America (CCA) in Leavenworth.

Other sources of forensic and clinical information after 12/16/04 considered, included the following mental health records and evaluations –

1) Notes from Marilyn Hutchinson, PhD from January and February 2005.
2) Evaluation Report by Ruth Boutinkuncel, PhD dated April 9, 2007.
3) Neuropsychological Evaluation by Robert Fucetola, PhD, ABPP-CN on 7/26-27/06.
4) Integrative Brain Behavior Evaluation by Rubin C. Gur, PhD dated 4/3/07.
5) Testimony and consultation with V.S. Ramachandran, M.D.
6) CCA medical and mental health records including those of treating psychiatrist Linda McCandless, M.D.
7) Meeting with V.S. Ramachandran, M.D. regarding his findings on May 10, 2007.

Additional background material provided included Ms. Montgomery's prior medical records, educational and employment records, records from prior legal and court proceedings, law enforcement documents generated in investigating the criminal charges. These are listed in an attached Appendix.

**Information from Lisa Montgomery on 4/10/07** –

Mrs. Montgomery was born on 2/27/68. Her father, John Hedberg, was stationed in Vietnam at the time. Mrs. Montgomery had little contact with Mr. Hedberg before her parents separated at age 4. Mr. Hedberg had a daughter by an earlier relationship named Dianna, who was removed by social services when Mrs. Montgomery was still a young child. Mrs. Montgomery then was the oldest. The next sibling was Patty. Their mother, Judy, was still married to John Hedberg when Patty was born. She is 2 ½ years younger than Lisa. Judy subsequently married Jack Kleiner. They had three children. Teddy Kleiner, is six years younger, Jerri Jo is seven years younger, while Tommy is ten years younger than Mrs. Montgomery.

Mrs. Montgomery was born in Ft. Lewis, Washington. After the divorce, her mother moved to Kansas to be near her parents, Nils and Wilma Rignell in Leonardville, Kansas. The family lived in Wamego and then Manhattan. Judy moved in with Jack Kleiner. Lisa thought they were married but later found a marriage license listing the date of the marriage as 1975 when Lisa would have been age 7. Jack Kleiner had five children who lived in Manhattan, Kansas with his ex-wife. Lisa's family lived with Jack's parents in Manhattan. Jack's mother died when Lisa was in kindergarten. Jack's father, Glenn, died later when they lived in Tulsa. Glenn taught her how to play Checkers. At a younger age Lisa knew Jack's children, Penney and Terry. Midway through kindergarten the family moved to Tulsa where Lisa finished kindergarten. Jack worked in auto salvage. They remained in Tulsa through Lisa's fifth grade year. She attended first and second grade at Shoetoe Elementary, third grade at Jackson Elementary and fourth and fifth grade at Pershing Elementary. Lisa described herself as introverted and said she didn't make friends.

The family then decided to move to Oregon. They instead settled in Modesto, California where Lisa attended the first half of sixth grade. Her mother then became homesick. Lisa lived with her maternal aunt and her husband for the rest of the school year and finished sixth grade.

Lisa's mother, Judy, was the sixth of seven children in her family and had five sisters and a younger brother. The eldest, Ann, died several years ago. Ann had no husband and one son named David. The next aunt, Elsie, lives in either Kentucky or Indiana. Lisa had only sporadic contact with her. Lisa's Aunt Ellen died in February 2007. Ellen was not married. Aunt Alice is married to Vic and lives in Topeka. The fifth aunt, Darlene, is married to Marvin and has a daughter named Wendy Treib and a son named Kenny. Lisa's first cousin, Wendy, lives in Fredericksburg, Texas near San Antonio. Lisa's uncle Bobby is younger than her mother Judy. Bobby lives in Riley, Kansas. He is married to Cindy and has two children, Lonnie and Brett.

The family returned to Tulsa where Lisa attended seventh grade at Cleveland Junior High. During this year her mother was hospitalized for a week. When Judy came home she couldn't do much. Judy heard that Jack was having affairs. They lived in a

two bedroom house. Lisa slept in the laundry. Jack began fondling her. Lisa didn't tell anyone. She estimated the fondling occurred about twice a week, and the sexual abuse went on for years.

The Kleiner's bought a place in South Tulsa where they stayed in the summer. They then bought a place in the country near Sperry. Lisa attended the eighth through the eleventh grade in Sperry. She graduated from high school in Cleveland, Oklahoma in 1986. She only attended there one year.

Lisa played the violin in fourth grade. Later she played French horn in the band. She was first chair. Otherwise she was not involved in school activities and primarily babysat her younger siblings.

After the family moved to the farm, Lisa shared a room with Patty and Jeri and the frequency of the fondling decreased. Lisa thought the fondling was wrong. She didn't like Jack and tried to get him to stop. Then Jack built a separate bedroom for her. After this the sexual activity progressed to intercourse. If she didn't agree, Jack would beat her head on the floor. He also threatened to molest Patty if she did not submit. The sexual molestation by Jack continued until just before Lisa turned 16, when Judy caught them. Lisa recalled that Judy had a gun and asked how long it had been going on. Lisa doesn't remember what happened after that. She knew her mother was mad at her because Lisa had messed up her life. Lisa didn't know she had other feelings about this until recently. Lisa was disappointed in her mother's response. She began to cry, and said she was not sure how to feel. Her mother took her a couple of times to a counselor in Tulsa. Jack left for a couple of days, but would stand outside and glare at them. Lisa described they lived in the middle of nowhere. Lisa had one boyfriend from band named Carl, who still writes to her. Lisa also stayed in touch with her friend, Lori, until her death in 2004.

Her mother went to Richard Bowman who was then the Chief of Police to ask him what to do about Lisa. She is not sure if a formal police report was ever made. Jack moved back into the home after a short time. Judy and the children moved out in June. Her mother still left her in charge of the younger kids. They moved from the

farm into Sperry in the middle of her tenth grade year and stayed until the end of her eleventh grade year. They then moved to a place by a lake near Cleveland. After her mother caught Jack, she would take them to a friend in Tulsa and leave them there. Judy would then stay with Richard and pick them up later. This happened several times a month. Lisa had urged her mother a couple of years earlier to go to counseling, but her mother wouldn't go. Lisa believes her mother did what she had to do. There were no charges against Jack for molesting Lisa because Judy needed the child support. Judy worked in the evenings while Lisa took care of the younger children from the time the children came home from school until her mother returned at 11:00 pm. Her mother worked two jobs and was studying for her G.E.D. When Tommy broke his arm, Lisa took care of him. Richard was the mayor at the time. Whatever time Judy had off she spent with Richard Bowman. Lisa wished her mother was home more, and was sad that Tommy barely knew Judy.

Lisa never believed she was pregnant by Jack, or that she delivered his child. Years later her daughter, Kayla, wrote a fictional story, which Lisa's mother Judy misinterpreted as being what Lisa actually believed. Lisa did go for her first gynecological exam after her mother discovered the sexual abuse. She was told by her mother and the doctor that if she was pregnant she would have to have an abortion.

Judy married Richard Bowman in September of 1985. Richard had three children. Carl was 6 ½ years older than Lisa and was almost 25 when they met. Ethel was a year younger then Carl. Michael, Richard's youngest child, was the same age as Lisa's brother, Teddy. Carl moved in with them. Lisa and Carl often spent the weekend alone together and their relationship became sexual.

Lisa moved out of the house when she turned 18 (February 1986). Carl had gone to work at a prison. Richard also worked at the prison. Lisa stayed in school after she moved in with Carl. Richard gave them money for groceries. Lisa graduated in 1986. By August 1986, Lisa discovered she was three months pregnant. She did not like being pregnant, as she could not do things she liked, such as going bike riding. She experienced some morning sickness, but did not see a doctor until November or December 1986.

By the time their first child, Desiree, was born on 1/11/83 they had moved to Hominy, Oklahoma. Mrs. Montgomery recalled she had a good relationship with Carl's mother, Lucy, who gave her bath powder when Desiree was born. Desiree weighed only 4 ½ pounds. Lisa is Rh negative, but did not have a shot of Rogam at the time of Desiree's birth. After the birth Lisa began babysitting two little girls ages 2 and 4 and liked it.

Carl Bowman had a daughter by a prior marriage named Cindy. Carl's ex-wife was Kim. Both died when they were hit by a drunk driver.

Lisa gave birth to their second child, Chelsea 18 moths later on 7/9/88. While pregnant with Chelsea, Lisa was in a motor vehicle accident. She was hospitalized in Fairfax, Oklahoma. Afterward they moved back to Cleveland. Lisa went to Ponca City to stay with her mother. They had disagreements over child care. They were canning and freezing when Judy gave Desiree a hotdog. Lisa felt Judy interfered. They argued at a Mother's Day dinner at church. Lisa told Judy that Desiree was Lisa's daughter, not hers. Lisa and her mother didn't talk for weeks. Lisa pretended there was no difficulty. Judy eventually said they could work it out.

Lisa described the 1988 motor vehicle accident occurred when she was rear ended on the way home. The accident occurred in Fairfax. The other car was going 45 mph. Lisa was not wearing a seatbelt. Desiree's car seat broke and Lisa's head cracked the windshield.

Lisa also said she had been having migraine headaches since age 14. Her mother also has headaches occasionally. At age 14 Lisa took a whole bottle of Tylenol to kill herself. She was upset because Jack and her mom berated her and said she never did anything right. Lisa was in the 8th grade. She did not receive any mental health care. After the overdose her mother kept the Tylenol out of reach and doled out her medicine when she had a headache.

Lisa recalled that Judy began to tell Carl that Lisa was doing things that she was not doing. When Lisa was gone, Judy would tell Carl that Lisa was with another man. Judy would encourage Carl to divorce Lisa and take custody of Desiree. This occurred while Lisa was pregnant with Chelsea. Lisa began cramping and went back to the hospital in Hominy, Oklahoma. She was afraid she would lose the baby, but Chelsea was her easiest delivery. Chelsea was full term and weighed five pounds. As long as they stayed away from Judy, Lisa's relationship with Carl was fine. The family moved to Cleveland and then moved back to Hominy.

Lisa decided to work in Ponca City. Her mother lived in Fairfax and commuted to the same nursing home. Carl continued to work at the Connor Correctional Center, a medium/maximum facility.

Lisa next became pregnant with Carl Jr. (Dob: 10/20/89). Lisa went to the same doctor who delivered Carl Sr. in Bartlesville, Oklahoma. Lisa had a premature labor in August 1989.

Judy and Richard Bowman then moved to San Diego. Richard had retired from the Navy and had lived in San Diego before. Teddy, Jerri, Tommy and Michael went with them. Patty had married after Chelsea was born. Judy and Richard had an argument, and Judy left in August and moved back to Ponca City. Around December 1, 1989 Judy reunited with Richard in San Diego. They learned a new prison was being built there. Carl was a Sergeant at Connor's Correctional Center, but could get housing in California and went to California with Judy. Carl returned around Christmas and took Desiree back with him to California.

An older guy her mother knew sometimes babysat the children. He told Carl that Lisa was having an affair. Lisa described that Carl was gone all the time while she worked nights at a convenience store, paid all the bills, and took care of everything. Lisa stayed at a friend's house named Roberta with C.J. one weekend. She went out with Roberta's brother in law and was romantically involved with him. She has no doubt that this man is the father of her youngest daughter, Kayla.

At the end of February 1990 Carl returned to California and took their two daughters without permission. Carl bought a van. Judy helped and said the girls were related to both her and Richard, implying she wanted to raise them. Lisa wanted the daughters back. She went to California. Carl seemed glad she had come. They decided to return to Bartlesville, Oklahoma in August 1990. Kayla was then born 2 ½ months premature on August 8, 1990. Carl knew Kayla was not his daughter. Kayla had to remain in the hospital for a long time and came home on a monitor. A short time later Carl and Judy "blackmailed" her to have a tubal ligation by threatening to take the other children away if she did not.

They returned to stay in the San Diego area and moved to Harriston Canyon where they lived until 1991. Their home was outside El Cajon. Judy lived next door in the caretaker's house behind them. Carl worked security at Wells Fargo. Chelsea and CJ both had asthma. Judy would just walk into their house all the time unannounced. They disagreed over the temperature of the formula. Lisa was caring for Karen and Jessica, (Patty's daughters) as well as her own children and would go grocery shopping with six kids.

They moved back to Bartlesville again in 1991. Carl went to work in Tulsa as a security guard, while Lisa worked at a nursing home. Lisa cared for the children during the day, while Carl cared for the children at night. The children would go to their grandmother's for a nap until Carl came home from work. Lisa then quit her job, while Carl began working 16 hour days at a zinc refinery. The EPA then shut the factory down. Lisa worried the children had been exposed to lead and would be learning disabled. She home schooled the children who spelled poorly. They moved to a bigger house. Lisa hired babysitters, and began to go out to bars with friends who were a group of mother's who had preschool age children. Desiree was in preschool.

Judy had moved to Carthage, Missouri. Patty had moved to Ohio, but then moved to Leonardville. Richard, Judy and one aunt and uncle lived near Carthage on a dairy farm. Teddy then was put in jail. During the visit Teddy, Jerri and Michael took Judy's ATM card and went to Oklahoma.

At the time, Tommy was 13 years old. Judy again began to tell Carl that Lisa was running around on him. Lisa thought that since she was being accused she might as well do it. She believed her anger over Judy and Carl's accusations adversely affected her judgment. Lisa had an affair with Bret, who she later discovered was married. Carl didn't do anything except play video games when he was home. Her mother continued to instigate trouble between them. Lisa and Carl decided to divorce in 1993. Both of them wanted custody of the children. Carl took all of the furniture except one bed and one dresser and moved out. Lisa decided to take the children and get away for a weekend. Lisa and Carl were to discuss how to care for the children. On the way to the meeting, Lisa had a wreck and hit two cows. Kayla was in a sideways carseat and hit the rear view mirror. Lisa and Kayla were hospitalized in Bartlesville. Carl next filed for custody. Carl then wanted to go to his dad's family reunion. Judy and Richard went to California for a vacation and decided to live there. Carl kept them and took the children to the reunion. Carl and the children began living in Imperial Beach, California with Richard, Judy and Jerri Jo. Lisa went to California to retrieve the children, but Carl and Judy called the police and Lisa returned to Oklahoma, empty handed.

Lisa and Bret drove to where Carl was staying to talk to the police. They eventually talked to Carl, and Bret fixed Carl's car. They found the children at Judy's church. They had a confrontation in the church parking lot. Judy already had CJ and Kayla. Judy and Jerri Jo pulled Desiree and Chelsea out of Lisa's arms, while Tommy held Lisa's arms back. The police were slow to arrive and then didn't interfere. Lisa's friend helped her get a temporary custody order. When she went to get the children they were gone. Carl then returned to Oklahoma. Lisa and Bret also returned to Oklahoma where there was a court hearing. Judy and Carl took the children to the hearing. The judge said the children could spend 12 hours a day with Lisa and 12 hours a day with Carl. At a final hearing in 1993 the judge awarded Lisa custody. After this Lisa didn't talk to Judy for some time.

Lisa, during this time, lived in Bartlesville with Bret. She became friends with Bret's wife. Bret had a son and a daughter. Lisa took care of her children from 7:00 am to 7:00 pm, as well as Bret's daughter, Casey. Lisa then worked nights at a nursing

home. By late 1993 Lisa had bad headaches which caused other wrecks. Bret became more distant and wanted to spend time with his own kids. Lisa moved back in with Carl on 12/1/93 in a low income apartment because Carl couldn't make child support payments. The state said if he did not pay they would give the children to Richard and Judy who could support them. Lisa said she decided to reunite with Carl because she wanted them to have a dad.

Lisa then began attending Junior college and liked it. She took a course in Sociology. She had previously taken some junior college courses at age 17. She hoped to get a degree in nursing.

Carl began to make unfavorable comments about her weight. Lisa thought she weighed more than when she had been pregnant. Lisa began to throw up. She went to a doctor who was a neurologist, who referred her to another doctor. Lisa only went to the neurologist once however and did not see the other doctor. Lisa did not like male doctors. Her first two obstetricians were women, while her last two children were delivered by midwives.

They next moved to Springdale, Arkansas to get away from Judy. Carl's cousins lived there. Carl worked for Cargill. Judy still visited. Lisa and Carl remarried in Arkansas in 1994. Lisa believes she delivered a baby boy there. The baby did not have a name yet. Carl took the baby boy to Judy to show him to her. Judy did not return the baby, but instead took the baby to Deming, New Mexico. Lisa was not furious but was determined to divorce and raise her children on her own. Yet she was over an economic barrel. She believed she would get the baby back eventually. After a year, Judy no longer had the baby when Judy came to Bartlesville in August 1995 on the way to Leonardville to have Tommy, then age 16, live with his grandma there. Lisa believes Judy may have given up the baby for adoption.

Carl then wanted to move to Deming, about 20 miles north of Columbus, New Mexico. They lived with Carl's mom, grandma and sister in Missouri for a year before going to Deming. Carl drove an ice cream truck in Fedoria and Neosho, Missouri, but made only $300/week. Lisa recalled feeling depressed there.

The family moved to Deming in August 1995. Lisa went there before Carl. Carl broke down in a hail storm and Judy had to go get him. They lived with Richard and Judy. Richard worked on houses, while Judy cleaned them. Lisa worked for the newspaper putting ads in the paper. Lisa remained in Deming until July 1998. She and Carl were together the first year. They had only a wood stove for heat.

Then Lisa wanted to go her mom's family reunion in Kansas. Carl said he would leave if Lisa went to the reunion. Her mom, Carl and Jerri came to the reunion near Riley, Kansas but Carl left. After they returned to Deming, Carl moved into the caretaker's house for the Moose Lodge.

Lisa dated several people including the Assistant District attorney and Robert, an attorney who handled her divorce for free. She also saw a physician's assistant, Tim Flint. Lisa does not believe she had any more pregnancies in New Mexico. Meanwhile Carl returned to Oklahoma with Chelsea and C.J. Lisa began drinking a lot and developed a taste for it. She became ill after drinking a bottle of Jack Daniels, and had symptoms of alcohol withdrawal, such as shaking and sweating. She also was in a motor vehicle accident with a pick up in Deming in 1998.

Lisa's mother, Judy, moved to Topeka, Kansas after divorcing Carl's father, Richard Bowman. Judy then married Hector Ochoa. Judy and Hector soon divorced. Judy then married her current husband, Danny Shaughnessy. Lisa recalled Judy had been married once before she married Lisa's father John Hedberg. Her mother then married Jack Kleiner, Richard Bowman and Hector. Danny was Judy's 6th husband.

Lisa took the children to stay with Carl Bowman in Bartlesville, Oklahoma. She then moved to Topeka where she had three maternal aunts, Ann, Ellen and Alice. Lisa stayed with Alice over July 4th, after Danny said she could not stay with them. Lisa then lived for a month with a group of people at Arnie's house. Lisa then talked to Judy's ex-husband Hector, who she had first met at the Moose Lodge in Deming, New Mexico. Hector helped her get a job as a security guard at Wells Fargo. After she got the children from Carl in Bartlesville, Hector let her stay in his extra bedroom. Carl

believed if he didn't respond to the divorce papers it wouldn't go through and he would not have to pay child support. Carl then hired an attorney. Lisa took the papers to Robert, her attorney, in Deming. There was no child support or judgment for a year.

Lisa continued to work at Wells Fargo in Topeka. She then obtained a second job at Essex Wire where she met her current husband, Kevin Montgomery. Lisa then began working at the K-Mart Distribution Center in Lawrence. Kevin had three sons by his ex-wife, Lori named Derrick, Dustin and Dillon. She met Kevin in August 1998 and they married on March 23, 2000.

Lisa left Topeka to go to Oklahoma in October 1998 and again moved in with Carl. Judy was angry that Lisa had lived with Hector, and thought Lisa and Hector had a sexual relationship which Lisa denied. Judy made a complaint to SRS which involved Lisa working and leaving the children alone. Judy also accused Hector of molesting girls, which Lisa again denied. Judy also in 1998 made an allegation that she had a video of Lisa sleeping with a black man. Lisa said Judy based this on the fact she had given a black man a ride early one morning on the way home from work. There was no sexual relationship, however.

Lisa stayed in Bartlesville with Carl for three months. She believed if Kevin cared about her that distance would not be important. She then got her own apartment and worked at Spear Management, a firm that made PVC pipe. Carl was the boss there. Lisa continued to live in Bartlesville from October 1998 through June 1999. Kevin would visit every two weeks. They would take the kids camping. Kevin's visits showed Lisa that he cared about her. Kayla broke her finger at Kevin's parent's house. Lisa took Kayla to a doctor in Topeka. Lisa then returned to Topeka and lived with Hector until December 1999. She obtained some work through the Job Corps. After their marriage she and Kevin lived with his parents, Roger and Joy Montgomery. Judy again called SRS to say they had too many kids - Lisa's four children plus Kevin's three boys. They were poor as Lori took everything in the divorce from Kevin. Judy and Danny married in January 2000, while Lisa and Kevin married in March 2000.

Since her arrest, Kevin now lives with his parents. Judy and Danny bought a farm south of Topeka near Carbondale. She last heard from Judy in January 2007. Judy said she had moved to an undisclosed location because of Lisa.

Lisa and Kevin were married before a judge in Burlington, Kansas. The marriage was "up and down". Kevin was laid off from Excell when they married and is now laid off again. Lisa began working at Greyhound in Topeka, and continued working there until a week before her arrest. She also worked at a truck stop at Beto Junction for over a year. She then worked for a convenience store across from Baby Dolls, south of Topeka in Pauline. She stayed home with the kids during the summer of 2003 (likely 2002.)

This was the second time since her tubal ligation that Lisa believed she was pregnant. She denied that she had ever had a reversal of her tubal ligation, as she testified, as they had no money for that. Lisa knew the surgical reversal was not true, but had a positive home pregnancy test and believed her tubes had reattached. Judy called Lisa a liar when she learned of the pregnancy. Lisa quit working at the end of February or early March 2003. Kevin was laid off work at Ken Build in Osage City and then began working at the Wolf Creek Nuclear Power Plant. Teddy and Bonnie lost custody of their son, Justin. Judy had earlier filed for custody of Hope, their daughter and also filed for custody of Justin. Lisa explained that Bonnie and Teddy had Justin at a hospital in Topeka in July 2002. They stayed with Judy in Topeka. Judy and Bonnie were constantly fighting. Judy then got a Power of Attorney because Teddy and Bonnie had to return to Oklahoma so Bonnie could clear up some legal problem.

Lisa dropped Bonnie off in Wichita. Teddy and Bonnie stayed with Patty. Judy then had Justin. Lisa's sister, Jerri, went to Chicago. Then Patty and Jeremy were arrested. Lisa had a friend at the Coffee County Sheriff's Department who gave her a tip that Teddy and Bonnie were wanted as well. Teddy and Bonnie went on to Oklahoma. Judy did not honor her agreement, so Teddy got Justin back. Lisa believes that Judy then alerted the sheriff that Bonnie had outstanding warrants, and that Teddy was making meth. Teddy and Bonnie were with Patty over the weekend. Lisa worked nights in Topeka. Teddy and Bonnie took Justin to Lisa's house. Lisa

sheltered them because she did not want Judy to take another child and disappear like Judy did with Lisa's baby in 1994. Teddy eventually went to rehab in Kansas City, Kansas.

Lori Dunn, the Sheriff of Osage County, then did a welfare check, as Judy and Patty said Justin had worms and diaper rash. Justin was put in foster care when Teddy went to rehab, and Bonnie stayed with Lisa. Bonnie then returned to stay with Patty and then went to Job Corps in Lyndon. Teddy got out of rehab and went to work at Wal-Mart in Ottawa.

Teddy then had two home visits. He was arrested for operating a meth lab. Both he and Bonnie were put in jail. Lisa quit work in April 2003 as she believed she was 7 to 8 months pregnant and was tired. She had been working at Greyhound and the Conoco Star Convenience Store. A short time later Lisa believed her baby was born dead at home. Lisa suspected the baby was dead, but lied about giving the stillborn baby for research at KSU so others would leave her alone. It was a baby girl she named Kelly. She buried the still born child out back of her house.

The marital relationship was rocky. Kevin was laid off again. The children went to stay with Richard Bowman who had moved to Colorado. Richard had married Eleanor in Deming or Arizona, and now lived near Colorado Springs after living briefly in Tennessee. Lisa had visited Richard in Colorado.

Teddy and Bonnie were arrested in July 2003. Judy sent Lisa and Patty to their trailer to get their things and the family pictures. While they were there Tommy arrived and began tearing the walls apart looking for something. Then Tommy's car would not start. Patty tried to jump start it. Lisa and Tommy then began to argue about what Tommy was doing. Tommy became so enraged he put a knife to Lisa's throat. Tommy worked at Wal-Mart with Ted. Lisa believed Tommy had been dealing meth with Teddy. Tommy also had to go to detox in the past. Lisa and Judy cooperated to get Tommy help. Lisa wanted Tommy to return the things to Judy that he was taking from the trailer. As Patty was starting the car, Tommy tried to choke her and hit her head on the windshield. Tommy then left. His car was still broken.

Judy said if Lisa reported what happened, that Judy might not get custody of Justin because Tommy still lived with her.

Still Lisa and Kevin met with Lori Dunn, the sheriff, and went to the Pomona office to put a warrant on Tommy. Tommy went to court and was sent to anger management. In August 2003 Lisa went to work in Lyndon. Tommy came to the store. Patty lived around the corner. Lisa believes that Patty encouraged Tommy to do this to intimate her. Lisa called the police but they wouldn't take her report.

The next Monday morning Lisa was babysitting her friend Jenny's children. Lisa went to Lyndon and then drove to Ottawa. Tommy began following her. A short time later Lisa found one of her puppies had been crushed. She called the sheriff in Osage and the judge signed a protective order. This made Judy so angry that Judy threatened that Lisa would be next, and that Judy would make sure she lost her children. Lisa then had a protective order filed against Judy and Patty. Judy and Patty even came to one of Desiree's school events and threatened Lisa.

Lisa started working at Wendy's in January 2004, and a short time later began working at Casey's. Someone at Greyhound died that same month. There was a hearing about Justin in the spring of 2004 and Lisa decided to become involved. Tommy was always in jail. Patty and Danny threatened her at the court hearing. She had to be escorted out of town by the police afterwards. The hearing was in Franklin County.

Around this time Lisa again believed she was pregnant. Lisa kept track of her periods and missed two of them. Kevin bought a home pregnancy test which Lisa said was positive.

Lisa went to Alabama to buy a puppy from Patsy Hughes, a good friend she had met on line. Patsy also cared for foster kids. Kayla who was involved in the Rat Terrier business with Lisa and went to stay with Patsy to learn more about breeding. Lisa was working long hours at Wendy's, Greyhound and Casey's.

Lisa did not go see a doctor. She estimated she gained 22 or 23 pounds. Kevin felt the baby kick. She estimated her due date was 12/13/04. She believed it was a girl who she would name Abigail. Lisa researched home birth on the computer when she was not working. She also looked at some C-section sites, but said this was for delivering dogs at home. She cut back on her work hours in November. At Thanksgiving she weighed 135 lbs, and by December 10th her weight had increased to 150 lbs. She decided to have the baby at home, so there would be no complications. She fought with Kevin the whole month. She was afraid Kevin might have hurt the baby. She wanted to leave Kevin. She believed that his parents might help him take the baby from her as they had more money, or might even file for custody of the child.

The kids talked to Richard about visiting for Christmas. Lisa talked to Richard about moving to Colorado. She also talked to Kevin about moving to Kansas City, as Kevin now had a job with Acme Sign in Kansas City. Kevin had seen a promising lot on his way home. She didn't see Kevin much however, because of their work schedules. They had argued about the number books in a room adjoining their bedroom. Lisa boxed up the books to get rid of them and set the boxes on the bed. Kevin became angry about this. In frustration Lisa threw the books down the stairs. The kids picked them up. This occurred after Thanksgiving. After this argument she and Kevin were barely speaking.

Lisa was still troubled that Judy had custody of Justin. Lisa wanted to file for custody. Kevin had agreed but then backed out. Lisa planned to leave Kevin after the baby was born and start again. Lisa recalled that she was depressed; and had trouble sleeping due to nightmares.

Lisa was asked about hearing her mother's voice. She said this had not happened in a long time. She was not sure what she heard was her mother's voice or what she called strong thoughts. She recalled missing her 14 year old daughter Kayla, who was in Alabama. Kayla was scheduled to return on December 20th or 21st.

There also were financial difficulties. Vanessa Bowman, Carl's wife, objected to Carl paying child support and said he couldn't pay even $300/month. The court had

ordered child support increase from $700 to $900/month. Carl and Vanessa had the same attorney, who had been involved in the custody dispute over Justin, file a custody motion against them. Carl filed a motion in October 2004 to reduce child support and quit paying any support as Carl's worker's compensation had been denied.

Lisa had not considered adoption, but did think in the past of adopting another of Teddy's children named Grace.

Lisa became interested in Rat Terriers when Carl sent her two birds and two puppies in lieu of child support. The puppies were two females, one of whom died. She had talked to Ken and Darla Jones about how to do in line breeding. Lisa's dog, Angel and her dad, Lucky, had three pups. Lisa wanted to breed one of her puppies with a male that bred Bobby Jo Stinnett's female. She wanted to give the puppy to Kayla for Christmas. Lisa had argued with another breeder named Jason Dawson and Monie Simms in Kentucky. Lisa had delivered several of Jason's puppies to Kentucky, but Ms. Simms said the puppies were in poor condition and refused to take them. Ms. Simms said she would explain this to Jason, but then told Jason that Lisa had refused to give the puppies to her.

Two events on 12/10/04 caused added stress. A judge sentenced Tommy to six months in jail based in part on his violation of a Protection Order against Lisa. Lisa thought the sentence was excessive. She told Tommy she would go to the judge on his behalf to obtain a reduction of his sentence. Tommy initially was skeptical, but knew Lisa would keep her word. Also on 12/10/04 Carl and Vanessa filed a custody suit against her. Carl particularly wanted custody of C.J. and Chelsea. C.J. wanted to live with Carl, but Lisa was afraid Chelsea would drop out of school if she went to live with Carl. Lisa believed Carl and Vanessa could win custody as they had the same attorney who helped Judy obtain custody of Justin.

Lisa was worried about the birth because she was RH negative. She did not believe she had a Rogam shot with Desiree and believed the baby could have an adverse reaction. Lisa believes that this in fact happened. Lisa delivered a child upstairs in

her home on 12/13/04 after a short labor. There was minimal bleeding. The baby was born dead. The extra towels and the dead baby were buried by Lisa at a location she would not disclose. She thought she would next move to Colorado with Richard and try to make things right with her family.

As Lisa had given conflicting accounts, she was pressed about this. Lisa said she barely remembered labor and actually did not know what happened to the baby. She noted other things in her past she could not remember, which began with the sexual abuse of Jack Kleiner. There were also things she couldn't remember about the 2003 birth.

Lisa had communicated with Bobby Jo Stinnett using the alias of Darlene Fisher. She wanted to see if Bobby Jo would answer questions about her dog the same way. She had dealt with owners who misrepresented their dogs earlier. She did not think Fairfax was too far away. She knew Mrs. Stinnett would recognize her when she arrived as she had spent much time with her at a dog show in Abilene earlier that year.

Lisa believed she was at Mrs. Stinnett's home for 2 ½ to 3 hours that day. She believes that her brother Tommy was with her. She estimated she was at Mrs. Stinnett's house in Skidmore on Thursday 12/16/04 from about noon to 2:30 pm. She knew a witness had seen them leaving about 3:05 pm.

Lisa picked up Tommy at 6:30 am that morning (Thursday, December 16, 2004.) Tommy and his girlfriend, Nina, had a house near Lyndon. She had earlier talked to Tommy one night over the previous weekend and told him she would speak to the Judge about his sentence. She was not scared of him. The Protective Order expired on 12/12/04. He was going with her to go Christmas shopping. She thought she might give one of Mrs. Stinnett's puppies to Chelsea or Kayla as a Christmas present. She later decided not to buy the puppy, as it was not show quality, which was what Kayla wanted.

Lisa denied wanting a baby at that point. She was asked about the belief she had twins. Lisa said Kayla started saying this and Lisa did not contradict her. Lisa, herself, did not believe she had twins, however. Lisa also said she obtained an ultrasound off the internet. Kevin thought Lisa was trying to represent that this ultrasound was a picture of hr baby. Lisa denied ever telling him that. Lisa did admit lying about seeing a doctor during the 2004 pregnancy. She had not seen Kevin much and had forgotten to tell him the pregnancy had ended unsuccessfully. Lisa believed it was time to break up with Kevin. It was not what she wanted, but she had never been on her own and wanted the chance to do this. She wanted to take Chelsea and Kayla with her. She did not believe the court would give custody of Kayla to Carl, as Kayla was not his child.

She had thought of moving to Colorado over the Christmas break from school. Kayla would be coming home shortly before Christmas. She was worried about Judy testifying for Carl. Judy was angry about the Protective Order Lisa had filed against Judy and Patty. Judy's attorney had wanted her to drop it as he was afraid it would adversely affect Judy getting custody of Justin. She was most concerned about Chelsea, who like herself would quit jobs if she became bored. Lisa also denied that she envied her cousin Wendy, who had a tubal ligation that was reversed. Wendy had four children before the tubal ligation and four more children after the ligation was reversed. Lisa believed Wendy had too many children.

Lisa had gone to Skidmore the day before to look at Mrs. Stinnett's Rat Terriers. She had not e-mailed her beforehand and Mrs. Stinnett was not home. Although she had used the name Darlene Fisher, she knew Bobby Jo would recognize her. Bobby Jo, Zeb, Tracy Ramirez, Tracy's boyfriend, Lisa and Kevin had all gone to dinner together at a Mexican Restaurant in Abilene during a dog show there the previous summer. Lisa spent hours with Mrs. Stinnett there discussing dog breeding.

Mrs. Stinnett had used one of Jason's males as the sire of her puppies. Jason's sire was the son of one of Lisa's dogs. Lisa's dog Angel, had eight puppies earlier but with Jason's sire produced only three puppies. Lisa had a red female like Bobby Jo's. Jason wanted Lisa's red female. Tracy Ramirez used Carrie Short's male to breed her

female. Therefore Tracy owed a pup to Carrie. Jason, however, sent Carrie a pup, so Tracy owed Jason one of her litter. Jason wanted to trade his pick of Carrie's litter for Lisa's red female. Lisa was interested as she wanted some new genes, but Kayla threw a fit because she wanted the pick of the litter. Lisa got the pick of the litter of Tracy's pups. Carrie's male had produced a litter before that had pups with a cleft palate. Tracy had one in her litter that also had a cleft palate, so Lisa was not able to breed the pup she obtained from Carrie and she gave it away to a friend. John Chance in Texas was telling Lisa how to in line breeding. Lisa bred one of Tracy's females. Tracy told her Jason was mad because Kayla said Lisa bred pups that had the gene for a cleft palate. Lisa's litter, however, had no cleft palate pups. Mrs. Stinnett's red female was related to Lisa's and the one she gave to Jason. Lisa hoped to give Mrs. Stinnett's red pup as a peace offering to Kayla. Bobby Jo had just qualified to judge another registry (AKC) while Lisa was registered through UKC. Lisa discovered Bobby Jo's red pup was only pet quality, while Kayla wanted a pup that was show quality.

When Lisa arrived, Bobby Jo Stinnett did not know she was coming. Lisa told her about using the name Darlene Fisher and why she had done that. Mrs. Stinnett understood. They spent several hours visiting. Mrs. Stinnett received a telephone call about 2:20 pm or so. Lisa remembered this as she looked at the clock. About this time Lisa and Tommy were outside playing with the pups. Lisa had decided not to take the puppy. She planned to take her dog, Angel, with her to Colorado and believed she would have no difficulty finding a suitable male for breeding there.

Lisa stated she had no thought of harming Bobby Jo Stinnett or taking her baby ahead of time. While there was a rope in the car, Lisa did not remember taking a rope into the house. She does not believe a rope would have fit into her jacket pocket. The knife was found in her trunk. Lisa does not know where the knife came from. She stated one report said the knife had a wooden handle, while another report said the knife used to kill Mrs. Stinnett didn't.

For most of the time they talked in the dining room. At one point Mrs. Stinnett took the puppies out of the kennel so they could see them, and then put them back in the kennel. Tommy mostly listened. At one point Tommy was offered a glass of water, but

wanted a Pepsi. Lisa last remembers that they were headed for the door. Tommy came around the table behind Lisa. Mrs. Stinnett was sitting at the computer.

Lisa does not recall how Mrs. Stinnett was killed. She remembers she had bad headaches all that week. She recalls at one point she and Bobby Jo Stinnett talked about Mrs. Stinnett's pregnancy. Lisa recalled she asked Mrs. Stinnett if she wanted a car seat and baby blankets. Mrs. Stinnett said she would be getting plenty of blankets from the grandma. Lisa remembers little of Mrs. Stinnett's interaction with Tommy. Tommy and Teddy had talked about breeding dogs earlier. Lisa does not recall experiencing any feelings about the fact she was no longer pregnant. Lisa did not believe she was upset about this.

Lisa did have a friend Lori, who died the previous summer in a motorcycle accident with a guy outside of Houston. They were going 70 to 80 miles per hour. Lisa had known Lori since eighth grade. Lisa had just received an e-mail from her before Lori's death. Lori had been buried in McAlister, Oklahoma with her family. Lisa became tearful about this and admitted Lori's death had bothered her a lot. She had gone to see Lori, who was in the ICU on life support. Lori's heart rate had gone up when Lisa talked to her, and the nurse believed Lori could hear her. Then Lori's blood pressure dropped when they tried to insert a feeding tube and Lori died.

Returning to Mrs. Stinnett's death, Lisa has a memory of seeing Mrs. Stinnett laying there and trying to wake her up. The baby was on the other side of Mrs. Stinnett's body. She thought the baby was dead, but then saw the baby's hand move. She stepped across and picked up the baby, but not right away. She grabbed some towels and shook the baby. She couldn't get the rope off Mrs. Stinnett's neck. Lisa was on her knees but couldn't get the knot loose. Lisa was holding the baby. Lisa recalled that she pulled the umbilical cord when she picked up the baby. She saw a knife on the floor and cut the cord. She had a bad headache. Lisa thought of calling 911 on Desiree's cell phone but the phone said there was no service. She did not stop elsewhere to obtain assistance for Mrs. Stinnett. Tommy was there and said if they contacted someone it would look like Lisa had done that.

Lisa recalled Tommy was driving and got lost. Lisa was having a hard time breathing. Lisa couldn't drive because her head hurt. She took an Excedrin. After Tommy became lost, Lisa took over the driving. The sun was going down. She went to a convenience store near 6th and McVicar in Topeka. Tommy had friends who lived nearby including another girlfriend. Tommy told Lisa he loved her and to go ahead and tell that he was there, he didn't care. She told Tommy if anything happened she would take the blame.

Lisa knew there was a birthing center near St. Francis Hospital. Kevin had taken them to St. Francis earlier when Desireee and Lisa hit her head while jumping on a trampoline. She called Kevin and told him she had given birth to the baby. Lisa said she thought she would let things flow. She didn't know what to do. She stated she didn't think far ahead. She represented that the baby was hers until later she confessed to the police.

When asked why she confessed, Lisa said she was tired and had been sitting there for what seemed like hours. The police said it would go easier for her and that they knew she did this. Lisa also felt guilty because if she had not gone to Mrs. Stinnett's house, this would not have happened. Lisa said she cried the whole time, had a headache and couldn't think. They did hand her a paper with the Miranda Rights. She did not think she could afford an attorney, and believed that an appointed attorney would not represent her well because of her prior court experiences with Carl over child support. She stated she did not trust appointed attorneys. Lisa still does not believe she could have done this as it is "not me" to do something this violent. She does not believe she had the strength in her hands to strangle Bobby Jo Stinnett as she has had carpel tunnel syndrome in her wrists.

Lisa's friend, Jenny Hayes, called her in Topeka. Lisa had dropped Tommy off at a gas station. She changed clothes. She stated she always carried spare clothes in the car. Her head hurt so bad that she couldn't drive home, so Kevin came to get her.

Lisa stated by that point she wanted whatever Kevin wanted. She recalled that Kevin seemed so happy. She never had been good at making people happy. She decided to

go along with it. She didn't know what she would do with the baby, but knew she could leave later and leave the baby with Kevin.

Since being in CCA, Mrs. Montgomery had been seen by Dr. McCandless who has treated her for Bipolar Disorder. Dr. McCandless prescribed Depakote, a mood stabilizer because she was crying all the time. Recently Dr. McCandless raised the dose of Wellbutrin (Bupropion) an antidepressant to 225 mg per day. Mrs. Montgomery believed she also took Elavil (another antidepressant) to sleep, as well as Zantac and an analgesic.

In addition to depression and suicidal thoughts, Mrs. Montgomery reported periods when she has racing thoughts, talked fast and had increased activity, such as putting things away, exercising and cleaning. She has spent money unwisely and been sexually active unwisely during these periods as well.

**Discussion of Information from Other Sources, Treaters and Evaluators** -

Dr. McCandless, Mrs. Montgomery's treating psychiatrist at CCA, has diagnosed her with a Bipolar Disorder and has been treating her with medications appropriate for that condition.

Background interviews were significant for a family history of mental illness. Ms. Montgomery's childhood was characterized by frequent school transitions and family moves. She was introverted and made few friends. Her biological father was largely absent. Both her mother and stepfather were abusive. With her mother the abuse was primarily emotional and sometimes physical. With her stepfather there was violence and intimidation, which supported years of sexual abuse progressing from fondling to intercourse during her early adolescence. When the sexual abuse was discovered by Judy, the family was disrupted and suffered financial hardship. Ms. Montgomery's mother, Judy, blamed Lisa for the abuse despite her young age. Her mother proceeded to have a relationship with the sheriff, who she later married. Ms. Montgomery received neither legal nor ongoing mental health assistance. No mental

health care was obtained even when Lisa became suicidal and overdosed in junior high school.

Documentation supports Ms. Montgomery's turbulent marital relationship with her stepbrother, Carl. Ms. Montgomery went from the role of a parental child caring for her younger siblings to caring for four children born in a little over four years. This was followed by a bilateral tubal ligation. Mrs. Montgomery did not want sterilization, which she felt had been forced upon her by her mother and husband who conspired against her.

During Ms. Montgomery's adulthood there were ongoing feuds and battles with her mother and husband. The battleground seemed to Mrs. Shaughnessey's grandchildren. Custody battles were waged over not only Lisa's children, but her other siblings as well. Between moves, job changes, marital estrangements, interfamilial conflicts, shifting alliances and court hearings the situation was one of constant turmoil.

Physically, Ms. Montgomery suffered a number of head traumas and had recurring headaches. She also had carpel tunnel syndrome affecting her hands. Medical and mental health treatment was minimal to non-existent except for emergency care.

To further add to the difficulties, Ms. Montgomery came to believe she was pregnant. These pregnancies occurred in 1994, 2002-2003, and 2004. Ms. Montgomery believed her mother had kidnapped the first of three children with the aide of her husband and placed the child for adoption never to be seen again. Dr. Ramachandran who examined Mrs. Montgomery surrounding these later pregnancies, opined Mrs. Montgomery suffered from pseudocyesis or false pregnancies in which there are some physical symptoms of pregnancy and a strong belief by the individual that they are pregnant when there is no fetus. Still the individual believes they are pregnant with delusional like intensity.

In 2004 Mrs. Montgomery faced a series of stressors in addition to her belief she was again pregnant. That summer she experienced the death of a long time close friend

her age. Mrs. Montgomery worked long hours for three different jobs simultaneously and also engaged in rearing and breeding Rat Terriers. There also was conflict in the dog breeding business. Her relationship with her husband increasingly became strained, both by financial difficulties and by arguments about her pregnancy. Conflict within the family resulted in Lisa filing first a Protection Order and then a complaint against her brother Tommy. In addition there were Protection Orders against her mother, Judy and younger sister Patty, as a result of family bitterness surrounding the custody of Teddy's son, Justin. Her husband Kevin began working some distance away in the Kansas City area, while her daughter, Kayla, went to stay with a friend in Alabama.

As Ms. Montgomery became more overwhelmed there were few sources of support and she became more isolated. In October 2004 there were further financial difficulties when Carl stopped child support. On 12/10/04 Carl and his new wife, Vanessa, filed for custody. The same day, judge sentenced her younger brother, Tommy, to jail based in part on Lisa's complaint.

Dating back to her adolescent sexual abuse, Lisa had learned to cope by using denial, fantasy, compartmentalization, and at times of extreme trauma, some dissociative amnesia as a way to protect her from catastrophic stress. Examples include some reported memory loss around her stepfather's violent and sexual behavior toward her, and some memory loss around the false pregnancy/deliveries in 2003 and on 12/13/2004. Lisa at times would confabulate or make up details to cover these gaps. At other times she would lie to establish her credibility in the face of family criticism. These stories also enabled her to appear more normal in her own eyes and cover her frightening sense of inner confusion.

Examples of this phenomena would be her testifying she had a surgical reversal of her tubal ligation or presenting false papers to say she had donated her 2003 stillborn child to medical science. Still at another level she believed at least biologically there had been a reversal of her tubal ligation that enabled her to be pregnant. This was supported by some physical signs such as a cessation of periods, weight gain, feeling the baby kick and some breast enlargement as well as pica.

Mrs. Montgomery now denies she wanted the 2004 pregnancy or the baby. She states she planned to leave her husband and was planning to try to establish her own identity in a new location, Colorado. It is difficult to know now how much this was her thinking at the time, versus a subsequent reconstruction in her thinking born out of her depression in the wake of the events of 12/16/04. Some details which she now reports such as the presence of her brother, Tommy, will have to be compared to other evidence and weighed by the trier of fact.

When examined by me in March 2005, Mrs. Montgomery was in the midst of a major depressive episode with psychotic features. Mrs. Montgomery is uncertain whether there were strong thoughts or the actual voice of her mother that she heard around the time of the offense.

Mrs. Montgomery now denies any preplanning to kill Mrs. Stinnett and take her baby. Once again this will need to be weighed against the evidence and decided by the trier of fact. Mrs. Montgomery does acknowledge that after Mrs. Stinnett's death, she pretended the baby was hers, perhaps out of a wish this was indeed the case. Although she does not remember killing Mrs. Stinnett, she does feel responsible now for her death because she initiated their contact that day. Her lack of memory serves to distance her in her own mind from the death of Mrs. Stinnett, as she cannot have done such an act.

A neuropsychological evaluation by Robert Fucetola, PhD at Washington University in St. Louis in July 2006 noted motor vehicle accidents with head trauma in 1993, twice in 1998, in January and September, and a trampoline accident in June 1999. She also reported in this evaluation being struck in the head numerous times by her stepfather and having severe headaches since adolescence. Dr. Fucetola found ongoing symptoms of depression and anxiety. Intellectual testing revealed a significant difference between verbal and non-verbal ability, with her non-verbal ability being much better than her verbal intelligence. Other measures of cognitive ability were in the normal range, and there was no evidence of any deliberate production of cognitive impairment.

This testing was followed by brain imaging studies by Ruben C. Gur, Phd who again reviewed her medical history/records surrounding her 1998-1999 head injuries. Dr. Gur found a structural imaging (MRI) did reveal relative weakness in right medial structures, which are related to impulse control and the formation of personal integration and a sense of self. These abnormalities could be etiologically related to traumatic head injury. There also was a pronounced bilateral increase in ventricular volume, with a reduced brain volume in the right parietal and medial areas that could manifest in difficulty with emotional processing, emotional flattening, and neglecting to attend to some events.

The functional study (PET) showed increased limbic activity relative to frontal lobe activity, which included the entire limbic system. Other areas of increased activation included the medial dorsal aspect of the frontal lobe, some occipital areas and the thalamus, brain stem and cerebellum. The strongest elevations were in right limbic regions which are often involved with emotional processing and memory formation. Dr. Gur concludes that the increased activity, particularly in the right hippocampus and surrounding areas, as well as the amygdala created a vulnerability to impulsive behavior. Dr. Gur also noted that the increased hypothalamic activation could be consistent with hormonal changes sometimes noted in pseudocyesis. Dr. Gur postulated that these brain deficits could be caused by a number of factor including head injuries, a neurodevelopment disorder, poor prenatal conditions and an exacerbation by PTSD.

Ruth Boutin Kuncel, PhD administered an extensive body of psychological instruments, and performed an extensive historical review, as well as a review of the earlier work and testing of Marilyn Hutchinson, Phd. Dr. Kuncel found an extensive family history around the loss of children, including Judy's belief that Lisa's stillborn older brother Randy had been switched with someone else's dead baby at birth. Lisa's father also kidnapped her and her sister Patty for two weeks. Judy once took Lisa's children to Texas, and at various times tried to obtain custody of Lisa's, Patty's and Teddy's children.

The psychological instruments employed by Dr. Kuncel did not suggest that Mrs. Montgomery was falsely producing symptoms or malingering. The psychological instrument also did not suggest that Mrs. Montgomery was characteristically prone to violence. Dr. Kuncel did emphasize the impact of sexual abuse, post traumatic stress disorder, chronic depression and Mrs. Montgomery's fragile reality testing in deciphering what was real from not real around issues of emotional significance. Dr. Kuncel's diagnosis included Post-traumatic Stress Disorder, Major Depressive Disorder, recurrent, a Generalized Anxiety Disorder and a Dependent Personality Disorder with Borderline Features.

**Behavioral Observations** -

Mrs. Montgomery was cooperative in responding to questions. She tended to do better when recalling specific events. Some structure was utilized to keep her thinking from becoming too tangential.

Mrs. Montgomery was much less guarded and suspicious then when seen in March 2005. Hallucinations were no longer present, and she generally exhibited better emotional control. Her suicide risk seemed less and she had formed a therapeutic alliance with her treater, Dr. McCandless. This was evident in our second meeting when we met in Dr. McCandless's office. Lisa noticed the doctor was currently on vacation and made reference to the emotional issues she had discussed with Dr. McCandless in that office.

For most events Mrs. Montgomery's affect was bland. She did show more emotional distress and anxiety when discussing her confusion surrounding the birth of a baby on 12/13/04 and the death of Mrs. Stinnett on 12/16/04. For both events, as well as several other significant events on her part, Mrs. Montgomery reported a lack of specific recall. The association with traumatic incidents suggest some emotionally based involuntary forgetting, often seen in those exposed to trauma to prevent decompensation.

Mrs. Montgomery also became tearful when recalling the death of her friend, but did not exhibit memory loss when processing this event. Another issue prompting emotional distress was her adolescent sexual abuse by her stepfather and her mother's reaction to it by blaming Lisa.

Mrs. Montgomery became quite emotional when discussing her agreement with her attorneys to have medical tests that would definitively prove whether she could ever have been pregnant after her 1990 tubal ligation. She became overwhelmed when thinking of the prospect that her pregnancies could have been false, and stated if this was true she would not know what to believe about any other events in her life. What emerged is that Mrs. Montgomery had little grasp of how to check out her perceptions with external events. Instead her perceptions and beliefs are determined more by internal emotional status.

**DIAGNOSIS:**

It should be noted that DSM IV TR diagnosis are not meant for the legal arena. Diagnosis are more of a treatment tool and are not equivalent to legal criteria. With this provision in mind the following are given as a diagnostic approximation of Ms. Montgomery's functioning. Diagnoses are hypotheses and subject to change with new information, including the individual's response to treatment interventions over time.

**CLINICAL CONDITIONS: (Axis I)**

| | |
|---|---|
| 309.81 | Post-traumatic Stress Disorder, Chronic, beginning with prolonged sexual abuse and physical abuse in adolescence by her stepfather. |
| 296.33 | Major Depressive Disorder, Recurrent, severe without psychotic features without full interepisode recovery. Depression has at times included psychotic features such as hallucinations. |

Rule out 296.7 Bipolar I Disorder, Most recent episode unspecified.

300.82 Somatoform Disorder, NOS-Pseudocyesis

**Underlying Conditions: (Axis II)**

301.9 Personality Disorder, NOS with borderline and dependent features.

**OPINION AND DISCUSSION:**

Given the amount of turmoil and conflict in Mrs. Montgomery's family on an ongoing basis, including Lisa's preoccupation with a highly conflicted relationship with her mother, Mrs. Montgomery's attraction to being pregnant and small children was likely a retreat into an area with little conflict for her, and an area that helped her establish her own identity.

The events leading up to 12/16/04 indicate Mrs. Montgomery was experiencing increasing stress from all sides, leading to a sense of being overwhelmed and feeling out of control. To some extent she tried to compartmentalize her existence preferring to block out or avoid unpleasant realties. Another method to reduce stress was likely escape either into the rebirth of a new child, or a new relatively peaceful existence in Colorado. In the week before 12/16/04, Mrs. Montgomery was facing marital disruption, economic problems, family conflict over the sentence of her brother, and renewed custody litigation with her ex-husband and his wife. Mrs. Montgomery saw herself a being attacked from all sides, even by her husband and in-laws, who she feared might try to take her baby. Finally, at some level Mrs. Montgomery was faced by the reality that there was no baby, this prompting a challenge to her perception of her entire reality.

With the passage of time since 12/16/04 and the plasticity of Mrs. Montgomery's ability to formulate her own reality, her precise thinking at the time may never be known completely. Areas of dispute include whether there was planning, the presence

of her brother, and the manner in which Mrs. Stinnett's death and the taking of her baby occurred. What is known is that Mrs. Montgomery had a tenuous hold on reality that was likely challenged severely in the presence of a young woman with a supportive family about to experience the birth of her first child.

It is my opinion that in light of Mrs. Montgomery's psychological fragility from multiple causes including some damage to brain structures responsible for controlling impulses and integrating events, that she decompensated and as a result of a mental disease or defect to the point that she was substantially unable to appreciate the full nature, quality, or wrongfulness of her acts at the time of Mrs. Stinnett's death and the abduction of her child, Victoria Jo Stinnett.

It is my further opinion that Mrs. Montgomery's reported pregnancies were not intentionally produced to deceive others, but were the result of her Somatoform Disorder, Pseudocyesis. Pseudocyesis like some other mental disorders, including Anorexia Nervosa and Conversion Disorders, result in a distortion of ones belief about their own body that are resistant to external realities.

Finally, it is my opinion that the killing of Mrs. Stinnett and the taking of her child by caesarian section were committed by Mrs. Montgomery at a time of severe mental or emotional disturbance.

William S. Logan, M.D.

William S. Logan, MD
Diplomate, American Board of Psychiatry and Neurology 1982
Diplomate, American Board of Forensic Psychiatry 1987
Subspecialty in Forensic Psychiatry by the
American Board of Psychiatry and Neurology 1994 and 2003

Date Signed: 5/15/07

WSL/sg