UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| LISA MARIE MONTGOMERY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-00020-JPH-DLP |
| | ) | |
| WARDEN OF USP TERRE HAUTE, | ) | |
| IN, *et al.* | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**RESPONSE IN OPPOSITION TO
PETITION FOR HABEAS CORPUS AND MOTION FOR STAY**

Four days before her scheduled execution, Petitioner Lisa Montgomery filed a 90-page petition for habeas corpus in this Court challenging for the first time her competency to be executed. Montgomery unreasonably delayed in filing her petition and cannot make a substantial threshold showing of incompetency. This Court should deny her petition and motion for stay.

**INTRODUCTION**

In 2008, the United States District Court for the Western District of Missouri sentenced Lisa Montgomery to death for the crime of kidnapping resulting in death. Montgomery strangled Bobbie Jo Stinnett, cut Stinnett's eight-month-old baby out of her womb with a kitchen knife, and attempted to claim the baby as her own. Montgomery exhausted her appellate and post-conviction rights last May.

On October 16, 2020, the Director of the Federal Bureau of Prisons scheduled Montgomery's execution for December 8. Montgomery, aided by well over a dozen lawyers, commenced a flurry of litigation beginning in late October. She experienced some initial success. On November 19, the District of Columbia enjoined the government from executing Montgomery

before December 31. When the Director of the BOP designated January 12 as her new execution date, Montgomery sued over that date and succeeded in persuading the same district court to vacate it.

But on January 1, the D.C. Circuit summarily reversed that vacatur of the new execution date, and the en banc court subsequently denied rehearing. On January 8, the district court denied Montgomery's claim that her new execution date violates the Federal Death Penalty Act. While Montgomery continues to pursue appeals and stays of execution in the D.C. Circuit and the Supreme Court, her prospects of avoiding execution through those avenues have dimmed.

From the outset of her execution-related litigation, Montgomery forecasted her intent to assert a claim under *Ford v. Wainwright*, 477 U.S. 399 (1986), that she is presently incompetent to be executed. She stated in a filing on October 28 that "[w]hether Mrs. Montgomery is psychiatrically competent to be executed is not at issue in this suit, but will be addressed in an appropriate forum." But despite knowing since October 16 that her execution was imminent, Montgomery refrained for months from filing a *Ford* claim.

Until now. Around 7:00 pm on Friday, 84 days after receiving notice of her initial execution date and four days before her scheduled execution, Montgomery filed her 90-page petition asserting that she is incompetent to be executed. On Saturday afternoon, she filed a "corrected" version of the petition, including several appendices which had been omitted from the initial petition, and a motion to stay her execution.

Montgomery's petition and motion to stay should be denied on either or both of two independent grounds.

*First*, Montgomery unreasonably delayed her request for relief. Montgomery's *Ford* claim has been ripe at least since the date of her execution was set in October, nearly three months ago.

2

She suggests no legitimate reason to excuse her delay in asserting it. Her petition relies almost entirely on evidence offered during her trial and post-conviction litigation, which has been available for years. She stated on October 28 her intent to claim incompetency to be executed.

The only plausible explanation for the timing of Montgomery's petition is that she is trying to obtain the relief she seeks, delay of her January 12 execution, by denying this Court adequate time to evaluate the merits of her claims. In other words, she seeks to impose upon this Court, and all superior courts, "'hydraulic pressure'" to grant a stay until the merits of her claim can be fully evaluated. *See Evans v. Bennett*, 440 U.S. 1305, 1307 (1979) (Rehnquist, J., in chambers) ("To use the technique of a last-minute filing as a sort of insurance to get at least a temporary stay when an adequate application might have been presented earlier is, in my opinion, a tactic unworthy of our profession."). Montgomery's unreasonable delay is, by itself, a sufficient and necessary reason to deny relief. *See Bedford v. Bobby*, 645 F.3d 372, 377 (6th Cir. 2011) (vacating the district court's stay when the inmate first raised his *Ford* claim eight days before his execution); *see generally Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 & n.5 (2019).

*Second*, Montgomery has failed to make the constitutionally required substantial threshold showing of incompetency. A prisoner competent to be tried is presumed competent to be executed and must make a substantial threshold showing to the contrary to be entitled to a hearing. Montgomery's proffered evidence falls far short. Montgomery points to prior diagnoses of mental illness. But those past diagnoses have little bearing on Montgomery's current mental state, and in any event the question is not whether she is mentally ill but rather whether, as a result of mental illness, she is incapable of rationally understanding the reason for execution. In addition, Montgomery relies upon the opinions of two purported experts, both of whom opine in conclusory fashion that she is incompetent. Neither of these "experts" have communicated or interacted with

Montgomery since 2016. Their opinions of Montgomery's current mental state derive primarily from things Montgomery's lawyers claim Montgomery has said to them. This Court should reject opinions predicated on such a basis, particularly because Montgomery has a history of deception, and her lawyers have been admonished by another federal judge for unprofessional conduct while representing Montgomery in post-conviction proceedings. Montgomery's proffered opinions are also unpersuasive because they do not address the relevant question—whether mental health problems prevent Montgomery from having a rational understanding of the government's reasons for resorting to capital punishment—and they are directly contradicted by evidence of Montgomery's current mental state as reflected in transcripts of her recent phone calls and current mental health records.

Montgomery's due process claim is equally meritless. A prisoner is not entitled to a hearing of any kind on whether she is competent to be executed unless she makes "a substantial threshold showing" of incompetency. *Panetti, v. Quarterman*, 551 U.S. 930, 949 (2007) ("Once a prisoner seeking a stay of execution has made a substantial threshold showing of insanity, the protection afforded by procedural due process includes a fair hearing in accord with fundamental fairness.") (internal quotation marks omitted). Montgomery has made no such showing here. And the government has not prevented Montgomery from seeking to acquire evidence about her mental health. BOP has been at all times willing to afford Montgomery's experts access to her, either in-person or through videoconferencing. Montgomery's attorneys have simply never asked for such access. The fact that two particular individuals have been unwilling to travel to meet with Montgomery due to COVID does not preclude another competent expert from doing so. Any suggestion that Montgomery believes an in-person evaluation is necessary to evaluate competency

is belied by her own "experts," who purport to be able to opine on her competency based on hearsay from her attorneys.

At bottom, if there were in fact any legitimate reason to believe Montgomery is incompetent, she would have asserted her claims expeditiously and with sufficient time to prove their merit. She did not, and her delay serves both as a reason to deny relief and proof that her claims lack merit.

This Court should deny Montgomery's petition and motion to stay.

## BACKGROUND

A few days before Christmas in 2004, Montgomery attacked Bobbie Jo Stinnett, cut her premature baby from her womb with a kitchen knife, and strangled her to death. *United States v. Montgomery*, 635 F.3d 1074, 1079-80 (8th Cir. 2011). Montgomery then placed the baby in a car seat she had hidden in her trunk, lied to her husband that she had given birth while shopping, and pretended the baby was her own. *Id.* at 1080.

Montgomery admitted her crime, was convicted of kidnapping resulting in death, and was sentenced to death in the Western District of Missouri. *Id.* at 1080, 1085. She exhausted her appellate and post-conviction rights on May 26, 2020. *See Montgomery v. United States*, 565 U.S. 1263 (2012); *Montgomery v. United States*, 140 S. Ct. 2820 (2020).

On October 16, 2020, the Attorney General announced that BOP had scheduled Montgomery's execution to take place on December 8, 2020. Execution Notice, *United States v. Montgomery*, 05-cr-6002 (W.D. Mo. Oct. 16, 2020), Dkt. 444. At the time of her designation and through the time that she filed her petition, Montgomery was confined at FMC Carswell, in Fort Worth, Texas. *Montgomery v. Barr*, No. 4:20-CV-01281-P, 2020 WL 7353711, at *1 (N.D. Tex.

Dec. 15, 2020). BOP has elsewhere disclosed that Montgomery would be transferred to Terre

Haute, Indiana, one or two days before her execution (*i.e.*, on January 10 or 11). *Id.* at *5.[1]

On October 28, 2020, Montgomery suggested to another court that she intended to

challenge her competency to be executed.

> Whether Mrs. Montgomery is psychiatrically competent to be executed is not at
> issue in this suit, but will be addressed in an appropriate forum pursuant to *Madison
> v. Alabama*, 139 S.Ct. 718 (2019).

Complaint, *In re Fed. Bureau of Prisons Execution Protocol Litig.* ("*Protocol Cases*"), 1:19-mc-

145 (D.D.C. Oct. 28, 2020), Dkt. 303-1.

On November 13, 2020, the United States Attorney for the Western District of Missouri,

wrote Montgomery's current counsel:

> I write regarding your client, Lisa Montgomery, whose execution is scheduled for
> December 8, 2020. On October 28, 2020, you filed a proposed complaint in the
> United States District Court for District of Columbia stating that, "Whether Mrs.
> Montgomery is psychiatrically competent to be executed is not at issue in this suit,
> but will be addressed in an appropriate forum pursuant to *Madison v. Alabama*, 139
> S.Ct. 718 (2019)." As we are currently fewer than four weeks from her execution
> date, could you please advise whether a suit raising such a claim will be filed, and
> if so, in which judicial district the suit will be filed? My office will assist with the
> Government's [response] to such a claim, and this information will greatly aid with
> ensuring a prompt and orderly adjudication.

[Dkt. 13-7 at 2.] Montgomery's counsel did not respond.

Montgomery subsequently filed two different lawsuits in the District of Columbia. One

argued for a preliminary injunction so that her counsel, who were suffering from COVID, could

have additional time to prepare a clemency petition. The district court granted her request,

enjoining her execution until December 31, 2020. *Montgomery v. Barr*, 20-CV-3261, 2020 WL

6799140, at *11 (D.D.C. Nov. 19, 2020). On November 23, the Director designated January 12,

---

[1] For security reasons, BOP has not publicly given a more specific description of the time
of the planned transfer.

2021, as Montgomery's new execution date. Execution Notice, *Montgomery*, 5:05-cr-6002 (W.D. Mo. Nov. 23, 2020), Dkt. 445.

Montgomery has used the time since the scheduling of her execution to raise various regulatory and constitutional claims about the scheduling of her execution and her planned transfer from FMC Carswell, in Texas, to FCC Terre Haute, in the Southern District of Indiana. *See Montgomery v. Barr*, No. 4:20-cv-1281, 2020 WL 7353711 (N.D. Tex. Dec. 15, 2020) (dismissing under 28 U.S.C. § 1915A Montgomery's claim seeking to bar her transfer from FMC Carswell to FCC Terre Haute); *Montgomery v. Rosen*, 20-cv-3261, 2020 WL 7695994 (D.D.C. Dec. 24, 2020) (granting Montgomery motion for partial summary judgment on APA regulatory claim), *summarily reversed*, 2021 WL 22316 (D.C. Cir. Jan 1, 2021), *reh'g & reh'g en banc denied*, 20-5379 (D.C. Cir. Jan. 5, 2020); *Montgomery v. Rosen*, 20-cv-3261 (D.D.C. Jan. 8, 2021), Dkt. 61.

On January 7, 2021, Montgomery's counsel wrote government officials to request a delay of Montgomery's execution because they "have a legal and ethical obligation to evaluate Mrs. Montgomery's current mental state to determine the existence of any potential Eighth Amendment claims," that they claim they cannot discharge during the pandemic. [Dkt. 13-10 at 2.] The officials responded:

> Thank you for your letter. Ms. Montgomery's execution date remains as scheduled. We informed you almost two months ago when you first requested a delay of Ms. Montgomery's execution date that the Bureau of Prisons would facilitate remote communication to assist counsel and others (such as medical experts) with whatever access you desire. However, you have not made any requests for such access during this time. We will continue to accommodate requests moving forward.

[Dkt. 13-11 at 2.]

On January 8, 2021, at some time around 7:00 pm, Montgomery filed the present petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.

**ARGUMENT**

This Court should deny Montgomery's motion to stay and her petition. It should deny her motion to stay because she has unreasonably delayed in bringing a claim that could have been filed earlier and because the equities otherwise favor executing her lawful sentence. She has also failed to show a substantial likelihood of success on the claim that she has made a substantial threshold showing of incompetency, and the Court should deny her motion to stay and deny her petition on that ground. Because the stay inquiry subsumes an inquiry into the merits, Respondents organize their response around those factors.

"[A] stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue influence from the federal courts. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). In considering a request for stay of execution, the Seventh Circuit has instructed courts to consider "two critical factors": "(1) whether the inmate has delayed unnecessarily in bringing the claim; and (2) whether the inmate shows a significant probability of success on the merits." *Lambert v. Bass*, 498 F.3d 446, 451 (7th Cir. 2007) (per curiam).

## I.   Montgomery Unreasonably Delayed in Filing Her Petition

This Court should deny Montgomery's motion to stay her execution because she unreasonably delayed her request for relief. Petitioner's criminal judgment has been final since 2012. *United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011), *cert. denied*, 565 U.S. 1263 (2012). She was first notified that she had an impending execution date nearly three months ago, on October 16, 2020 (giving execution date of December 8, 2020). Execution Notice, *United States v. Montgomery*, 5:05-cr-6002 (W.D. Mo. Oct. 16, 2020), Dkt. 444. And the current execution date of January 12, 2021, was established on November 23, 2020, after the first date was delayed to permit Montgomery's counsel additional time to file a clemency application on her behalf.

Execution Notice, *Montgomery*, 5:05-cr-6002 (W.D. Mo. Nov. 23, 2020), Dkt. 445. Yet Montgomery waited until after 7:00 p.m. on the Friday night before her Tuesday execution to file her ninety-page habeas petition and until 3:40 p.m. on Saturday to move for a stay. By refusing to bring her claim earlier, Montgomery forces this Court to decide her petition based on her unverified assertions and without the benefit of time for factual development. This is a dilatory action designed solely to delay a lawful execution*, see Hill*, 547 U.S. at 584-85; *Bucklew*, 139 S. Ct. at 1134, that this Court should reject.

A court must apply "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 547 U.S. at 584 (quoting *Nelson v. Campbell*, 541 U.S. 637, 650 (2004). The public has a "powerful and legitimate interest in punishing the guilty," *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (citation omitted), and "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence," *Bucklew*, 139 S. Ct. at 1133 (quotation marks omitted). "Only with an assurance of real finality can the [government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon*, 523 U.S. at 556. Federal courts thus "can and should" reject "dilatory or speculative suits," *see Hill*, 547 U.S. at 585, and should ensure that "[l]ast-minute stays should be the extreme exception, not the norm," *Bucklew v*, 139 S. Ct. at 1134. "[T]he last-minute nature of an application that could have been brought earlier, or an applicant's attempt at manipulation, may be grounds for denial of a stay." *Id.* at 1134 (quotation omitted).

The court's obligation to reject dilatory claims applies with equal force to those raising questions of competency: "[L]ast-minute filings that are frivolous and designed to delay

executions can be dismissed in the regular course." *Panetti*, 551 U.S. at 946. Thus, in *Dunn v. Ray*, 139 S. Ct. 661 (2019), the Supreme Court vacated a stay entered by the Eleventh Circuit because the death-row inmate waited until ten days before his execution date to challenge a restriction on having a spiritual advisor in the execution chamber itself, even though the date of the execution had been set nearly three months earlier. *See Bucklew*, 139 S. Ct. at 1134 n.5 (explaining that *Dunn* "implicated the strong equitable presumption that no stay should be granted where a claim could have been brought as such a time as to allow consideration of the merits without requiring entry of a stay" (citation and quotation marks omitted)). And specifically with respect to *Ford* claims, a court of appeals vacated a district court's stay when the inmate first raised his *Ford* claim eight days in advance of his execution—twice as much notice as Montgomery has given this Court. *See Bedford v. Bobby*, 645 F.3d 372, 376-77 (6th Cir. 2011). The case of Wesley Purkey is instructive: Purkey first filed his *Ford* claim in the District of Columbia, where the court granted his motion for a preliminary injunction on the day scheduled for execution date only to have that injunction vacated early the next morning by the Supreme Court. *Purkey v. Barr*, 19-cv-3570 (D.D.C. July 15, 2020), *vacating injunction*, 20A9, 140 S. Ct. 2594 (July 16, 2020). When Purkey refiled his claim in this Court, this Court correctly rejected it as untimely: "It is lamentable that counsel's procedural gamesmanship may have prevented a substantive review of Mr. Purkey's *Ford* claim as it should have been presented. But a stay of execution is an extraordinary remedy, and the Court must consider the equities before granting relief. Despite the risk of irreparable harm to Mr. Purkey, the balance of equities do not weigh in his favor." *Purkey v. Warden*, 2:20-cv-365 (S.D. Ind. July 16, 2020), Dkt. 14.[2]

---

[2] Montgomery cites *Purkey v. United States*, 964 F.3d 603, 618 (7th Cir. 2020), for the proposition that "[i]n death penalty cases, staying an execution date to 'permit the orderly ( . . . continued)

Neither Montgomery's 90-page habeas petition nor her cursory 4-page stay motion provides any plausible, legitimate explanation for her unjustifiable delay, and none exists. Indeed, the record makes clear that Montgomery has long planned to bring a *Ford* claim. As far back as October 28, 2020, Montgomery informed another court that "[w]hether Mrs. Montgomery is psychiatrically competent to be executed . . . will be addressed in an appropriate forum pursuant to *Madison v. Alabama*, 139 S. Ct. 718 (2019)." Complaint (Dkt. 303-1), *Protocol Cases*, 1:19-mc-145 (D.D.C. Oct. 28, 2020). Given these assertions, on November 13 government officials asked Montgomery's counsel when she would file a *Ford* claim to "aid with ensuring a prompt and orderly adjudication" [Dkt. 13-7 at 2]. Rather than agree to an orderly resolution (or respond at all), however, Montgomery's delayed her filing for nearly two more months.

In her corrected Petition, Montgomery argues that a *Ford* claim ripens when "an execution date is imminent." [Dkt. 11 at 5.] And to be sure, the Supreme Court has recognized that "claims of incompetency to be executed remain unripe at early stages of the proceedings." *Panetti*, 551 U.S. at 947. But this case is well beyond the early stages. And the Supreme Court has never suggested that inmates must wait until just days before their executions to bring a *Ford* claim. *See, e.g.*, *id.* at 938 (noting that Panetti's *Ford* claim was filed two months prior to original date of execution); *Madison v. Alabama*, 139 S. Ct. 718, 723 (2019) (recounting that Madison's first *Ford* claim was filed before an execution date had been set).

---

conclusion of [court] proceedings' and allow the Court 'the same time for consideration and deliberation that [it] would give any case' has been found to be in the public interest with no substantial injury to the government." [Dkt. 12 at 2-3.] That case provides less support than it appears. On July 2, 2020, the Seventh Circuit ruled for the government on the merits but stayed Purkey's execution pending potential rehearing en banc. 964 F.3d at 618. On July 15, 2020, the Supreme Court vacated that stay at the application of the United States, 141 S. Ct. 195 (July 15, 2020), and Purkey was executed the next day.

Even if, as Montgomery's first petition argued, she could not have reasonably asserted her *Ford* claim until after "a date of execution ha[d] been set," [Dkt. 1 at 5,]; *see, e.g.*, *Bowles v. Fl. Dep't of Corr.*, 935 F.3d 1176, 1181 (11th Cir. 2019); *In re Campbell*, 874 F.3d 454, 466 (6th Cir. 2017), that event occurred more than 12 weeks ago. Since that time, instead of seeking relief under *Ford*, Montgomery has spent the last three months pursuing other claims in other jurisdictions and has only come to this Court as claims elsewhere have stalled. *See Montgomery v. Barr*, No. 4:20-cv-1281, 2020 WL 7353711 (N.D. Tex. Dec. 15, 2020); *Montgomery v. Rosen*, 20-cv-3261, 2020 WL 7695994 (D.D.C. Dec. 24, 2020), *summarily reversed*, 2021 WL 22316 (D.C. Cir. Jan 1, 2021), *reh'g & reh'g en banc denied*, 20-5379 (D.C. Cir. Jan. 5, 2020); Memorandum Opinion, *Montgomery v. Rosen*, 20-cv-3261 (D.D.C. Jan. 8, 2021), Dkt. 61. This Court should not permit Montgomery to litigate sequentially claims that ripened months ago.

Montgomery also asserts that individuals "can be at risk of deteriorations in their mental states" as an execution nears. [Dkt. 11 at 85.] But Montgomery's petition relies almost entirely on evidence offered during her trial and litigation of her motion under 28 U.S.C. § 2255, all of which has been available for years. *See, e.g.*, [Dkt. 11 at 15] ("Dr. McCandles testified [at trial] . . . .") (brackets in original); *id.* at 21 ("Dr. Camille Kempke testified during 2255 proceedings."); *id.* at 24 ("Dr. Porterfield testified in 2255 proceedings . . . ."); *id.* at 43 ("Dr. Nadkarni . . . testified in the 2255 proceedings . . . .) (emphasis omitted); *id.* at 51 ("Dr. George Woods . . . testified during 2255 proceedings.") (emphasis omitted); *id.* at 63 ("Dr. Ruben Gur . . . testified at the 2255 hearing") (emphasis omitted). Her experts have made no attempt to conduct any meaningful evaluations of Montgomery since it became clear in October that the execution was approaching. And even the recent declarations she provides in support fail to find that she has undergone a sudden change that prevented her from bringing this claim weeks or months ago. *See, e.g.*, [Dkt.

11-12 at 3-4] (describing attorneys' reports without giving dates, other than to note that attorneys have not visited Montgomery since November 2, 2020); [Dkt. 11-12 at 40-41] ("It is my understanding that Mrs. Montgomery's context changed dramatically on October 16, 2020 . . . . Since that time, it appears that Mrs. Montgomery psychotic symptomology has begun to break through."); *see also Bedford*, 645 F.3d at 376-77 (rejecting a stay request based on a last-minute *Ford* claim where no "recent medical incident that exacerbated his condition" nor any "recent examination showing that what had once been a modest mental infirmity had suddenly become a more serious one.").

Montgomery's stay motion attempts to blame the government for "scheduling her execution during a world-wide pandemic." [Dkt. 12 at 3.] But the pandemic does nothing to excuse her strategic decision to delay the filing of her *Ford* claim and stay motion. And, in fact, "courts across the country have declined to delay executions for pandemic-related reasons." *Hall v. Barr*, No. 20-cv-3184-TSC, 2020 WL 6743080, at *5 (D.D.C. Nov. 16, 2020) (citing examples), *aff'd*, 830 Fed. Appx. 8 (D.C. Cir. Nov. 19, 2020), *stay and petition for certiorari denied*, Nos. 20-688 and 20A100, 2020 WL 6798776 (U.S. Nov. 19, 2020).

Montgomery's delay thus forces this Court into the procedural difficulty that the Supreme Court and *Bedford* have decried. Most obviously, had Montgomery filed when her claim ripened, the parties could have developed the facts and presented this Court (or, rather, a court in the Northern District of Texas, where Montgomery has been confined, *see Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004)) with an opportunity to determine Montgomery's competency on the merits with a full, adversarial record and without litigating a stay. By her delay, Montgomery forces this Court (and to the extent of any appeals, all superior courts) either to determine whether to deny a stay (and effectively the petition) without the benefit of even the possibility of any meaningful

13

factual development or to grant a stay and delay the execution of a lawful sentence based solely on allegations and expert declarations that rely on unreliable hearsay and cannot be tested by cross-examination. *See Bedford*, 645 F.3d at 376 ("[A] frequent prerequisite to obtaining relief on the claim—a hearing in which the trial court hears evidence about the issue—is positively undermined by waiting until the eleventh hour and nearly the fifty-ninth minute for bringing the claim."). Had Montgomery believed in the strength of her evidence, she would have brought this claim immediately rather than risk litigating under the unfavorable stay standards.

Montgomery committed a vicious kidnapping and murder more than sixteen years ago—a conviction and sentence that courts have repeatedly upheld. The Court should deny her untimely petition.

## II. Montgomery Has Not Shown a Substantial Likelihood of Success on the Merits

Montgomery's petition and motion for stay fail on the merits as well because she has failed to show a substantial likelihood of success on her claim that she has made a substantial threshold showing of incompetency or that her due process rights have been violated.

A prisoner seeking a stay of execution must show "a significant possibility of success on the merits." *Hill*, 547 U.S. at 584; *see Nelson*, 541 U.S. at 649; *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (setting aside Eighth Amendment claim because, among other reasons, "plaintiffs have not established that they are likely to succeed on the merits"). Indeed, the Supreme Court has summarily set aside lower-court orders that "enjoined [an] execution without finding that [the prisoner] has a significant possibility of success on the merits." *Dunn v. McNabb*, 138 S. Ct. 369, 369 (2017). "The prospect of irreparable harm is not itself enough." *Lee v. Watson*, No. 19-3399, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019). This Court should deny Montgomery's motion and petition because she cannot show a substantial likelihood that she will succeed on the merits.

A.    **Montgomery Has Not Shown a Substantial Likelihood of Success on her *Ford* Claim**

The Eighth Amendment prohibits executing a prisoner who cannot "'reach a rational understanding of the reason for his execution.'" *Madison*, 139 S. Ct. at 723 (quoting *Panetti*, 551 U.S. at 958); *see Ford*, 477 U.S. at 409-10. "[T]he issue is whether a prisoner's concept of reality is so impaired that he cannot grasp the execution's meaning and purpose or the link between his crime and its punishment." *Madison*, 139 S. Ct. at 723 (cleaned up and quotations omitted). Because a prisoner "must have been judged competent to stand trial" "in order to have been convicted and sentenced," the government "may properly presume that [a prisoner] remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process." *Ford*, 477 U.S. at 425-26 (Powell, J., concurring); *see also Panetti*, 551 U.S. at 949 (noting that Justice Powell's concurrence in *Ford* is controlling on the question of procedure). The prisoner bears the burden to rebut the presumption of competence by making a substantial threshold showing of incompetence. Only after a prisoner makes this initial showing is she entitled to any sort of process to adjudicate her competence: "Once a prisoner seeking a stay of execution has made a substantial threshold showing of insanity, the protection afforded by procedural due process includes a fair hearing in accord with fundamental fairness." *Panetti*, 551 U.S. at 949 (quotations omitted).  Montgomery's attempt to make such a showing is predicated on two things: (1) Montgomery's history of mental illness, and (2) declarations from Dr. Katherine Porterfield, a clinical psychologist, and Dr. George Woods, a physician specializing in neuropsychiatry, among other things—neither of whom has examined Montgomery since 2016. [Dkt. 11-12.]  Whether considered together or separately, these sources fall far short of establishing the substantial showing necessary to make out this last-minute *Ford* claim.

**1.      Montgomery's Claimed Mental Illness Does Not Support a Substantial Threshold Showing of Incompetency**

The majority of Montgomery's petition is dedicated to recounting her prior diagnoses of mental illness. That a prisoner has a history of mental illness does not mean she is incompetent to be executed. "The mental state requisite for competence to suffer capital punishment neither presumes nor requires a person who would be considered 'normal,' or even 'rational,' in a layperson's understanding of those terms." *Panetti*, 551 U.S. at 960.  The *Ford/Panetti* "standard focuses on whether a mental disorder has had a particular *effect*: an inability to rationally understand why the state is seeking execution." *Madison*, 139 S. Ct. at 728. Montgomery's prior diagnoses are, however, at best only tangentially relevant to that question.

Montgomery's descriptions of mental illness bear no resemblance to the facts in cases the Supreme Court found the threshold showing requirement met. *See Panetti*, 551 U.S. at 954-55 (prisoner believed his execution was part of spiritual warfare between demons and angels and, although he claimed to understand the state said it wanted to execute him for his crime, he believed that reason was a sham and the state wanted to execute him to stop him from preaching); *Ford*, 477 U.S. at 402-03 (prisoner believed members of his family were being held hostage in the prison, referred to himself as the pope, believed he could not be executed, and regressed into speaking in code).

Nothing in Montgomery's petition suggests her mental illnesses have had a similar effect, and none of her evidence of mental illness proves, or is even particularly probative of, her claim that she does not rationally understand the reason for her execution. *See Charles v. Stephens*, 612 Fed.Appx. 214, 221 (5th Cir. 2015) (per curiam) ("[E]ven assuming he has some form of mental illness, none of this evidence shows that he does not know about his execution or that he does not rationally understand the reason for it.").

Montgomery claims to suffer from bipolar disorder, depression, PTSD, something called "complex PTSD," epilepsy,[3] and brain damage. [Dkt. 11 at 17-19, 32, 43-44, 48, 60, 62, 66-67.] Montgomery was diagnosed with bipolar disorder, PTSD, and depression at the time of her trial. Order at 8-9, 11, 23, *Montgomery v. United States*, 12-cv-8001 (W.D. Mo. Mar. 3, 2017), Dkt. 212. She also sought to introduce evidence at trial that "her brain had structural and functional abnormalities consistent with the diagnosis of pseudocyesis," a false belief of being pregnant. *See Montgomery*, 635 F.3d at 1082. Nevertheless, Montgomery's mental illnesses were not so severe as to render her incompetent to stand trial. Judge Fenner, who presided over Montgomery's trial and postconviction proceedings, observed that "[a]t pretrial appearances and throughout the trial, [Montgomery] appeared engaged in and displayed understanding of the proceedings. As testified by all three of her trial defense attorneys and observed by the Court, [Montgomery] passed notes to her counsel asking questions and giving suggestions." Order at 94, *Montgomery v. United States*, 12-cv-8001 (W.D. Mo. Mar. 3, 2017), Dkt. 212.

Dr. Porterfield diagnosed Montgomery with "Complex PTSD" in connection with her postconviction proceedings, which Dr. Porterfield opines "is characterized by severe dissociative symptoms." [Dkt. 11-12 at 2.] But Judge Fenner observed that was "a diagnosis not recognized in the DSM-IV." Order at 41, *Montgomery v. United States*, 12-cv-8001 (W.D. Mo. Mar. 3, 2017), Dkt. 212. And in any event, Montgomery made a similar claim of dissociation at her trial, where her expert opined that "Montgomery suffered from severe pseudocyesis delusion and that she was in a dissociative state when she murdered Stinnett and delivered the baby." *Montgomery*, 635 F.3d

---

[3]Regarding Montgomery's claimed diagnosis of epilepsy, the district court presiding over her postconviction proceedings observed that "Dr. Nadkarni's diagnosis of epilepsy stands alone against all other diagnoses of [Montgomery], and does not fit into either trial counsel's theme or habeas counsel's proposed theme." Order at 43, *Montgomery v. United States*, 12-cv-8001 (W.D. Mo. Mar. 3, 2017), Dkt. 212.

at 1083. The government's expert effectively rebutted this opinion, explaining that Montgomery "was entirely capable of appreciating that she was engaged in a lengthy and elaborate plan designed to kill Bobbie Jo Stinnett at a stage of advanced pregnancy, to successfully conduct a Cesarean section on her first attempt and to kidnap a healthy infant she could present to the world as her own." *Id.* at 1085 (cleaned up and quotation omitted).

In short, none of Montgomery's years-old recycled evidence established that she suffered from a mental illness then that made her incompetent to stand trial. What is largely the same evidence cannot possibly overcome the presumption that she "remains sane" now "at the time sentence is to be carried out." *Ford*, 477 U.S. at 425-26 (Powell, J., concurring).

### 2. The Declarations from Doctors Porterfield and Woods Cannot Support a Substantial Threshold Showing of Incompetency

Montgomery also relies upon declarations from Doctors Porterfield and Woods, who both opine she is incompetent. These declarations do not meet professional standards for reliability, are contradicted by Montgomery's mental health records, rely on undisclosed hearsay statements from Montgomery's attorneys, and are wholly conclusory. The Court should accord them no weight.

*First*, the opinions do not comport with the applicable professional standards for assessing competency. Dr. Porterfield based her opinion on information obtained from Montgomery's attorneys, her prior evaluations of Montgomery in 2016, review of records and witness interviews, and her knowledge and experience. [Dkt. 11-12 at 2.] Dr. Woods based his opinion on interviews with Montgomery in 2013 and 2016, review of records including up-to-date BOP mental health records, review of her medication, and reports from Montgomery's attorneys. [Dtk. 11-12 at 34-35.] Although they purport to opine on Montgomery's current competency, *neither doctor has had any direct interaction or communication with Montgomery since 2016. See Charles*, 612 Fed.

Appx. at 220-21 (holding prisoner's reliance on the same mental health evidence he relied on in prior proceedings was insufficient to show incompetence to be executed).

Forensic psychologist Dr. Christina Pietz[4] has explained in detail why the information that Doctors Porterfield and Woods relied upon affords an insufficient basis for offering an opinion on competency:

> 16. Although it is appropriate and consistent with the specialty guidelines for forensic psychology for an evaluator to discuss with attorneys their concerns regarding their client's competency, no professional evaluating competency should rely solely on that information and historical clinical evaluations in making a determination as to current competency. Likewise, although historical information is important, competency (or incompetency) is a present-tense issue. Consequently, when assessing a person's competency, it is imperative that the clinician obtain sufficient facts or data related to the person's current functioning and current competency-related issues. Based on what has been provided in the Petition for Writ of Habeas Corpus filed January 8, 2021, and Amended Petition for Writ of Habeas Corpus filed January 9, 2021 (collectively, the "Petition"), and attached declarations from Dr. Porterfield and Dr. Woods, any opinions as to current competency do not appear to have been based on sufficient, current facts or data to conform to any known professional standards for evaluating competency.

> 17. Regarding Dr. Porterfield's statements as relayed in the Petition, while Dr. Porterfield's statements are based upon examinations that were conceivably relevant to mitigating issues at trial, as reflected in her declaration attached to the Petition and prior declarations, Dr. Porterfield's opinions do not conform to or reliably apply generally accepted psychological principles or methods to answer any questions regarding Mrs. Montgomery's current competency to be executed, as delineated in *Ford v. Wainwright*.

---

[4] Anticipating that Montgomery would file a *Ford* claim in a timely manner, the Government retained Dr. Pietz in late November 2020. Because Montgomery had not filed a claim regarding her competency and because there was no medically indicated reason to examine her beyond the care she was currently receiving, the Government could not compel an examination of Montgomery by Dr. Pietz. Despite Montgomery's extreme delay in filing her claim, Dr. Pietz was able to provide a declaration for this Court explaining what she could determine through reviewing Montgomery's medical records and social phone calls, her experiences with conducting competency examinations during the pandemic, and her opinions regarding the opinions of Doctors Porterfield and Woods included in Montgomery's petition.

18. Similarly, regarding Dr. Woods's statements as relayed in the Petition, Dr. Woods's statements, as reflected in his declaration attached to the Petition and prior declarations, do not appear to conform to or reliably apply any generally accepted principles or methods to answer any questions regarding Mrs. Montgomery's current competency to be executed, as delineated in *Ford v. Wainwright*. The Petition, including Dr. Woods's declaration, does not suggest or demonstrate Dr. Woods bases his opinion on sufficient facts or data related to Mrs. Montgomery's current functioning and current competency-related issues, particularly in light of the detailed records from providers at FMC Carswell familiar with Mrs. Montgomery's clinical presentation.

[Dkt. 13-3 at 4-5, Dr. Pietz Decl. ¶¶ 16-18.]   The failure of Montgomery's proffered experts to reliably apply such generally accepted principles and methods is sufficient grounds to disregard their opinions entirely.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

*Second*, recent medical records from Montgomery's BOP mental health providers directly contradict the doctors' opinions. Dr. Porterfield does not claim to have reviewed such records. Although Dr. Woods claims to have reviewed "up-to-date BOP mental health records," [Dkt. 11-12 at 34], he fails to address them or explain how his opinion accounts for them. As discussed in more detail below, these reports contain information—from mental health providers currently treating Montgomery—that directly contradicts Dr. Woods's opinion.

*Third*, the doctors' opinions rely entirely or primarily on Montgomery's attorneys for information about her current mental status. This is double hearsay of the most unreliable form: statements made by a condemned prisoner with a history of exceptional deception funneled through her own attorneys. Because the opinions are based upon such facially unreliable information, they cannot support a substantial threshold showing of incompetency. *See, e.g.*, *Dallas & Mavis Forwarding Co., Inc. v. Stegal*, 659 F.2d 721, 722 (6th Cir. 1981) (holding that the district court properly excluded expert testimony "because it was based on no physical evidence (none existed) and was derived primarily from the story of a biased eyewitness. This is the sort of hearsay testimony whose admission [Rule 703] was meant to foreclose."); *In re Agent*

*Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985) (Weinstein, J.) ("Rule 703 permits experts to rely upon hearsay. . . . Nevertheless, the court may not abdicate its independent responsibility to decide if the bases meet minimum standards of reliability as a condition of admissibility.").

Montgomery's history of manipulation and deception is well-established. After undergoing a sterilization procedure in 1990, Montgomery falsely claimed to have had four more pregnancies. *Montgomery*, 635 F.3d at 1081. She made the fourth claim while involved in a custody dispute with her first husband. *Id.* After her first husband and his wife told Montgomery they planned to "expose her deception and use it against her in the custody proceedings," "Montgomery said that she would prove them wrong." *Id.*

Montgomery knew that Bobbie Jo Stinnett was pregnant. *Id.* at 1079. Montgomery used an alias to contact Stinnett online and feign interest in purchasing a puppy. *Id.* She then drove to Stinnett's home, with a kitchen knife and cord in her jacket pocket, where she strangled Stinnett and cut her baby out of her abdomen. *Id.* at 1079-80. After the murder, Montgomery drove away, cleaned up the baby, and put the baby in a car seat she had stored in her trunk. *Id.* at 1080. She told her husband "that she had gone into labor while Christmas shopping and that she had given birth at a women's clinic in Topeka." *Id.* She and her husband announced the birth of "their daughter" to friends and family. *Id.* She subsequently told officers that she had given birth in her kitchen at home and "disposed of the placenta in a nearby creek." *Id.* Prior to trial, Montgomery malingered that she actually believed she was pregnant, but the jury rejected her defense of pseudocyesis. *Id.* at 1085-86.

Moreover, Montgomery's counsel in this case have previously been "admonished" "for their improper and unprofessional conduct" in prior proceedings where they represented

Montgomery. Order at 127-28, *Montgomery v. United States*, 12-cv-8001 (W.D. Mo. Mar. 3, 2017), Dkt. 212. In Montgomery's § 2255 proceedings, Judge Fenner pointed to "the inappropriate and false description of trial counsel's performance during *voir dire*," "the false accusation that [one of the government's experts] committed perjury," "the twisted interpretation of the record to accuse trial counsel of discrimination," and "the accusation that [two experts] presented false testimony without any support for that claim." *Id.* at 122-23. Judge Fenner also pointed to an allegation that two federal public defenders perpetrated fraud when "[t]here was no evidence of fraud," and observed that "[f]or Movant's habeas counsel to maintain such a personal and professionally damning allegation of fraud against [other attorneys], given the totality of the record herein, is disturbing to the Court." *Id.* at 124-26. Judge Fenner further explained that habeas counsel's claim that the United States Attorney "acted unethically . . . is offensive and an abuse of process" and also admonished habeas counsel for attempting to "raise the specter of gender discrimination on the part of this Court" when "[n]othing supports the allegation raising gender bias in any decision made." *Id.* at 126-27.

Judge Fenner concluded that "[h]abeas counsel in the instances cited acted with disregard for the personal and professional reputation of individuals involved in the handling of this case." *Id.* at 127. "The Court understands that the stakes are high and counsel has vigorously and passionately represented Movant, but that is no excuse to ignore professional decorum and conduct one's self *without regard for anything other than one's cause*." *Id.* at 127-28 (emphasis added). The win-at-all-costs tactics Montgomery's counsel employed in her § 2255 proceedings undermine the reliability of whatever representations they made to Doctors Porterfield and Woods.

Last November, Judge McFadden of the District of Columbia observed the following in an order denying Montgomery's motion for recusal and transferring her lawsuit challenging her conditions of confinement:

> Further factfinding may also be necessary to properly resolve Montgomery's claims. Montgomery's complaint and motion for a preliminary injunction rely heavily on a declaration filled with hearsay statements from Montgomery—a condemned prisoner with a history of dishonesty—through an attorney who has been admonished by another federal court for unprofessional conduct. *See, e.g.*, Decl. of Kelley J. Henry, Pl.'s Mot. Ex. 11, ECF No. 12-12; *see also United States v. Montgomery*, 635 F.3d 1074, 1081 (8th Cir. 2011) (tracing Montgomery's repeated and false claims of pregnancy); *Montgomery v. United States*, No. 4:12-cv-08001-GAF, slip op. at 122–28 (W.D. Mo. Mar. 3, 2017) (admonishing Henry and others for "their improper and unprofessional conduct" during Montgomery's habeas corpus proceedings). Indeed, this declaration forms the major pillar for her conditions-of-confinement allegations. *See, e.g.*, Pl.'s Mem. at 23–24. The Court is dubious that such a declaration could justify the relief Montgomery seeks. The testimony of FMC Carswell officials, or Montgomery herself, might be needed to develop the record.

*Montgomery v. Barr*, No. 20-cv-3214, 2020 WL 6939808, at *7 (D.D.C. Nov. 25, 2020).

Given Montgomery's history of dishonesty, the Court should disregard these opinions based on hearsay from Montgomery's attorneys. There is no credible evidence Montgomery made the statements the doctors relied on, and there are many reasons to question that she did.[5]

*Fourth*, the opinions are conclusory and offer no insight into Montgomery's ability to understand the reasons for her execution. They opine that, based on years-old clinical evaluations, Montgomery is mentally ill, and recite that Montgomery's lawyers have said she is exhibiting symptoms of mental illness. But a prisoner can be mentally ill and even exhibit symptoms of mental illness, yet still understand the reason for her execution. And although both experts describe

---

[5] Montgomery's use of attorney-client communications also effectively deprives Respondents of the ability to rebut the bases for the opinions. Montgomery and her attorneys know that her attorney-client calls are not monitored. Although Montgomery's affirmative use of privileged discussions most likely waives privilege, the delayed filing of her petition means such waiver does not matter, because there is no time for discovery.

Montgomery's "reported symptoms," including, for example, "auditory hallucinations," "nightmares," and "gaps in consciousness," [Dkt. 11-12 at 3-4, 39], the opinions are wholly bereft of any information about what Montgomery has said or believes regarding her understanding of why she is being executed. As the Supreme Court recently explained, mental illness and its symptoms are plainly relevant to applying the *Ford/Panetti* standard and thus "neurologists, psychologists, and other experts can contribute to the court's understanding of [the] issues." *Madison*, 139 S. Ct. at 738. But ultimately what matters is the "consequence" of those symptoms— "to wit, the prisoner's ability to rationally understand his punishment." *Id.* Without providing a legitimate basis or rationale for their conclusions, Montgomery's experts' recitation of the legal standard cannot carry her burden to make a substantial showing here.

Particularly when a *Ford* claim is asserted on the eve of execution, a court should carefully scrutinize a proffered expert opinion to ensure it is sufficiently reliable to support the conclusion it draws. To do otherwise would create a perverse incentive that encourages prisoners with meritless *Ford* claims, and an accommodating "expert," to delay their claims in hopes of obtaining a stay before anyone detects the opinion's lack of merit. That is exactly what Montgomery has done here.

For all these reasons, the opinions from Doctors Porterfield and Woods are unreliable, and do not suffice to make the required substantial threshold showing.

### 3.    Montgomery's Recent Conversations and Interactions with Mental Health Professionals Demonstrate Her Mental Competency and Refute Her Declarations

In marked contrast with Montgomery's unsupported expert declarations, her recent medical records do not suggest that she is presently suffering from any symptoms of mental illness that would impair her ability to comprehend her legal situation or interact with her attorneys. [Dkt. 13-3 at 3, Dr. Pietz Decl. ¶ 12.] Rather, Montgomery "understands her current legal situation, legal

options, that she is going be executed, and that execution means death." [*Id.*] Montgomery can provide a rational, accurate description of the status of her postconviction legal proceedings. [*Id.* ¶ 13.] She presents no evidence of symptoms of psychosis, *i.e.*, delusions and/or hallucinations. [*Id.* ¶ 14.] As of January 7, her thought processes remain logical and organized. [*Id.*] Montgomery appropriately applies legal concepts to her current situation, including clemency, appeals, and remaining legal claims, in detail. [*Id.* ¶ 15.] Montgomery can cite and appropriately apply legal concepts to her specific situation which display a level of comprehension inconsistent with merely reciting legal concepts told to her by other persons, including her attorneys. [*Id.*]

Montgomery's medical records[6] reflect her understanding of her legal situation and impending execution. [*See generally* Dkt. 13-4, Dr. Wheat Decl.] On January 7, 2021, Montgomery "expressed guilt related to her crime and the impact her sentence is having on those who care about her." [Dkt. 13-5 at 1.] Similarly, she has recently expressed worry "about how those who survive her will be affected by her execution if it takes place." [*Id.* at 2.] On January 5, "[s]he described herself as both sad and worried but stated she is 'at peace' if she is executed. She initiated conversation about how she was preparing for her potential execution to include the last meal she chose and who will be at her execution to support her." [*Id.* at 2.] *See also* [Dkt. 13-6 at 14-15 (Tr. 8:9-10:21 (Jan. 2, 2021)).] Montgomery "also stated she is using what she perceives as her remaining days to stay in contact with her legal team and call each of her children." [Dkt. 13-5 at 3.] Montgomery also "identified one peer with whom she would like to speak as they had

---

[6] Because the medical and psychology records are voluminous and largely consist of impertinent information, the Government filed only a Rule 1006 Summary of the medical records. [Dkt. 13-5.] Historical medical and psychology records have been provided to Montgomery, and updated records have been provided on a rolling basis, nearly every business day since November 20, 2020. *See* Fed. R. Evid. 1006. If the Court prefers, the Government will file the complete medical and psychology records for October 16, 2020, through the time retrieved on January 9, 2021.

established a close friendship while housed together" and "she felt this opportunity would provide her with closure and peace leading up to her scheduled execution." [*Id.* at 4.] On December 16, 2020, Montgomery "attributed her sadness to recently signing papers related to cremation, ongoing concerns about her daughter's physical health, and her scheduled execution." [*Id.* at 5.] *See also* [Dkt. 13-6 at 10-11 (Tr. 2:20-3:25 (Dec. 11, 2020))] (noting in conversation with her daughter that the government will pay for cremation at a funeral home in Terre Haute and Montgomery believes "I think they should pay for it. I mean they're the ones doing it, they should pay for it."); *Ferguson v. Sec'y, Fla. Dept. of Corr.*, 716 F.3d 1315, 1341 (11th Cir. 2013) (considering a prisoner's understanding of the disposition of his remains as evidence supporting competency).

Montgomery's medical records also reflect that she displays appropriate emotion when reacting to positive and negative developments in her legal cases. *See*, *e.g.*, [Dkt. 13-5 at 5] (reporting feeling "great" and smiling after a district court vacated her execution date); [*id.* at 4] (displaying flat affect and dysphoric mood after panel of court of appeals summarily reversed district court). And though perhaps unadvisable, on December 6, 2020, Montgomery "laughed and joked about a 'party' she [wa]s planning for herself [on December 8, 2020, her original execution date] and she stated she plan[ned] to eat extra commissary food on that day." [*Id.* at 5.] As Montgomery summarized for her daughter, she "was just like, we'll just celebrate it because it didn't happen." [Dkt. 13-6 at 10 (Tr. 15:12-24 (Dec. 2, 2020)).]

Moreover, Montgomery's recent telephone calls with her family[7] further reveal that she fully understands the reasons for her upcoming execution. She understands quite well that she has

---

[7] Because the telephone call transcripts are voluminous and largely consist of impertinent and/or embarrassing information, the Government filed only a Rule 1006 Summary of the telephone call transcripts. [Dkt. 13-6.] On January 10, 2021, the Government provided the full, unredacted call transcripts to counsel for Montgomery. *See* Fed. R. Evid. 1006. If the Court prefers, the Government will file the complete transcripts under seal.

a criminal "sentence" for "[o]ne big" charge, [*Id.* at 2 (Tr. 9:24 - 11:6 (Aug. 13, 2020))], and is subject to "the death penalty." [*Id.* at 1 (Tr. 20:19 – 21:6 (Aug. 6, 2020)).] She recalls the date of her crime: "she stated that [December 16] is 'always hard' because it is the anniversary of her crime." [Dkt. 13-5 at 5.] Two days before December 16, she recounted that "it'll be 16 years this week," since her crime. [Dkt. 13-6 at 12 (Tr. 10:24-11:4 (Dec. 14, 2020)).] And on December 17, she explained that "today makes me 16 years of being locked up. . . . So, you know that yesterday was like[.]" [*Id.* at 13-14 (Tr. 15:8-22 (Dec. 17, 2020))] (referencing the anniversary of her crime and the anniversary of being caught one day after her crime).

Montgomery also has revealing interests. In August, she noted that she was interested in a book about John Wilkes Booth "on a personal level" because Mary Surratt, who owned the boarding house where Booth was staying at, was hanged and became the first woman to receive the death penalty from the federal government. [*Id.* at 6-7 (Tr. 5:13 – 7:17 (Sept. 1, 2020)).] Also of note, Montgomery has elsewhere shown that she appreciates the connection between crime and punishment when discussing her ex-husband's recent criminal trouble: "And they got all kinds of evidence against him, so he's going down for a long time." [*Id.* at 8-9 (Tr. 9:17-10:5 (Nov. 10, 2020)).] As for the consequences of her own crime, Montgomery's recent conversations do not suggest that she suffers from any current lack of understanding about why she faces those changes. Rather, she has expressed hope that President "Trump will grant me clemency or a reprieve." [*Id.* at 15-16 (Tr. 12:22-14:1 (Jan. 2, 2021)).] In the alternative, she has placed her hopes in the President-elect, because she believes "he'll abolish the death penalty." [*Id.* at 1 (Tr. 20:19 – 21:6 (Aug. 6, 2020))]. *See also id.* at 5-6 (Tr. 5:13–7:17 (Aug. 27, 2020)).] She has therefore discussed with her sister why she is counting the days until January 20, rather than January 12. [*Id.* at 12-13 (Tr. 15:18-16:19 (Dec. 14, 2020)).]

Montgomery's recent medical evaluations and her social correspondence refute any suggestion of the level of mental deficiency required by *Ford*.

**B.     Montgomery Has Not Shown a Substantial Likelihood of Success on Her Due Process Claim**

Because Montgomery fails to make a substantial threshold showing of incompetence, she cannot show a likelihood of success on her due process claim. In arguing otherwise, Montgomery misapprehends the applicable due process standard by relying upon Justice Marshall's plurality opinion in *Ford*. [Dkt. 11 at 12-13, 84.] As the Supreme Court subsequently held in *Panetti*, the controlling opinion in *Ford* on the issue of procedure is Justice Powell's concurrence, not Justice Marshall's plurality opinion. *See Panetti*, 551 U.S. at 949 (citing *Marks v. United States*, 430 U.S 188, 193 (1977)). Justice Powell explained that he "would not require the kind of full-scale 'sanity trial' that Justice MARSHALL appears to find necessary." *Ford*, 477 U.S. at 425 (Powell, J., concurring). "Due process is a flexible concept, requiring only such procedural protections as the particular situation demands." *Id.* (quotation omitted).  As discussed above, under that standard, the government may presume that Montgomery is competent, and need provide no process until she makes a substantial threshold showing otherwise. *Ford*, 477 U.S. at 425-26 (Powell, J., concurring); *see also Panetti*, 551 U.S. at 949.

In any event, Montgomery's due process claim fails on its own terms. Under the controlling standard, "[o]nce a prisoner seeking a stay of execution has made 'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness." *Id.* Montgomery's claim is based on her allegation that "[a]ppointed counsel and their experts [we]re unable to evaluate [Mrs.] Montgomery face-to-face—without risking their lives." [Dkt. 11 at 85.] But that allegation fails to show any lack of fundamental fairness in the procedures available for Montgomery to pursue her *Ford* claim.

*First*, Montgomery fails to explain why fundamental fairness would require in-person evaluation.  Montgomery offers no reasons why her attorneys need to evaluate her in-person.[8] As for Doctors Porterfield and Woods, both assert that in-person meetings would be helpful for conducting an evaluation, but they do not claim such meetings are necessary. [Dkt. 11-12 at 4-5, 41-42.] To the contrary, they claim to have been able to determine her competency to a reasonable degree of psychiatric and psychological certainty without any sort of recent direct interaction with Montgomery whatsoever. [Dkt. 11-12 at 4, 41.]

And, in any event, Montgomery fails to adequately account for Doctors Porterfield's and Woods's ability to examine her remotely via video conference. Dr. Pietz explains that competency evaluations can and are being conducted remotely via videoconference, consistent with professional standards. [Dkt. 13-3 at 3-4, Dr. Pietz Decl. ¶ 9.] Doctors Porterfield and Woods state that in-person evaluations would be ideal, but neither assert that it would violate professional standards to conduct an evaluation over videoconference. [Dkt. 11-12 at 4-5, 41-42.] Left almost entirely explained is why Doctors Porterfield and Woods chose to rely on hearsay—manifestly the least reliable way to conduct an evaluation—rather than interact directly with Montgomery via videoconference, the next-best option to an in-person meeting. Dr. Porterfield merely speculates that "a remote evaluation of Mrs. Montgomery risks triggering her and leaving her in a compromised state that this evaluator would be unable to detect and properly address." [Dkt. 11-12 at 5.]

*Second*, even assuming that due process would require the availability of some in-person evaluation, Montgomery's allegations fail to show any unavailability. Doctors Porterfield and

---

[8] Nor does she explain why traveling would present any unusual risk to her attorneys, who have apparently already contracted the virus and recovered from it—and thus presumably enjoy some level of immunity. [Dkt. 11 at 85 n.197.]

Woods claim that they were unwilling to travel to meet with Montgomery in person due to COVID. [Dkt. 11-12 at 3, 34.] Dr. Woods claims he cannot travel due to health conditions. [Dkt. 11-12 at 34.] Dr. Porterfield states no reason aside from unspecified "travel restrictions." [Dkt. 11-12 at 3.] Even if both doctors' decisions are reasonable, however, Montgomery does not claim to have undertaken any efforts to retain other professionals who would be willing to evaluate her in-person, including professionals residing in the Fort Worth area who would not need to travel to do so. Under proceedings available to her, Montgomery could have sought funding to retain additional experts pursuant to 18 U.S.C. § 3599(f).  But to the Government's knowledge she did not. There is no apparent reason she could not have engaged other professionals—either local to the Fort Worth area or willing to travel there—to evaluate her. As Dr. Pietz explains, it is unnecessary for a forensic psychologist to have previous experience with an individual in order to evaluate her competency. [Dkt. 13-3 at 3-4, Dr. Pietz Decl. ¶ 11]

In light of those available procedures, there no basis to conclude that anything prohibited or inhibited Montgomery from having experts evaluate her to support her *Ford* claim. In the last six months, her attorneys never contacted the staff at FMC Carswell about requesting an expert evaluation, either in person or through videoconferencing. [Dkt. 13-1 at 2, Cottrell Decl. ¶ 4.] Montgomery asserts without support that "[t]he federal prison[s] are unable to protect visitors to inmates." [Dkt. 11 at 87.] But she ignores all the precautions FMC Carswell has undertaken to protect visitors and inmates.[9] She also ignores that numerous other mental health professionals are willing to conduct competency evaluations on-site in federal prisons despite the COVID-19 pandemic, and that such professionals can mitigate any risk by taking appropriate precautions,

---

[9] https://www.bop.gov/locations/institutions/crw/crw_tvp.pdf.

including by donning appropriate personal protective equipment. [Dkt. 13-3 at 3, Dr. Pietz Decl. ¶ 10].

*Third*, Montgomery discusses at length the status of COVID infections at Terre Haute FCC, as if that information were relevant to the risk involved in meeting with her in-person. [Dkt. 11 at 86-87.] But Montgomery has been incarcerated at FMC Carswell, not FCC Terre Haute, so the infections at Terre Haute are irrelevant. *See* Winter Decl. ¶¶ 4, 6, *Montgomery v. Barr*, No. 20-cv-3214 (D.D.C. Nov. 20, 2020), Dkt. 23-3 (explaining that Montgomery was housed at FMC Carswell and describing the BOP's options for transportation involved transporting her to Terre Haute one to two days prior to her execution). [*See also* Dkt. 13-8, R. Winter. Decl.]

In the end, Montgomery's due process claim boils down to a complaint that two particular individuals, who have served as experts for Montgomery before and at least one of whom has provided multiple affidavits with conveniently tailored opinions throughout Montgomery's recent flurry of litigation, were unwilling to voluntarily travel to meet with her. She neither explains how this is the Government's fault nor points to any authority suggesting that a prisoner's due process rights are violated in such circumstances. This Court should reject her claim.

**CONCLUSION**

For the reasons stated above, this Court should deny Montgomery's motion for a stay of execution [Dkt. 12], and deny her petition for habeas corpus [Dkt. 11].

Respectfully submitted,

JOHN CHILDRESS
Acting United States Attorney

By: */s/Brian P. Casey*
BRIAN P. CASEY
Special Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122
Fax: (816) 426-3126
Brian.Casey@usdoj.gov

*Attorneys for Respondents*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2021, the foregoing was filed electronically through ECF/CM. On this same date, a copy of the foregoing was served electronically to all counsel of record through the Court's ECF/CM system.

*s/ Brian P. Casey*
Brian P. Casey
Special Assistant United States Attorney