**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**TERRA HAUTE DIVISION**

| | | |
|---|---|---|
| **LISA MONTGOMERY,** | ) | |
| | ) | |
| **Petitioner,** | ) | **No. 2:21-cv-00020-JPH-DLP** |
| | ) | **DEATH PENALTY CASE** |
| **v.** | ) | |
| | ) | **SCHEDULED FOR EXECUTION** |
| **WARDEN USP TERRE HAUTE,** | ) | **January 12, 2021** |
| **MICHAEL CARAJAL,** | ) | |
| **JEFFREY ROSEN** | ) | |
| **Respondents.** | ) | |

# REPLY TO RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR STAY OF EXECUTION

## I. INTRODUCTION

Mrs. Montgomery's counsel cannot see her face-to-face, and neither can mental health professionals. While Mrs. Montgomery has appointed counsel and also has experts (in name), they are functionally absent due to the government having [re]scheduled her execution for a time when Covid is raging and ravishing prisons, inmates, attorneys, judges, mental health professionals, and the public.

This mentally ill person's only refuge is the Constitution. Mrs. Montgomery has presented, and presents in this pleading, a threshold--a substantial–showing of incompetence. A system that requires her to do more

"without the assistance of counsel or a mental health expert...is, by

definition, an **insane system**" and is "inconsistent with the mandates of both *Panetti* and *Ford*."

*Wood v. Quarter man*, 572 F .Supp. 2d 814 (W.D. Tex. 2008)(petitioner in 28 U.S.A. § 2254 proceeding granted a stay of execution and delayed any *Ford* hearing).[1]

**II. FORMER BOP PSYCHIATRIST**

The government spends page after page arguing that Mrs. Montgomery's experts' reports rely upon hearsay from Mrs. Montgomery and her attorneys, that a mentally ill defendants's background and history are irrelevant, and that experts who form opinions without contemporaneously seeing a patient face-to-face are not credible. Yet the government embraces what its *paid agents* have written down about what Lisa Montgomery supposedly has said. It is one or the other.

A former expert employed by Respondent, who is no longer dependant on the government's approval or paycheck, belies the government's complaints:

[1]Wood "was diagnosed as having emotional difficulties as a child;" he suffered from "delusional thought patterns; a post-trial evaluation concluded his "ability to appreciate the consequences of [his] options or behave in a self-protective fashion is profoundly impaired and almost delusional'"; "various prison medical staff have noted instances of paranoid comments made by petitioner during his current incarceration; (6) petitioner has been treated for suicidal ideation and multiple suicide attempts during his current incarceration, and (7) petitioner has made numerous patently delusional comments to his federal habeas counsel"). *Wood* at 816-17. **Mrs. Montgomery's case checks all these boxes.**

<u>DECLARATION OF CAMILLE KEMPKE</u>

I, Camille Kempke, M.D., hereby declare the following:

1. I am a Board Certified psychiatrist, currently retired.

2. I served as a psychiatrist at the Carswell Medical Center (Federal Bureau of Prisons) from February 2008 through September 2010.

3. During the course of my employment, I was the treating psychiatrist for Lisa Montgomery. Initially I saw her on the M-3 (mental health segregation) unit and later I treated her after she was housed in the admin unit.

4. When Mrs. Montgomery arrived at Carswell, she carried a bipolar diagnosis. She was medicated with Depakote but was not doing well psychiatrically.

5. She presented as disheveled and unclean. I had a hard time getting her to answer my questions or to come to the door to talk to me.

6. I initially thought that Mrs. Montgomery's presentation was due to depression over her conviction and death sentence, but I later learned that was not the case. After we began appropriately medicating her with antipsychotics, her affect, demeanor, and presentation changed dramatically. The information I later learned about Mrs. Montgomery's social history reinforced my revised assessment: Mrs. Montgomery's presentation was not simply depression, but psychotic depression.

7. I witnessed Mrs. Montgomery in an acute dissociative psychotic state at least two times.

8. When I treated her, her psychosis primarily manifested as crying, withdrawal, not responding to social cues, difficulty with concentration and deliberation, poor understanding of what she read, and hearing voices talking to her from the radio.

9. Mrs. Montgomery's counsel have informed me that she has been moved to death watch following the setting of her execution date.

10. They have described to me Mrs. Montgomery's current conditions of confinement, which are consistent with what I know to be the suicide precautions used at Carswell.

11. Though BOP is currently ensuring that Mrs. Montgomery showers three times a week, it is my understanding that she does so as quickly as possible—generally in under the 2 minute timer in the inmate shower—to avoid a prolonged re-experiencing of the sensation of observation and vulnerability into which showering recapitulates her. According to her lawyers, Mrs. Montgomery endorses that showers always cause her to re-experience her childhood violation. She reports crying in the shower, not because it is a safe place to cry, but rather because the experience in the shower itself is so scary that she cannot withstand it. This is consistent with my observations when she exhibited extreme aversion to showering.

12. Mrs. Montgomery's counsel have described Mrs. Montgomery's current functioning, including that Mrs. Montgomery hears her dead mother's voice and is having nightmares. She cannot describe either the instructions of the auditory hallucinations or the nightmares, because they are too terrifying.

13. Counsel has related that since October 16, 2020, Mrs. Montgomery has experienced lapses of time, including more than one that was commented upon by a guard who observed Mrs. Montgomery sitting staring blankly for a prolonged period. Mrs. Montgomery had not been aware of doing so. Mrs. Montgomery has described other lapses, including reading several pages of a book and realizing she could not remember any of what she read, and writing a letter and then not being able to remember doing it. Mrs. Montgomery reports being unsure of what is real—saying that without access to her most trusted friend, she is unsure of what is happening to her, so she cannot assess whether her perceptions are skewed or not.

14. Per counsel, Mrs. Montgomery reports feeling outside herself—as if watching from a distance, and the sensation of existing in a house in her mind as she did when she was raped as a child. The fact that Mrs. Montgomery is re-experiencing the mental detachment that previously allowed her to survive chronic abuse and gang rape is clinically significant and reflects decompensation and a detachment from reality.

15. Counsel have described that Mrs. Montgomery believes she has received messages from God in a dot-to-dot drawing that she was provided by the BOP. Mrs. Montgomery's counsel have described Mrs. Montgomery finding messages in a feather, a sensation of clouds parting and warmth from the sun, and in seeing the moon in a location she found uncanny. Without more information, it is impossible to know whether these were true hallucinations or delusions of reference. In either case, these indicate that Mrs. Montgomery is psychotic.

16. **The difficulties in reality testing described above are similar to those Mrs. Montgomery exhibited before I prescribed Risperdal; this means the beneficial effect of the Risperdal is insufficient to control her symptoms.**

**17. It is my professional opinion to a reasonable degree of medical certainty that, based on my knowledge of Mrs. Montgomery's history of psychosis and the psychotic symptoms reported by counsel, she is currently unable to rationally understand the government's rationale for her execution.**

Attachment G, Declaration of Dr. Camille Kempke (emphasis added). A patient's history is highly probative on her present mental state.

**III. An Evidentiary Hearing is Necessary**

Expert opinions (like the governments') are usually based in part on hearsay as part of the basis for an opinion, evidence that would otherwise be

inadmissible. By presenting its own experts, the government has created questions of fact that require resolution at an evidentiary hearing.[2]

**IV. Need to Rely on Defense Counsel**

Attorneys for inmates have more interaction with court and courts rely upon their representations. *Ford*, 477 U.S. at 402 (relying on counsel's notes and

---

[2]*See Ford*, 477 U.S. at 415 (emphasis added).

> We recently had occasion to underscore the value to be derived from a factfinder's consideration of differing psychiatric opinions when resolving contested issues of mental state. In *Ake v. Oklahoma*, 470 U.S. 68 (1985), we recognized that, because "**psychiatrists disagree widely and frequently on what constitutes mental illness [and] on the appropriate diagnosis to be attached to given behavior and symptoms," the factfinder must resolve differences in opinion within the psychiatric profession "on the basis of the evidence offered by each party"** when a defendant's sanity is at issue in a criminal trial. Id., at 81. The same holds true after conviction; without any adversarial assistance from the prisoner's representative - **especially when the psychiatric opinion he proffers is based on much more extensive evaluation than that of the state-appointed commission** - the factfinder loses the substantial benefit of potentially probative information. The result is a much greater likelihood of an erroneous decision.

The government's filings present contested issues of fact that can only be resolved at an evidentiary hearing. *Walton v. Johnson*, 269 F. Supp.2d 692 (W.D.Va. 2003)(sufficient conflicting evidence existed to warrant an evidentiary hearing on whether petitioner was competent to be executed.); *Provenzano v. Florida*,751 So.2d 37 (Fla. 1999)(when defendant and state submit pleadings containing conflicting psychiatric reports on competency to be executed material questions of fact arise which must be resolved in "the crucible of an adversarial proceeding.)

observations); *Panetti*, 551 U.S. at 936 (noting stand-by counsel's observations of Panetti "both in private and in front of the jury"); *Reid v. Tennessee*, 2007WL 1846652 (July, 2007)(relying upon lengthy affidavit from counsel and a defense investigator about interactions with Reid.).[3] Similarly, the observations and concerns of defense counsel are of recognized import in assessing a defendant's competence to stand trial. *See, e.g*., *Anderson v. Gibson*, 902 F.3d 1126, 1134 (9th Cir. 2018) (*Pate* error occurred where trial court failed to conduct competency evaluation after, *inter alia*, defense counsel expressed concern about defendant's competence ); *McManus v. Neal*, 779 F.3d 634 (7th Cir. 2015) (due process violation found in trial court's mishandling of defense counsel's assertions that defendant was not competent to proceed; *Maxwell v. Roe*, 606 F.3d 561, 569-70

---

[3]*Reid* quotes *State v. Nix*, 40 S.W. 35, 459 (Tenn 2001):

> "[unsupported, conclusory, or general allegations of mental illness" are insufficient to meet the required threshold showing.... "While affidavits and depositions of mental health professionals may be utilized, they are not essential, and a *petitioner may rely upon* affidavits and depositions from family members, *prison officials, attorneys*, or any other person who has knowledge of facts that demonstrate either the petitioner's inability to manage his personal affairs or the petitioner's inability to understand his legal rights and liabilities."

*Reid* at *2, quoting *Nix*, 40 S.W.3d at 464 (emphasis added; citing Tennessee law).

(interactions between trial counsel and defendant raised questions of defendant's competence to stand trial); *United States v. Diehl Armstrong*, 2008 WL 2963056 (W.D. Pa. July 29, 2008) (finding defendant incompetent to stand trial in part based on defense counsel's representations about interactions with defendant); *Johnson v. Keane*, 974 F. Supp. 225, 231 (S.D. N.Y. 1997) ("Defense counsel, of course, may be in an even better position than the trial judge to evaluate a defendant's capacity. Therefore, courts have repeatedly emphasized the importance of defense counsel's opinion in determining when circumstances call for a hearing.") Recognizing that the allegations in Mrs. Montgomery's complaint create a substantial showing, the government resorts to ad hominem attacks on all counsel and their experts. The single citation to the district court's final order "admonishing counsel" fails to inform the court the context and we will not waste this court's time here. The district court mentioned by the Government in fact found mrs. Montgomery had multiple mental diseases and defects.

With respect to attacks on counsel the district court did not provide counsel any opportunity to respond or defend themselves. Nor did the district court make a bar complaint or enter any sanction whatsoever. And in fact, took pains to note that he was not finding counsel ineffective. None of Mrs. Montgomery's counsel have ever been disciplined by any professional body. Ms. Henry is a nationally

recognized expert in capital litigation and is the 2019 recipient of the American Bar Association's John Paul Stevens Guiding Hand of Counsel Award. Likewise, Ms. Harwell is a frequent presenter at national seminars regarding neuroscience and trauma. Ms. Nouri is a respected criminal defense lawyer who was hand-picked by the district court judge to represent Mrs. Montgomery. The government's desperate need to smear the reputation of every person involved with Mrs. Montgomery's case speaks to the weakness of their arguments on the merits.

**V. There has been no unreasonble delay**

As it correctly notes, the government was apprized two months ago that a *Ford* claim was likely. But the government was also advised that it would depend upon whether Lisa Montgomery decompensated. She has now decompensated.

That is why some *Ford* cannot be filed "early." *Ford* claims are not cognizable until "execution is imminent," *Panetti*, 551 U.S. at 949, meaning "about to happen,"[4] not when it is convenient for the parties or the courts. Mrs. Montgomery's counsel would be pilloried by the government if they filed a *Ford* claim too early; now the government libels counsel and their experts for filing a

[4]*See* Black's Law Dictionary, Ninth Ed., 2009, Garner, B., ed., p. 450 ("imminent danger. (16c) 1. An immediate, real threat to one's safety that justifies the use of force in self-defense.").

*Ford* claim when they are supposed to.

Here is how the government has been kept abreast of *Ford* developments. The Government has been on notice that Mrs. Montgomery suffers from severe mental illness which was likely to deteriorate as a result of the Guantanamo-like conditions they imposed on her immediately upon choosing her for execution. After the warrant was read to Mrs. Montgomery she was immediately stripped of all of her clothing and given only a suicide smock to cover herself. She was deprived of all undergarments. She was not allowed socks or shoes. A large male guard placed lubricant on her ring finger and ripped her wedding ring off. Her prescription eyeglasses were confiscated. She was put in a special cell which had been built for her which has a video camera in the ceiling. The video camera allows male officers to observe Mrs. Montgomery while using the bathroom. The suicide smock gapes when using the bathroom exposing her breasts and genitalia. When counsel met with Mrs. Montgomery on October 19, 2020, they became alarmed by these conditions and immediately attempted to remedy them. They immediately called and emailed the prison's lawyer, Kaci Inman, to register their complaints. When those efforts were unsuccessful, they followed up with a letter detailing the inhumane conditions under which Mrs. Montgomery was held. Appendix ##. The letter contained the following topic headings:

1) Panties should be provided to Mrs. Montgomery immediately.

2) Mrs. Montgomery should be provided with additional clothing.

3) Because the cell is cold, Mrs. Montgomery should be provided with socks and another blanket.

4) Mrs. Montgomery must be provided with supplies and opportunities to maintain basic hygiene.

5) It is inappropriate for male guards to view the 24-hour-daily surveillance monitor of Mrs. Montgomery.

6) Mrs. Montgomery needs access to sufficient hydration and nutrition.

7) Mrs. Montgomery needs sleep.

8) Mrs. Montgomery needs to be given access to her CPAP machine.

9) Mrs. Montgomery should be given access to some form of mental stimulation/self-soothing activities, as well as fresh air.

10) Mrs. Montgomery needs access to her counsel.

11) Mrs. Montgomery needs to be able to see.

12) Despite being condemned to die, Mrs. Montgomery is entitled to be treated humanely and not subjected to pointless degradation.

Appendix H. For two solid weeks counsel continued to implore the prison to cease monitoring attorney/client conversations and to provide Mrs. Montgomery with a less restrictive environment because they feared that the environment was causing a deterioration in Mrs. Montgomery's mental functioning. BOP counsel never denied the allegations made about Mrs. Montgomery's conditions. Instead, they also expressed alarm at the possibility that Mrs. Montgomery might deterioriate and accused counsel of interfering with their daily interrogations of Mrs. Montgomery. Their lawyer wrote to counsel urging them to convince Mrs. Montgomery to speak to their doctors. Counsel responded to this letter as follows:

> We are deeply concerned for Mrs. Montgomery's well-being. We are alarmed by Mrs. Montgomery's psychological deterioration while under the current restrictive housing conditions, and as a result of her fear of retaliation by your team. We are particularly concerned that Mrs. Montgomery believes that she has to please your staff in order to keep her right to wear underwear. This is inflicting significant psychological distress upon Mrs. Montgomery and interfering with Mrs. Montgomery's ability to work with us regarding her legal claims. We ask that you inform her in writing of your assurances that you will provide her with underwear and socks every day while she is in your custody, and that you will allow her to shower and use the toilet without men watching. We ask that you let her know these basic conditions will not be taken away from her regardless how she answers questions by staff.
>
> We note that after we sent the letter asking for details about the conditions of Mrs. Montgomery's transfer to Terre Haute the warden reversed his prior determination that she could be hugged by her family members during her visits. It appears that you and your staff are

> withholding privileges in retaliation for our legal work. After decades of coercive control by her custodians and abusers, these kinds of retaliatory tactics are profoundly terrifying to Mrs. Montgomery. We do not doubt that she appears fearful of you. Restoring her confidence in basic decent conditions is a critical step that you can take now to improve her psychological well-being. As you are well aware, she faces a grave risk of psychosis and break from reality when under this kind of psychological stress.
>
> We are aware that communications between Mrs. Montgomery and her medical providers is shared with the lawyers representing the government who are seeking her execution. We ask that this practice cease immediately. Mrs. Montgomery has not and does not give you consent to share this information. She has given us consent to receive copies of her medical and psychological records. We have yet to receive those documents from you. In fact, we have been told that we can expect to wait up to six months before receiving these records. This is unacceptable.
>
> If your goal is to treat Mrs. Montgomery, then we respectfuclly suggest that you bring in independent contract mental health experts.
>
> Finally, we ask that you refrain from any direct or indirect interference with our attorney-client relationship with Mrs. Montgomery.

Appendix I, Nov. 11, 2020 letter to Kaci Inman from Kelley Henry. Ms. Inman did not respond to this letter. When informal attempts to remedy the situation failed, volunteer counsel filed a complaint alleging that Mrs. Montgomery's conditions and planned transfer to Terre Haute for execution were and would cause a continuing deterioration of Mrs. Montgomery's already fragile mental state on November 16, 2020. The complaint did not seek a stay of execution, but rather improvement in her conditions and for BOP to conduct the execution at the

Federal Medical Center in Fort Worth, Texas where Mrs. Montgomery has been housed since 2008. Presumably the Medial Center has IVs, gurneys, and personnel who know how to administer IV medications. Counsel warned the Government that due to Mrs. Montgomery's particular constellation of mental health symptoms their conduct *she was at risk for losing contact with reality*. The complaint and motion for injunctive relief was supported by Dr. Porterfield's declaration which states:

> 28) I have examined and treated survivors of torture over the past 22 years in multiple contexts (immigration courts, criminal proceedings, international courts, civil proceedings). This work has involved opining on the impact of various confinement conditions and maltreatment that was enacted on an individual. My area of clinical expertise includes identifying the impact of maltreatment and conditions that rise to the legal level of torture.
>
> 29) It is my clinical opinion that Ms. Montgomery's current conditions of confinement will have an impact tantamount to the impact of torture on her. I will outline why below.
>
> 30) Ms. Montgomery's early adolescent experiences of chronic sexual assault by her stepfather, as well as gang rape in the context of being trafficked to other adult men is essential to understanding her response to the current conditions of confinement. Essentially, she is a victim of sexual torture who is being placed into a context of bodily exposure, degradation, lack of control and deprivation that is highly likely to trigger her early experiences of sexual violence. The triggering of past victimization is an expected response when a survivor is placed in conditions that mirror aspects of the earlier traumas. The response is involuntary when this occurs—that is, it takes place through nervous system and endocrine system reactions that activate a stress response that was required during the earlier trauma. This response can be an

"uproar" response involving hyperarousal and explicit fear responses (fight or flight) or a "shutdown" response, which involves disconnecting from one's environment and one's sensations (dissociation). It is also possible for individuals to fluctuate between these two types of responses. Ms. Montgomery has a history of both types: uproar and shutdown responses. Her responses have been severe enough in the past that she has been psychotic—that is, unable to perceive reality in an accurate and stable fashion. Below, I will indicate the aspects of this current condition that are likely to trigger these responses.

31) *Bodily Exposure:* Since being told she is being executed, Ms. Montgomery has been kept in a lit room in a heavy quilted but ill-fitting smock with constant surveillance by male guards. She is forced to request toilet paper for her sanitary needs and she is not permitted to wear undergarments. These conditions are remarkably parallel to the conditions when she was being sexually victimized by her stepfather and multiple men. Specifically, her stepfather created a separate room, with an exit only to the outside of the house and which provided him the opportunity to watch her through a bathroom window. It was in this room that Ms. Montgomery was frequently raped by her stepfather and other men. She specifically recalled the men putting money on her dresser after raping her. Thus, Ms. Montgomery's current segregation confinement is horrifically similar to what she suffered for years in her adolescence. It is likely that such sickening reminders will make her psychologically deteriorate.

32) *Environmental manipulation:* The constant light in Ms. Montgomery's cell, as well as the cold temperature with inadequate coverings for Ms. Montgomery (both clothing and blankets appear to be inadequate to keep her warm) are the types of environmental conditions that can deteriorate a prisoner's daily functioning. The interaction between such conditions—the temperature keeping Ms. Montgomery physically uncomfortable and the light preventing her from experiencing circadian rhythms of arousal and rest—exacerbates the assault on her senses of each of the conditions. The conditions then are likely to affect sleep patterns in Ms. Montgomery. Sleep deprivation is widely known to lead

to fairly rapid deterioration in an individual's cognitive and emotional functioning, as well as increase the risk of medical problems.[1] Ms. Montgomery uses a CPAP machine for apnea, and without this machine, her sleep deprivation and subsequent deterioration will likely be more severe.

33) *Control/Deprivation:* Ms. Montgomery's current treatment is, even in the context of incarceration, an astonishingly controlled and deprived environment, with almost no recognition of this woman's many years of compliant behavior as an inmate. She is smocked; her room is constantly lit and cold; she has no comfort items; she is given no exercise or outside recreation opportunity; she must request toilet paper; she is denied medically necessary supplies such as her CPAP and eyeglasses. This kind of removal of basic human amenities creates a sense of helplessness and powerlessness. In essence, these conditions reduce Ms. Montgomery to a state of her most basic human functioning only—keeping herself warm, toileting, and eating. These conditions mirror Ms. Montgomery's adolescent experience of being under the complete coercive control of her stepfather. The state of helplessness is likely to become another trigger that will compromise Ms. Montgomery's functioning.

34) *Degradation*: Ms. Montgomery's treatment since being told she will be killed, has been degrading and humiliating. As has been discussed above, her nudity except for a smock, ability to shower only three times a week and having to ask for squares of toilet paper each time she uses the bathroom would be humiliating for almost any individual. Upon being told she was being executed, a correction officer smeared Vaseline on Ms. Montgomery's finger and forced off her wedding ring, an act that is highly questionable as a necessary precaution for a prisoner's safety. The prison's removal of Mrs. Montgomery's wedding band was degrading to Mrs. Montgomery's sense of self and her right to customary respect for her marriage. The destruction and defiling of treasured

[1] M. Mullington JM. Sustained sleep restriction reduces emotional and physical well-being. Pain. 2005 Dec 15;119(1-3); Kim DJ, Lee HP, Kim MS, Park YJ, Go HJ, Kim KS, Lee SP, Chae JH, Lee CT. The effect of total sleep deprivation on cognitive functions in normal adult male subjects. Int J Neurosci. 2001 Jul;109(1-2):127-37.

objects is widely known as a method used by regimes who torture in order to create a condition of annihilation of the sense of self of the victim.[2]

35) Sexual abuse victims' suffering is, of course, physical in nature, as the body is intruded upon, manipulated and harmed, but the psychological degradation and humiliation of sexual violence often leaves an even more painful imprint. Sexual assault victims struggle with overwhelming feelings of being damaged and objectified, often turning against themselves in the aftermath of the abuse. This makes them even more vulnerable to feeling humiliated or degraded, as they respond to their environment with these self-attacking meanings. Thus, these conditions described above are likely to worsen Ms. Montgomery's tenuous sense of herself and contribute to further deterioration.

36) *Overall worsening of her mental health condition:* Ms. Montgomery's severely impairing clinical conditions of complex posttraumatic stress disorder and bipolar disorder are likely to be exacerbated by the conditions that have been laid out above. Specifically, for a survivor of gang rape and chronic sexual assault to be isolated and left without proper clothing or undergarments while being surveilled on camera would be highly triggering to her fear arousal and threat-detection systems. It is likely that these conditions will make Ms. Montgomery vulnerable to psychotic levels of dissociation, as her brain reacts to the bodily threat that she is perceiving. Ms. Montgomery's life history demonstrates that her dissociation has reached the level of psychosis at many points throughout her life in which she has been unable to accurately perceive the state of her body (depersonalization), her environment (derealization) and her emotional states (disengagement). Being thrown into isolated, exposing conditions of confinement within moments of being told she will be executed would be severely destabilizing to a healthy individual, much less a person with massively impairing dissociative mental illness.

37) There is extensive scientific evidence that conditions of solitary confinement can exacerbate mental illness. Reviewing the literature,

---

[2] Herman, Judith (1992). Trauma and Recovery, Basic Books: New York 80-81.

Metzner and Fellner (2010) argue that:

> The adverse effects of solitary confinement are especially significant for persons with serious mental illness, (e.g. schizophrenia, bipolar disorder, major depressive disorder) that is usually characterized by psychotic symptoms and/or significant functional impairments. The stress, lack of meaningful social contact, and unstructured days can exacerbate symptoms of illness or provoke recurrence.[3]

Numerous researchers and clinicians have emphasized the particular dangers of solitary confinement on prisoners with mental illness, including worsening existing psychiatric disorders by making symptoms more severe and more pervasive.[4] For example, a prisoner who struggles (as Ms. Montgomery does) with keeping a clear hold on reality is vulnerable to a worsening of this condition (psychosis) by being deprived of the social contact and environmental contexts that reinforce reality.

**D. Impact of the proposed transfer of Ms. Montgomery from FMC Carswell to USP Terre Haute**

38) I am told that Ms. Montgomery has been advised through her counsel of the intent to transfer her from FMC Carswell where she has been held since 2008 to USP Terre Haute for execution. I am generally familiar with both institutions because I have evaluated prisoners in both locations. I am aware that FMC Carswell houses only women and that, as such, Ms. Montgomery has been surrounded by other female inmates since her incarceration there. I am aware that USP Terre Haute

---

[3] Metzner, J. & Fellner, J. (2010). Solitary confinement and mental illness in US prisons: A challenge for medical ethics. *J Am Acad Psychiatry Law.* 38:104–8.
[4] Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement. *Crime & Delinquency*, 49(2), 124-156; Kurki, L., & Morris, N. (2001). The purposes, practices, and problems of supermax prisons. Crime and Justice: A Review of Research, 28, 385-424.; Haney, C. (1993). "Infamous punishment": The psychological consequences of isolation. *National Prison Project Journal*, 8(2), 3-7, 21.

is a male institution, housing, in the normal course of business, only male inmates.

39) This proposed transfer is likely to have a profoundly devastating impact on Ms. Montgomery. As described above, Ms. Montgomery's posttraumatic stress from chronic sexual abuse and gang rape by men makes her highly vulnerable to triggers that make her feel unsafe. Being moved to a men's prison, while she awaits her execution will likely create unbearably frightening circumstances for Ms. Montgomery. It is likely that her perception that she will be assaulted in this environment will be triggered, leading to an increase in symptoms of dissociation and possibly psychosis. While this perception of vulnerability to assault may seem extreme, it is certainly not difficult to imagine how a female inmate in a male prison could feel afraid for her safety. For Ms. Montgomery, whose adolescence was in fact characterized by violent sexual assaults by multiple men, this perception of sexual threat is in fact a recapitulation of her lived experience.

40) *Summary:* As discussed above, the combination of conditions that comprise Ms. Montgomery's custody are highly likely to contribute to her psychological deterioration. As a survivor of chronic sexual assault, including gang rape and sex trafficking as an adolescent, Ms. Montgomery is likely to be deleteriously affected by the bodily exposure, environmental manipulation, extreme control measures and degrading treatment that she has experienced. Her mental illness, specifically complex posttraumatic stress disorder and bipolar disorder, is at great risk of worsening if she is kept in these conditions. Her move to a men's penitentiary is also a potentially traumatizing experience which will likely cause her to deteriorate.

Attachment ##, DATE, Declaration of Dr. Katherine Porterfield.

The Government was put on notice that Mrs. Montgomery's mental health would deteriorate as the execution approached depending on her conditions. Counsel did not sandbag or manufacture a *Ford* claim, as the Government's

pleading insinusates. Quite the contrary.  Counsel warned the government that Mrs. Montgomery's mental health would continue to decline unless the unduly harsh conditions of her confinement were amerliorated. Counsel offered suggestions to prevent this deterioration. Those suggestions were ignored. As predicted, Mrs. Montgomery's mental functioning as declined.

**Evidentiary hearing:**

Respectfully Submitted,

Kelley J. Henry
Supervisory Asst. Fed. Public Defender
Office of the Federal Public Defender
Middle District of Tennessee
810 Broadway, Suite 200
Nashville, Tennessee 37203
Phone: (615) 736-5047
Fax: (615) 736-5265
Kelley_Henry@fd.org

Amy D. Harwell
Assistant Chief, Capital Habeas Unit
Office of Federal Public Defender
Middle District of Tennessee
Amy_Harwell@fd.org

Lisa G. Nouri
Missouri Bar # 32800
2526 Holmes Street
Kansas City, Missouri 64108
Phone: (816) 875-0448
Lisanouri_atty@hotmail.com

BY: /s/ Kelley J. Henry
Counsel for Mrs. Montgomery

CERTIFICATE OF SERVICE

I certify that I filed the foregoing document using the court's CM/ECF filing system which electronically notified opposing counsel by email.

/s/ Kelley J. Henry
Counsel for Mrs. Montgomery