OFFICE OF THE
**FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF
TENNESSEE**

**HENRY A. MARTIN
FEDERAL PUBLIC DEFENDER**

810 BROADWAY, SUITE 200
NASHVILLE, TENNESSEE 37203-3805
TELEPHONE: 615-736-5047
FAX: 615-736-5265

October 21, 2020

Mrs. Kacie Inman
Senior CLC Attorney
Federal Bureau of Prisons
FMC Carswell
J Street, Building 3000
P.O. Box 27066
Fort Worth, TX 76127

Dear Mrs. Inman:

This letter is to follow up with additional concerns that have manifested since my initial email to you about the conditions of Mrs. Montgomery's confinement. I realize that we may need to be in relatively constant contact the next few weeks, but it seemed important to memorialize our most pressing concerns as quickly as possible.

**1) Panties should be provided to Mrs. Montgomery immediately.**

The other inmates on suicide watch are provided some form of underwear. It is also our understanding that the male inmates in Terre Haute are not deprived of their undergarments when an execution date it set. Mrs. Montgomery is a survivor of repeated and violent sexual assault. Given her history and prison's awareness of that trauma, forcing her to endure the sensation of being without basic undergarments is akin to torture. Though you state in your email today that the safety risk of each item of clothing or property must be assessed and evaluated by mental health professionals, it is unclear how access to one clean pair of panties at a time could possibly present a safety risk.

**2) Mrs. Montgomery should be provided with additional clothing.**

While very slightly less critical than access to panties, Mrs. Montgomery would feel much more secure in pants of some form, even if worn under that ridiculous suicide gown. Or, if pants are somehow a suicide precaution concern, she should be permitted to wear the dress that she usually wears.

**3) Because the cell is cold, Mrs. Montgomery should be provided with socks and another blanket.**

The cell in which Mrs. Montgomery is held is cold. Mrs. Montgomery reports that her feet in particular are very cold. While we understand suicide precautions, it is unclear how she could possibly harm herself with socks, particularly given the constant surveillance.

We ask that you confirm, as your email today stated, that an additional blanket was provided to Mrs. Montgomery, and ask that you ensure that this blanket is sufficient to address the temperature issues of the cell; if not, additional clothing and/or blankets must be provided. It is our understanding that she was provided a clean blanket but the old blanket taken. Access to items sufficient to keep Mrs. Montgomery from being constantly cold pose no realistic risk of harm.

**4) Mrs. Montgomery must be provided with supplies and opportunities to maintain basic hygiene.**

Since being moved to suicide watch, Mrs. Montgomery has only been given two opportunities to shower, and has not been given access to hygiene supplies. You have indicated in your email today that Mrs. Montgomery will be allowed showers only on Mondays, Wednesdays, and Fridays. Mrs. Montgomery needs regular – that is, daily – access to a shower. She should also be provided with access to: a washcloth to cleanse herself in the shower; deodorant to use once she is clean; oral hygiene supplies (i.e., toothbrush and tooth paste) to use twice daily; and more than 4 squares of toilet paper at a time. She should also be allowed to wash her hands with soap before eating. Again, while we understand that suicide watch necessitates certain precautions, it is unclear how Mrs. Montgomery could harm herself with access to adequate amounts of toilet paper and limited access to basic hygiene supplies and opportunities.

Her cell needs to be cleaned at regular intervals starting immediately. Due to her distress and the lack of deodorant, the cell has begun to stink. You have indicated in your email that her cell will be cleaned on Mondays, Wednesdays, and Fridays. We ask that you ensure that such cleaning is thorough and that if cleanliness or odor remains an issue despite these cleanings, that cleanings be conducted more frequently.

**5) It is inappropriate for male guards to view the 24-hour-daily surveillance monitor of Mrs. Montgomery.**

Mrs. Montgomery is being monitored 24 hours per day, including while she sleeps and uses the toilet. Mrs. Montgomery advised counsel that she overheard a male guard commenting that he could see the monitor from the guard's area. While we understand that she must be monitored for safety reasons, it is inappropriate for male guards to have access to view the monitor. This would be true for the dignity of any female prisoner but is all the more necessary to avoid given Mrs. Montgomery's history of repeated violent sexual trauma by men. The thought that male guards can view her during vulnerable

and exposed moments any time of day is psychologically harmful to Mrs. Montgomery.

**6) Mrs. Montgomery needs access to sufficient hydration and nutrition.**

It is our understanding that right now, she must ask for access to a funnel-type paper cup for water each time she wishes to drink. It is our understanding that other M3 inmates on suicide precautions are allowed a rubber cup in their cells so as to be able to access water. We request that Mrs. Montgomery be provided a rubber cup instead of having to ask for individual paper cones.

The water in the cell also tastes so bad as to be unpotable. In your email, you state that Mrs. Montgomery has continual access to water in her cell; however, dehydration remains a pressing risk if the water to which she has access is not fit to drink.

It is our understanding that Carswell routinely provides a powdered drink mixture with the meal trays, but that, for some unknown reason, those have been removed from Mrs. Montgomery's trays. She needs the drink mix or access to the drink mix she already owns that is in her regular cell. We also ask that she be allowed to order supplementary food from commissary. You noted in your email that you are looking into the availability of powdered drink mix and that she has been provided with some soda, and that the availability of additional commissary items will be determined based upon the assessment of mental health staff. It is again unclear how allowing supplementary beverages and food from the commissary, in order for Mrs. Montgomery to maintain adequate hydration, nutrition, and caloric intake, could increase her risk of suicide.

Additionally, it is our understanding that her meals are delivered hours before she is fed—her 4:30 p.m. supper arriving as early as 10:00 a.m. and sitting outside her cell, unrefrigerated, for more than six hours. This includes the ostensibly "hot" items. We request that all food be properly refrigerated until the time it is to be delivered, and that it then be heated for that delivery. In any event, Mrs. Montgomery should not, in any case, be fed meat or other perishables that have been sitting exposed in the hallway for hours.

**7) Mrs. Montgomery needs sleep.**

The light in her cell is currently illuminated 24 hours per day every day. Exposure to continuous light is a form of torture. There must be some way to dim the light of the cell for her to sleep even while allowing the guard to monitor her.

Additionally, there is a clock positioned in the hallway outside her cell that ticks loudly but that she cannot see from the cell. We ask that either the clock be repositioned such that Mrs. Montgomery can see the clock and thereby orient herself or, if that is somehow impossible, that the clock be removed so that she is not constantly subjected to the sound of a ticking clock.

**8) Mrs. Montgomery needs to be given access to her CPAP machine**.

Mrs. Montgomery has sleep apnea which is treated by use of a CPAP machine while she sleeps. She should not be denied access to necessary medical treatment while on suicide watch.

**9) Mrs. Montgomery should be given access to some form of mental stimulation/self-soothing activities, as well as fresh air.**

Mrs. Montgomery's psychological state would be aided by access to her MP3 player (music), a paperback book, crayons and coloring pages or a coloring book and/or by the ability to see a television. Her attorneys are willing to purchase such items and have them shipped to the facility by Amazon directly, such that nothing would have to be retrieved from her cell. Her continued confinement without stimulation or the ability to occupy her mind will contribute to a decline in her mental wellbeing and competency.

Additionally, we understand that Carswell has added recreation cages outside the unit where Mrs. Montgomery is housed for the use by M3 inmates. Mrs. Montgomery should be allowed time outside to breathe fresh air each day.

**10) Mrs. Montgomery needs access to her counsel.**

We need her to be able to write notes of questions and thoughts for her attorneys. This is an essential part of our attorney-client communication and relationship.

We request that Mrs. Montgomery also have access to her in-coming mail and be provided both with a way to write letters and to have them mailed. This should apply, at a minimum, to her legal team, her family, and her other acquaintances.

**11) Mrs. Montgomery needs to be able to see.**

Mrs. Montgomery requires prescription glasses to correct her vision. She needs to be provided the glasses prescribed by the BOP approved eye-doctor.

**12) Despite being condemned to die, Mrs. Montgomery is entitled to be treated humanely and not subjected to pointless degradation.**

Finally, we ask that Mrs. Montgomery's wedding band be returned. It is our understanding that no male prisoner at Terre Haute has been subjected to the degradation of his personhood that was inherent in the forcible stripping of the symbol of Mrs. Montgomery's marriage from her finger. The ring was so securely on her finger that the removal required lubricant, significant force, and was quite physically painful for Mrs. Montgomery. The actions of the prison in removing her wedding band have no possible safety justification and appear to have been taken solely to dehumanize and demean her.

As discussed in my earlier email, we ask that as you respond to each of these requests, advising us as to whether the prison intends to provide the requested item/activity, and if not, the putative justification for the refusal.

We will continue to primarily communicate with you by email and phone but felt that these concerns were sufficiently urgent that it was important to set them out more fully.

Sincerely,

Kelley J. Henry
Supervisory Assistant Federal Defender

Amy D. Harwell
Asst. Chief, Capital Habeas Unit

Counsel for Lisa Montgomery