Declaration of John M. Shields, Ph.D., ABPP

I, John M. Shields, declare as follows:

1. I am a clinical and forensic psychologist, licensed to practice in California, Arizona and New York. I am Board Certified in Forensic Psychology (Diplomate) by the American Board of Professional Psychology [ABPP]. I obtained my Ph.D. in Clinical Psychology from the California School of Professional Psychology in 1992. I am certified as a Clinical Trauma Professional by the International Association of Trauma Professionals and completed certification in Neuropsychological Assessment by the Extension Program of the University of California at Berkeley. My training and experience are in the areas of forensic psychology and neuropsychology.

2. I currently have a clinical practice, specializing in forensic psychology, in San Francisco, California and in New York, NY. I am also currently a consulting neuropsychologist and forensic psychologist with Baker Street Behavioral Health in New Jersey, as well as an Expert Consultant to the United States Air Force. I am on a number of city and county Court panels to provide Court appointed expert services in criminal and juvenile cases.

3. In the course of my practice as a forensic psychologist, and formerly a prison psychologist, I have had occasion to interview and/or evaluate hundreds of individuals, juvenile and adult, who have trauma histories; including diagnoses of post-traumatic stress disorder [PTSD] and complex-PTSD which is suggestive of the most severe trauma histories. I have testified previously as an expert witness in state, federal and military court on trauma.

4. I have previously worked as an evaluator for California Department of State Hospitals, both in the Mentally Disordered Offender and Sexually Violent Predator prograMrs. In those roles, I conducted evaluations of incarcerated individuals; many of whom had histories of severe, complex trauma. I also worked at the California Medical Facility [CMF], a state prison for inmates with significant psychiatric and/or medical conditions who require specialized care during their incarceration. In my role as a psychologist at CMF I conducted treatment and evaluation of inmates, and provided trainings for medical and mental health staff in the area of psychological

evaluation and differential diagnosis. In my private consulting practice, I have conducted more than 2,000 forensic evaluations, including more than 500 competency evaluations. The competence evaluations included both adult and juvenile competence to stand trial assessments. I have testified as an expert witness in state and federal court as an expert witness on more than 150 occasions, including in the area of competence evaluation.

5. I am familiar with the professional standard of care in conducting an evaluation of an individual's competency to be executed under the Supreme Court cases, *Ford v. Wainwright*, 477 U.S. 399 (1986), *Panetti v Quarterman*, 551 U.S. 930 (2007), and *Madison v. Alabama*, 139 S.Ct. 718 (2019). I am also familiar with the legal and psychological standards for assessing competence to be executed, as set out in the professional literature. In 1986, the U.S. Supreme Court ruled that the Eighth Amendment prohibits executing insane defendants [*Ford v. Wainwright*, 477 U.S. 399 (1986)]. Years later, in 2007, the Court clarified that the Eighth Amendment forbids executing those who cannot rationally understand why they are to be executed and noted that psychotic disorders may preclude such an understanding [*Panetti v. Quarterman*, 551 U.S. 930 (2007)]. Most recently, in 2019, the Court ruled that a finding of incompetency to be executed is not associated with any particular diagnosis but rather with a specific consequence, i.e., the defendant's inability to rationally understand the reasons for the imposition of the death sentence [*Madison v. Alabama*, 139 S. Ct 718 (2019)].

6. In *Madison*, Alabama's expert testified that Mr. Madison "was able to accurately discuss his legal appeals and legal theories with his attorneys," and therefore must rationally understand why he was being executed. Similarly, in the present case of Mrs. Montgomery, the government's experts, Drs. Wheat & Pietz, describe in some detail Mrs. Montgomery's ability to discuss her pending execution with attorneys and with mental health professionals. They appear to conclude in a similar manners as the state expert in *Madison*. Dr. Pietz states [para. 12 of her declaration],
   > " . . . from my review of records I do not see any evidence that Mrs. Montgomery is presently suffering from a major mental illness that would impair her ability to comprehend her legal situation or interact with her attorneys. Moreover, my assessment of Mrs. Montgomery's conversation with her family members suggests that Mrs.

> Montgomery understands her current legal situation, legal options, that she is going be executed, and that execution means death."

7. Despite these detailed discussions about her awareness of her pending execution, there is not a scintilla of clinical evidence that she has a rational understanding of *why* she is about to be executed. Drs. Wheat and Pietz do not address whether or not Mrs. Montgomery rationally understands the reasons for the imposition of the death sentence as required by *Madison*.

8. Both Drs. Wheat & Pietz are no doubt experienced psychologists. Both acknowledge that they did not conduct an interview of Mrs. Montgomery, nor did they evaluate her directly. Nonetheless, Dr. Pietz gives an opinion about Mrs. Montgomery regarding criteria she believes to be relevant to the question of Mrs. Montgomery's competence to be executed:
   > " . . . from my review of records I do not see any evidence that Mrs. Montgomery is presently suffering from a major mental illness that would impair her ability to comprehend her legal situation or interact with her attorneys." [Pietz declaration, pg. 3, para. #12]

9. Noted is that nowhere in Dr. Pietz' declaration is an acknowledgement of the limitations on the reliability and validity of opinions rendered when an interview of the subject is not conducted. The American Psychological Association "Ethical Principles of Psychologists and Code of Conduct," sections, 9.01.b-c, states,
   > "(b) Except as noted in 9.01c, psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When, despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made and the result of those efforts, clarify the probable impact of their limited information on the reliability and validity of their opinions, and appropriately limit the nature and extent of their conclusions or recommendations.
   > (See also Standards 2.01, Boundaries of Competence, and 9.06, Interpreting Assessment Results.)
   >
   > "(c) When psychologists conduct a record review or provide consultation or supervision and an individual examination is not

    warranted or necessary for the opinion, psychologists explain this and the sources of information on which they based their conclusions and recommendations."

10. It is my opinion that Sec. 9.01.c above does not apply given that all of the available literature I am aware of indicates that an evaluation of an individual for the purpose of establishing their competence to be executed is both warranted and necessary. Therefore, it is my opinion that Dr. Pietz' declaration should include a discussion of the probable impact of her limited information (lack of an in-person interview/evaluation of Mrs. Montgomery) on the reliability and validity of her opinions.

11. Noted is that the materials available, and which were reviewed by both Drs. Wheat and Pietz include discussion of Mrs. Montgomery's history of head injury, and medical findings indicating brain damage:

> "Mrs. Montgomery's brain is compromised structurally and functionally. My clinical observations are supported by the reports of Drs. Gur and Nadkarni, as well as the neuropsychological data produced by Dr. Fucetola, which I have reviewed. Mrs. Montgomery demonstrates behaviors and symptoms associated with functional impairment of the cerebellum. Schmahman et al have documented the role of the cerebellum in controlling executive skills. Although initially considered a part of the brain controlling balance, with purely motor functions, the last 22 years have demonstrated the cerebellum to be a major cognitive mechanism for the control of nuanced executive functioning skills, particularly decision making, affective control, understanding context, and effective deliberation. Mrs. Montgomery's cerebellum has been found to be quantitatively and qualitatively impaired, providing significant vulnerability to her cognitive capacity.
>
> Imaging of her brain reflects an overall loss of brain volume as well as a particular loss of tissue around the midline of her brain.[1]  *See Gur*

---

[1] Mrs. Montgomery also has a history of head trauma. While her brain was still forming, Mrs. Montgomery sustained repeated head injuries during her stepfather's frequent sexual assaults during her teenaged years. Mrs. Montgomery's mother and

*Report*. Other structures that appear diminished are the basal forebrain, particularly the frontal right side of the frontal/parietal lobes and the superior parietal lobe. PET scans show her brain is hypermetabolic, particularly in the amygdala. Mrs. Montgomery's brain impairment is a condition that cannot improve. Though additional trauma, injury, or aging may further compromise its functioning, the brain does not "repair" or heal from such losses. The portions of Mrs. Montgomery's brain that are impaired are early brain structures, which are fully developed early in a child's life. This is particularly seen in the hypermetabolic functioning of her amygdala—the center of the body's fear and stress responses that is also pivotal in the workings of memory. Erosion or sheering of brain tissue occurred, resulting in a loss of brain volume, particularly in midline of her brain and in the parietal region—which is critical for the processing of sensory information and accurate perceptions of reality. While imaging reveals the quantifiable, structural defects, Mrs. Montgomery's behaviors reflect these brain losses, including her impulsivity and vulnerability to cognitive deterioration and psychotic disorganization.

Mrs. Montgomery's functioning has maintained a baseline in prison despite her brain condition, in large part to the simplification of the demands of daily life created by the structure of the prison environment. Without the requirements to work in the public sector, care for her children, or provide for her necessities, Mrs. Montgomery has eventually, with significant reinforcement and initial titration of both environment and medication, been able to achieve minimal daily functioning —including being able to perform a prison job (doing laundry, floors, emptying trash cans), and to participate in prison activities (educational and recreation classes, pod-games, craft

---

stepfather subjected her to repeated blows on her head with their bare hands, fists, and objects during her childhood. Additionally, Mrs. Montgomery's half-brother reported that he threw a size D battery at her that struck her "square in the back of the head. She went down like a crushed rag doll." *Biopsychosocial p. 92*. She was taken to the emergency room for treatment. *Id.* Later, she suffered multiple motor vehicle accidents in which she hit her head, including more than one where she was unrestrained and hit her head on the windshield, on two occasions she suffered headache and impaired memory. *Fucetola Report*.

activities). However, the ameliorative effect of this structure has been vitiated by removing her from her pod and placing her on suicide watch without access to her coping mechanisms (music, hand-crafts, etc.). Further, the stress inherent in her impending execution, combined with the added stress of anticipation of her transport to another facility, appears to have exposed her brain's vulnerability, causing a recurrence of well-documented psychosis and impaired decision-making functioning." [Declaration of George Woods, MD, pgs. 3-5]

12. Noted is that the Supreme Court of the United States has addressed the issue of brain development and how the immature or "undeveloped" brain warrants special consideration. As Fabian (2010) summarized in part,

"The U.S. Supreme Court held in *Roper v. Simmons* that the Eighth and Fourteenth Amendments prohibited the punishment of death for Simmons or any juvenile younger than 18 (at the time of the crime). The basis for this finding rests upon neuroscience research which has indicated that the adolescent brain does not mature until early adulthood (American Bar Association, 2004a; Aronson, 2007; Giedd et al., 1999; Gotgay et al., 2004; Gur, 2005; Kwong et al., 1992; Lewis, Yeager, Blake, Bard, & Strenziok, 2004). Structural brain anatomical studies have revealed that various sections of the brain become fully myelinated and pruned at different times, with those brain regions responsible for basic life process and sensory perception maturing earliest (Kambam & Thompson, 2009; Yakovlev & Lecours, 1967).

"The frontal lobes of the brain, and especially the prefrontal cortex, are considered to play a critical role in the "higher order" functions of the brain, that is, abstraction and reasoning; understanding others' reactions; planning; organizing; controlling impulses; emotional regulation; understanding, processing, and communicating information; establishing, changing, and maintaining a mental set; handling sequential behavior; using knowledge to regulate behavior; and exhibiting empathy regarding how behavior affects others. In juveniles, the prefrontal cortex is not completely developed during adolescence (Golden, Jackson, Peterson-Rohne, & Gontkovsky, 1996)

and is the last region of the brain to mature (American Bar Association, 2004b). Subsequently, in adolescents, it is hypothesized that they process emotional information through the amygdala, or as "lower order" responses (emotional center of the brain). The amygdala neural system is impulsive and based on immediate emotional responses and the prospects of an option (Fabian, 2009a)."

13. If in *Roper v. Simmons*, the United States Supreme Court decided that special considerations are warranted regarding execution in the case of an immature or inadequately developed brain [as seen in juveniles], it stands to reason that a similar consideration is warranted in the case of a damaged brain as has been described in the case of Mrs. Montgomery. Even if this is not a legal assertion, such consideration is warranted by any forensic neuropsychologist who reviews Mrs. Montgomery's case. Such an analysis, or even mention of the need for such analysis is missing from both the declarations of Drs. Wheat and Pietz. If this aspect of Mrs. Montgomery's hsiotry wee noted, perhaps the government's consultants would take a more cautious approach to the methodology for evaluating her for execution.

14. The standard of care for this type of forensic evaluation [competence to be executed] requires face to face, in person contact, in order to observe the symptoms and manifestations in behavior of any psychotic illness or effects of a history of serious trauma. It is essential to observe nonverbal behaviors as well as engage a person verbally. Facial movements, such as a quivering lip and subtle eye movements, whether the individual is able to pay attention or is distracted by voices or dissociating as opposed to being distracted by something actually happening in the room. Essentially, a mental health professional doing a forensic evaluation by videoconferencing faces a serious risk of missing important, non-verbal symptoms that weigh on the determination of an individual's competency to be executed.

15. The research on telepsychology clearly points to the significant limitations of trying to conduct evaluations not in person and face to face: difficulty establishing and maintaining rapport, lack of privacy, lack of safety for the inmate, technological limitations, decreased ability to detect symptoms, and lower quality of care (See, Cowan et al, Barriers to Use of Telepsychiatry: Clinicians as Gatekeepers, Mayo Clinic Proceedings, December 2019; 94(12):2510-2523).

16. Since the beginning of the Covid-19 pandemic, professional papers have documented the limits of remote evaluations, even in non-high stakes settings. These limitation include: loss of rapport and clinical intimacy; less information was obtained during the interviews, including mannerisms, facial expressions, physical condition, odors, physical movements; increased difficulties for patients with auditory or visual impairments; efficacy was negatively effected, both by the limits with technology and in how mental health providers describe confidence about their own assessments under these conditions; less privacy was available and it was more difficult to make use of silences as a clinical tool; inability to conduct a full examination, including a physical exam and medical condition and medication monitoring; and the duration of the "visits" was more limited and not as in-depth (Uscher-Pines et al, Suddenly becoming a "Virtual Doctor": Experiences of psychiatrists transitioning to telemedicine during the COVID-19 pandemic, Psychiatric Services 2020, 71(11):1143-50; Chen et al, COVID-19 and telepsychiatry: Early outpatient experiences and implications for the future, General Hospital Psychiatry 2020, 66:89-95).

17. The published professional literature has addressed the evaluation of a defendant's competence to be executed (Park BP, Cipriano T: Competency to be executed and the dynamic nature of mental status in psychotic illness. J Am Acad Psychiatry Law 47:113–5, 2019.  Chamblee LE: Time for a legislative change: Florida's stagnant standard governing competency for execution. Fla St U L Rev 31:335–76, 2004.  Ebert B: Competency to be executed: a proposed instrument to evaluate an inmate's level of competency in light of the eighth amendment prohibition against the execution of the presently insane. Law & Psychol Rev 25:29–57, 2001.).

    In one such very recent discussion [Updegrove, A. H. & Vaughn, M. S. (2020).  Evaluating Competency for Execution after *Madison v. Alabama*, J Am Acad Psychiatry Law 48(4) online, 2020. DOI:10.29158/JAAPL.200003-20.], the issue of in-person evaluation is addressed:
    > "Evaluators should meet with the defendant *in person* [emphasis added] for an appropriate length of time when conducting a competency evaluation. What constitutes an appropriate period of time will necessarily vary based on the evaluee's mental state. In

Page **8** of **10**

situations where the evaluee is too impaired to meaningfully participate in the interview process, interviews may be brief. Other interviews, however, could last several hours. Because the required threshold for establishing competence for execution is relatively low, a single meeting may be sufficient to evaluate defendants who are cognitively intact and not actively displaying symptoms of mental illness. In other, more complex situations involving defendants exhibiting cognitive decline and active symptoms of mental illness, it may be necessary to meet with the defendant on multiple occasions. The evaluations themselves should take place in "a private, distraction-free area," which may require temporarily moving the defendant off of death row, where noise pollution is prevalent."

18. As stated above, I have conducted hundreds of evaluations related to competence. I know many forensic psychologists at all levels of practice: beginning to Board Certified. I know of no psychologist at any level who would choose to conduct a competence evaluation by telemedicine or over a telephone, if given the choice of how to conduct the evaluation: in person, or by webcam/telemedicine. The reason for such is that psychologists are aware that much is lost when an in-person interview is <u>not</u> conducted. This is so much the case that even the American Psychological Association [APA] included a section in its Ethics Code that addresses the importance of an interview of an evaluation subject. Although the APA does not address in-person vs. telemedicine methods, it does acknowledge that something is lost when an interview of some kind is not conducted. While there is some literature that purports that telemedicine evaluations are "just as good" as in person evaluations, many experienced clinicians know better, and would not choose a telemedicine interview over an in-person interview if given a choice.

19. Due to the current COVID-19 pandemic, I have been forced to conduct telemedicine interviews for the purpose of evaluating competence. It is my personal experience that much information is lost when using such a method. In incarcerated settings there is often noise in and around the interview rooms used for telemedicine interviews. When a subject appears to be distracted, it is difficult to tell what they are responding to; something they actual hear, or to some internal stimuli that may be the product of psychosis. Second, often the position of the camera or microphone in

telemedicine evaluations are not situated for optimal transmission of information. Telemedicine evaluations, in my experience, are not like watching the nightly news where the person on the screen is centered directly in front of you, is looking straight ahead, and has his/her voice amplified optimally. Telemedicine evaluations are of significantly less quality. Third, in my experience it is often impossible to discern subtle symptoms of responses to internal stimuli. Subjects who are actively psychotic and/or dissociating may look away from the camera, or move to being out of view of the camera, either of which obviously limits clinical information in a telemedicine interview. Such information which could be noted during an in-person interview may be indicative of acute psychopathology, which would be of central importance to one evaluating competency of any kind. Certainly in a case where life or death is at issue, the most prudent and professional course of practice would be to conduct a competence evaluation under the most optimal of circumstances: in-person. A telephonic, telemedicine or "webcam" interview is certainly not that.

20. In my professional opinion, a forensic evaluation of competence to be executed should not be conducted remotely, but rather face to face.

I declare under the penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

Dated this 11th day of January, 2021.

*[signature]*

John M. Shield, Ph.D., ABPP