UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| LISA MARIE MONTGOMERY,                )<br>                                                      )<br>                        Petitioner,        )<br>                                                      )<br>            v.                                      )<br>                                                      )<br>WARDEN OF USP TERRE HAUTE, IN, et  )<br>al.                                                  )<br>                                                      )<br>                        Respondents.    ) | No. 2:21-cv-00020-JPH-DLP |

**ORDER GRANTING MOTION TO STAY EXECUTION
PENDING A COMPETENCE HEARING**

Petitioner Lisa Montgomery is scheduled to be executed tomorrow, January 12, 2021, at the United States Penitentiary in Terre Haute, Indiana (USP – Terre Haute). Ms. Montgomery has filed a petition for writ of habeas corpus pursuant to 18 U.S.C. § 2241, alleging that she is incompetent to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986), and a motion to stay execution. Dkt. 1; dkt. 12. For the reasons that follow, the motion to stay is **GRANTED**.

## I.      INTRODUCTION

In 2007, a jury convicted Ms. Montgomery of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1). After hearing additional evidence at the sentencing phase of the trial, the jury found that the government had proven aggravating factors that warranted imposition of the death penalty, including that Ms. Montgomery committed the offense in an especially heinous or depraved manner. Ms. Montgomery raised her mental state as a defense at trial and as a

1

basis for relief in post-conviction proceedings. The verdict and sentence imposed were upheld both on appeal and during post-conviction relief proceedings.

In this case, Ms. Montgomery does not further challenge the validity of the conviction or sentence imposed. Rather, the sole issue presented is whether the government may lawfully execute Ms. Montgomery in her current mental state. Ms. Montgomery's counsel contend that executing her would be unconstitutional because her current mental state makes her unable to understand why the government seeks to execute her. They ask the Court to stay the execution so that the Court can hold a hearing and make findings about Ms. Montgomery's current mental condition based on a fully developed record.

In support of her motion to stay, Ms. Montgomery presents evidence from three expert witnesses who have each either treated Ms. Montgomery or interviewed her on multiple occasions. They all discuss Ms. Montgomery's history of mental illness, the specific diagnoses and corresponding treatments, and their discussions with Ms. Montgomery's counsel regarding her recent behavior. They all conclude that Ms. Montgomery's perception of reality is distorted and that she is currently unable to rationally understand the government's rationale for her execution. Based on this evidence, the Court finds that Ms. Montgomery has made a strong showing that she will be able to make the threshold showing of insanity that requires a hearing.

## II. BACKGROUND

### A.      Ms. Montgomery's Crime and Procedural Background

The following is a summary of Ms. Montgomery's crime, adapted from the Eighth Circuit's factual recitation on direct appeal. *United States v. Montgomery*, 635 F.3d 1074, 1079–80 (8th Cir. 2011).

Ms. Montgomery met Bobbie Jo Stinnett at a dog show in April 2004. Ms. Montgomery learned through an online message board dedicated to breeding rat terriers that Ms. Stinnett was pregnant. Despite undergoing a sterilization procedure more than a decade earlier, Ms. Montgomery began telling friends and family in the spring of 2004 that she was pregnant.

On December 15, 2004, Ms. Montgomery, using an alias, contacted Ms. Stinnett, expressing interest in purchasing a puppy from Ms. Stinnett. Ms. Montgomery went to Ms. Stinnett's house, where she strangled her and, using a kitchen knife, cut and removed Ms. Stinnett's baby girl. Ms. Stinnett was eight months pregnant at the time of her murder.

Ms. Montgomery called her husband, who was unaware of her sterilization, and told him that she had gone into labor while Christmas shopping and had given birth at a women's clinic. They took the baby home. The following day, law enforcement officials went to their home to speak with Ms. Montgomery. She initially told officers that she had given birth at home, but upon further questioning at the sheriff's office confessed to killing Ms. Stinnett, removing the fetus from Ms. Stinnett's womb, and abducting the child. The baby, who was in good health, was returned to her father.

Ms. Montgomery was charged in the United States District Court for the Western District of Missouri with kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1). *Id.* at 1081. Ms. Montgomery asserted the defense of insanity. *Id.* at 1082. Defense experts alleged that Ms. Montgomery suffered from depression, borderline personality disorder, post-traumatic stress disorder (PTSD), and pseudocyesis, a condition in which a woman falsely believes she is pregnant, associated with objective physical signs of pregnancy. *Id.* In October 2007, a jury rejected the insanity defense, convicted Ms. Montgomery of first-degree murder, and sentenced her to death.

Ms. Montgomery's conviction and sentence were affirmed on direct appeal. *Id.* at 1099. The Supreme Court declined review. *Montgomery v. United States,* 565 U.S. 1263 (2012).

In March 2012, Ms. Montgomery moved to vacate her conviction and sentence pursuant to 28 U.S.C. § 2255. *United States v. Montgomery*, No. 4:12-cv-8001-GAF (W.D. Mo.). On March 3, 2017, the district court denied relief and denied a certificate of appealability on all claims. *Id.*, dkt. 212. The Eighth Circuit denied leave to appeal, *Montgomery v. United States*, No. 17-1716 (8th Cir. Jan. 25, 2019), and the Supreme Court denied certiorari, *Montgomery v. United States*, 140 S. Ct. 2820 (May 26, 2020) and *Montgomery v. United States*, 141 S. Ct. 199 (Mem) (Aug. 3, 2020) (denying rehearing).

On October 16, 2020, the government set Ms. Montgomery's execution date for December 8, 2020. *United States v. Montgomery*, No. 5:05-cr-6002, dkt. 444 (W.D. Mo.). On November 19, 2020, the District Court for the District

of Columbia stayed the execution until at least January 1, 2021. *Montgomery v. Barr*, No. 20-cv-3261, 2020 WL 6799140, at *11 (D.D.C. Nov. 19, 2020). On November 23, 2020, the government set a new execution date of January 12, 2021. *United States v. Montgomery*, No. 5:05-cr-6002, dkt. 445 (W.D. Mo.). In December, the District Court for the District of Columbia held that the new date was unlawfully set. *Montgomery v. Rosen*, 20-cv-3261, 2020 WL 7695994 (D.D.C. Dec. 24, 2020). But the District of Columbia Court of Appeals summarily reversed that order on January 1, 2021, *Montgomery v. Rosen*, No. 20-5379 (D.C. Cir. Jan. 1, 2021), so the January 12, 2021 execution date remains in effect.

Ms. Montgomery's counsel filed the petition in this case days ago, on Friday January 8, 2021, and filed a corresponding motion to stay the next day. Pursuant to the briefing schedule entered by the Court on the evening of January 8, the government filed a response on January 10 and Ms. Montgomery's counsel filed a reply today.

### B.   Ms. Montgomery's History of Trauma and Mental Illness

While Ms. Montgomery's current mental state is the issue in this case, her past trauma and diagnoses are relevant because her clinical history informs the experts' opinions regarding her current mental state.

Ms. Montgomery's childhood trauma was extreme and "consistent with torture." Dkt. 11-12 (Woods Decl. 2020). Her mother and stepfather were physically and emotionally abusive. Dkt. 11-5 at 42–43 (Porterfield Decl. 2016). Her mother found humor in the fact that Ms. Montgomery's first words as a

toddler were, "[d]on't spank me." *Id.* Her stepfather sexually assaulted her on a weekly basis for years. *Id.* at 43; *see also Montgomery*, 635 F.3d at 1080. Her mother's emotional abuse included sadistic acts such as taping Ms. Montgomery's mouth shut with duct tape for speaking and beating the family dog to death in front of Ms. Montgomery and her siblings. *Id.* at 43–44.

The prison psychiatrist who treated Ms. Montgomery in the three years preceding her trial diagnosed her with depression, bipolar disorder, and PTSD. Dkt. 11-10 at 2, 14–15. At trial, medical experts from both sides agreed that Ms. Montgomery suffered from depression, borderline personality disorder, and PTSD. *Montgomery*, 635 F.3d at 1082. One of Ms. Montgomery's experts, Dr. Logan, characterized Ms. Montgomery's illness as depressive disorder which "at times included psychotic features such as hallucinations." Dkt. 11-6 at 80 (Logan Report).

After her trial, Ms. Montgomery was placed at the Federal Medical Center, Carswell ("FMC Carswell"), a federal prison in Texas for female inmates with special mental health needs. Dr. Camille Kempke, Ms. Montgomery's treating psychiatrist at FMC Carswell between 2008 and 2010, witnessed Ms. Montgomery in "an acute dissociative psychotic state" at least twice. Dkt. 16-1 at ¶ 2–3. *Id.*

Two psychological experts hired by Ms. Montgomery's team in support of her § 2255 proceedings recounted the key role dissociation plays in Ms. Montgomery's mental functioning and provided declarations in support of the motion to stay in this action. Dr. Katherine Porterfield, who examined

Ms. Montgomery in 2016, is a clinical psychologist who has worked with survivors of torture and trauma for more than two decades. Dkt. 11-12 at 2 (Porterfield Decl. 2020); dkt. 11-5 at 39 (Porterfield Decl. 2016). In her opinion, Ms. Montgomery suffers from complex post-traumatic stress disorder[1] (CPTSD), complex partial seizures and brain impairment, depression, and bipolar disorder. Dkt. 11-12 at 2. Ms. Montgomery's "CPTSD is characterized by severe dissociative symptoms." *Id.* As Dr. Porterfield explained, "[d]issociation is a process of the human nervous system in which neurochemical reactions to excessive stress lead to alterations in consciousness and perceptions of senses, the environment, and the self. Dissociation represents a lowering of consciousness, *sometimes to the point of actual rupture of consciousness and awareness*." *Id.* at 2–3 (emphasis added).

Dr. Porterfield described the dissociative symptoms prevalent in Ms. Montgomery's functioning as follows: (1) confused thought process— "frequently confused thinking that indicated questions about the reality of certain events and perceptions in her past"; (2) disengagement—feeling "out of it" or as if she was in her own world and would forget what day it was or how she got places; (3) depersonalization—feeling detached from her own body or like she

---

[1] CPTSD is not a condition that is recognized by the Diagnostic and Statistical Manual of Mental Disorders. According to Dr. Porterfield, it is a "diagnostic category proposed for inclusion in the World Health Organization International Classification of Diseases, 11th version, and arrived at by consensus among a panel of international trauma experts." Dkt. 11-5 at 48. Because dissociative symptoms are included in the criteria for PTSD—which experts on both sides agree Ms. Montgomery has—the Court pays more attention to the symptoms described by Ms. Montgomery's experts rather than the diagnostic label of CPTSD or PTSD.

does not belong in her body; (4) derealization—feeling her surroundings are not familiar in some cases, not real; (5) identity dissociation—feeling like she has different people inside herself or like there are people inside who are talking to her; (6) memory disturbance—experiencing blank spells or loss of time; and (7) emotional constriction—having restricted or limited emotional experience. Dkt. 11-5 at 48–54.

Dr. George Woods, a physician with a specialty in neuropsychiatric consultations, conducted clinical evaluations of Ms. Montgomery, which included interviews and assessments of Ms. Montgomery's neurological status, in January and February 2013 and July and August 2016. Dkt. 11-6 at 1; dkt. 11-12 at 34. He observed that Ms. Montgomery has cerebellar[2] dysfunction and other brain impairments. Dkt. 11-6 at 5. Ms. Montgomery's symptoms consistent with impairment of the cerebellum include "distractibility, hyperactivity, impulsiveness, disinhibition, anxiety, irritability, ruminative and obsessive behaviors, dysphoria, and depression, tactile defensiveness and sensory overload, apathy, and childlike behavior." *Id.* Dr. Woods also diagnosed Ms. Montgomery with Bipolar I Disorder, Most Recent Episode Depressed, Severe with Psychotic Features." *Id.* at 19. Ms. Montgomery's brain impairments, exposure to extreme trauma, mood disorder, and psychosis "interact synergistically" preventing her from being able to act "rationally and logically." *Id.* at 24.

---

[2] As Dr. Woods explained, "The cerebellum is a region of the brain that plays an important role in motor control and some cognitive functions such as attention and language and in regulating fear and pleasure." *Id.*

8

According to Dr. Woods, prior to the announcement of her execution date, the symptoms of Ms. Montgomery's illnesses had largely been controlled at FMC Carswell, due to three interactive factors: "1) a highly structured and predictable environment; 2) a stable community wherein she is largely surrounded by supportive female companions and where her exposure to the threat of sexual violence is greatly reduced; and 3) careful titration and monitoring of her regime of antipsychotic medications." Dkt. 11-12 at 35. The impact of her medication, in particular Risperdal,[3] an antipsychotic medication, when combined with a supportive community allowed her to function more successfully but did not resolve her underlying conditions. *Id.* at 40.

### C.    Ms. Montgomery's Current Mental Condition

On October 16, 2020, the warden read Ms. Montgomery her execution warrant and she was removed from her community and activities and placed in a suicide cell. Dkt. 11-12 at 40–41. Dr. Woods believes that this disruption to her routine and the stress of learning of her impending execution have resulted in a resurgence of her symptoms. *Id.* at 35, 39.

Ms. Montgomery's attorneys have reported the following symptoms or behaviors:

- auditory hallucinations with self-attacking content (hearing her abusive mother's voice);

---

[3] Upon her arrival at FMC Carswell, Ms. Montgomery's medication regiment was modified "from a commonly used combination of mood stabilizer and anti-depressant to Risperdal, a medication used for its antipsychotic properties." Dkt. 11-6 at 18 (Woods Decl. 2013).

- sleep disturbances and nightmares of past sexual violence that are so disturbing she is unable to recount them;

- disruption in bodily functions related to elimination due to her perception of male guards' observation of her;

- distorted sense of reality (uncertainty about whether the infant she kidnapped is really her child; being unsure of what is real without access to her most trusted friend to confirm reality);

- religious delusions/hallucinations (believing God spoke with her through connect-the-dot puzzles, finding messages in a feather, seeing the moon in a location she found uncanny);

- gaps in consciousness of time passing due to periods of dissociating (staring blankly for prolonged periods without awareness, writing letters and then forgetting doing so);

- alterations in perception of the external world (feeling outside of herself as if she is "existing in a house in her mind");

- inappropriate affect, irritability, and emotional description; and

- distorted perceptions of reality evincing paranoia (believing a male psychologist stated to her, "Don't you just want to say 'fuck the government and kill yourself?'").

Dkt. 11-2 at 3–4; dkt. 16-1. Dr. Porterfield, Dr. Woods, and Dr. Kempke all testify that these behaviors indicate current psychosis. 11-12 at 3–4 (Dr. Porterfield: "manifestations of dissociation, disturbed thinking and likely psychosis"); *id.* at 39 (Dr. Woods: "a reemergence of psychotic symptomology" indicating that Ms. Montgomery has "lost contact with reality"); Dkt. 16-1 (Dr. Kempke: observations "indicate that Mrs. Montgomery is psychotic").

Based on reported observations, review of past materials, review of BOP medical records, and, in Dr. Kempke's case, her past observation of Ms. Montgomery experiencing psychosis, all three experts opine that Ms. Montgomery is presently unable to rationally understand the government's

rationale for her execution as required by *Ford*. Dkt. 11-12 at 4 (Dr. Porterfield), 41 (Dr. Woods); dkt. 16-1 at ¶ 17 (Dr. Kempke).

Neither Dr. Porterfield nor Dr. Woods has conducted an in-person evaluation of Ms. Montgomery since 2016 on account of the COVID-19 pandemic. Dkt. 11-12 at 3, 34. Both doctors acknowledge that an evaluation could be conducted by video. *Id.* at 4–5, 42. They express concern that their ability to detect Ms. Montgomery's psychiatric symptoms would be hindered by a video evaluation, especially since Ms. Montgomery's dissociative symptoms can be subtle and "often appear as absences, blank responses, silence, difficulty focusing, fatigue, attentional lapses and distractibility." *Id.* at 4–5, 42. Dr. Porterfield also expressed concern that "a remote evaluation of Mrs. Montgomery risks triggering her and leaving her in a compromised state that this evaluator would be unable to detect and properly address." *Id.* at 5.

The government disputes Dr. Woods and Dr. Porterfield's conclusion.[4] According to Dr. Christina Pietz, a forensic psychologist contracted by the U.S. Attorney's Office for the Western District of Missouri in anticipation of possible *Ford* litigation, "no professional evaluating competency should rely solely on [counsel-provided] information and historical clinical evaluations in making a determination as to current competency" because "competency (or incompetency) is a present-tense issue." Dkt. 13-3 at ¶ 16. Accordingly, Dr. Porterfield and Dr. Woods's "opinions as to current competency do not

---

[4] Dr. Kempke's declaration was filed with Ms. Montgomery's reply brief so the government did not have the opportunity to respond to it.

appear to have been based on sufficient, current facts or data to conform to any known professional standards for evaluating competency." *Id.* at ¶¶ 16–18. Dr. Pietz also notes that during the COVID-19 pandemic, she has conducted several mental competency evaluations remotely that she believes comports with professional standards. *Id.* at ¶ 9. Dr. Pietz opines that there is no "evidence that Mrs. Montgomery is suffering from a major mental illness that would impair her ability to comprehend her legal situation or interact with her attorneys." *Id.* at ¶ 12. Unlike Ms. Montgomery's experts, Dr. Pietz has never evaluated Ms. Montgomery in person. *Id.* at ¶ 8.

The government has also presented evidence contradicting Ms. Montgomery's allegation of present incompetency, including summary excerpts of BOP medical records, excerpts of transcripts of jail calls of Ms. Montgomery talking with family members and friends, and declarations by Dr. Pietz and Dr. Leslie Wheat, a BOP psychologist who serves as the Regional Psychology Services Administrator for the South Central Region. Dkts. 13-3; 13-4; 13-5; 13-6.

The government argues that the BOP medical records reflect a comprehension of her legal situation and impending execution. Dkt. 13-4 at ¶ 10 (summarizing interactions with BOP clinicians). Those records indicate that Ms. Montgomery reported feeling "great," positive, and hopeful about the future after her first execution date was vacated; reported sleeping poorly due to concern about the execution; and described not being forthcoming with BOP psychologists about her feelings on advice of her attorneys. *Id.*

In phone calls with relatives between August 6, 2020, and January 2, 2021, Ms. Montgomery discussed issues related to her crime and upcoming execution, including recalling the anniversary of her crime, discussing the possibility of her upcoming execution including plans for cremation, the delay of her execution due to her attorneys contracting COVID-19, and discussing her petition for clemency and other ongoing legal challenges. Dkt. 13-6.

### III.      APPLICABLE LAW

#### A.     Standard for Stay of Execution

In deciding whether to stay an execution, the Court must consider: "(1) whether the stay applicant has made a strong showing that [s]he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "The first two factors . . . are the most critical." *Id.* Before entering a stay, the Court must also consider "the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004).

#### B.     Standards for Claim of Incompetence

Under *Ford v. Wainwright*, 477 U.S. 399 (1986), and its progeny, "[t]he Eighth Amendment . . . prohibits the execution of a prisoner whose mental illness prevents [her] from 'rationally understanding' why the State seeks to impose that punishment." *Madison v. Alabama*, 139 S. Ct. 718, 722 (2019) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007)). "A prisoner's awareness of the State's

13

rationale for an execution is not the same as a rational understanding of it. *Ford* does not foreclose inquiry into the latter." *Panetti*, 551 U.S. at 959. While doctors and other experts can help a judge understand the prisoner's cognitive defects, "the sole inquiry for the court remains whether the prisoner can rationally understand the reasons for his death sentence." *Madison*, 139 S. Ct. at 728.

Under *Ford*, Ms. Montgomery's burden is to make a substantial showing that her "mental illness prevents [her] from 'rational[ly] understanding' why the [government] seeks to [execute her]." *Madison*, 139 S. Ct. at 722 (quoting *Panetti*, 551 U.S. at 959). The question is whether her "concept of reality is so impaired that [she] cannot grasp the execution's meaning and purpose or the link between [her] crime and its punishment." *Id.* (quotation marks and citation omitted). The "standard focuses on whether a mental disorder has had a particular *effect*: an inability to rationally understand why the [government] is seeking execution." *Madison*, 139 S. Ct. at 728 (emphasis original). "As *Ford* and *Panetti* recognize, a delusional disorder can be of such severity—can 'so impair the prisoner's concept of reality'—that someone in its thrall will be unable 'to come to grips with' the punishment's meaning." *Madison*, 139 S. Ct. at 729 (quoting *Panetti*, 551 U.S. at 958). If Ms. Montgomery makes a "'substantial threshold showing of insanity' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U.S. at 949 (quoting *Ford*, 477 U.S. at 426, 424).

## IV.   DISCUSSION

### A. Likelihood of Success on the Merits

Counsel argue that executing Ms. Montgomery without first providing the "fair hearing" required by *Ford* would violate her right to due process under the Fifth Amendment. To succeed on the Fifth Amendment claim, counsel must make a "'substantial threshold showing of insanity.'" *Panetti*, 551 U.S. at 950 (quoting *Ford*, 477 U.S. at 426). Counsel have made the required substantial threshold showing and, in doing so, demonstrated a strong likelihood of success on the Fifth Amendment claim.

Three experts—including Dr. Kempke, a retired BOP psychiatrist who treated Ms. Montgomery while she was in custody—have concluded that Ms. Montgomery's current mental state is so divorced from reality that she cannot rationally understand the government's rationale for her execution. Dkt. 16-1, at p. 2, ¶ 17 (Dr. Kempke); dkt. 11-2 at 4, ¶ 6 (Dr. Porterfield); *id.* at 41 (Dr. Woods).

The Court finds the experts' declarations reliable and sufficient to make the required threshold showing. The experts each relied on a combination of the relevant scientific literature, past direct observations of Ms. Montgomery, and descriptions of Ms. Montgomery's current behavior relayed by counsel. While the *Panetti* standard concerns the consequence, not the diagnoses of mental illness, *Madison*, 139 S. Ct. at 728, Ms. Montgomery's past conduct and diagnoses are relevant to assessing her current condition. *See Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1320 (11th Cir. 2013) ("[T]he history of [the petitioner's]

15

mental condition, the opinions of experts regarding it, and judicial decisions about it over the years are all relevant to a discussion of his present mental condition."). As discussed above, Dr. Woods has found that Ms. Montgomery has physical brain impairments, dkt. 11-6 at 5, and has diagnosed her with "Bipolar I Disorder, Most Recent Episode Depressed, Severe with Psychotic Features." *Id.* at 19. Dr. Porterfield found that Ms. Montgomery suffers from complex post-traumatic stress disorder (CPTSD), complex partial seizures and brain impairment, depression, and bipolar disorder. Dkt. 11-12 at 2. The prison psychiatrist who treated Ms. Montgomery in the three years preceding her trial diagnosed her with depression, bipolar disorder, and PTSD. Dkt. 11-10 at 2, 14–15. Ms. Montgomery's current behaviors are considered in this context.

Those current behaviors include, among other things, Ms. Montgomery

- experiencing auditory hallucinations;

- being unsure what is real;

- believing that a male psychologist stated to her, "Don't you just want to say 'fuck the government and kill yourself?'";

- expressing uncertainty about whether the infant she kidnapped is really her child;

- stating that God spoke with her through connect-the-dot puzzles;

- experiencing lapses of time, as evidenced by her staring blankly for prolonged periods; and

- reporting experiences of "feeling outside herself—as if watching from a distance."

*See* dkt. 11-2 at 3–4; dkt. 16-1.

16

While treating Ms. Montgomery in the past, Dr. Kempke personally observed her "in an acute dissociative psychotic state at least two times." Dkt. 16-1 at 1, ¶ 7. Dr. Kempke explains that many of Ms. Montgomery's behaviors indicate that she is again experiencing psychotic dissociation. *Id.* at 2, ¶¶ 14–17. Given Dr. Kempke's past direct observations of Ms. Montgomery experiencing a dissociative psychotic state, her opinions about Ms. Montgomery's current competencies are especially probative.

Dr. Kempke's conclusions are supported by those of Dr. Woods and Dr. Porterfield, both of whom have diagnosed Ms. Montgomery in the past. Dr. Woods opines that Ms. Montgomery's "grasp of reality has always been tenuous" and that her current symptoms indicate that she "is further disconnected from reality." Dkt. 11-12 at 41. Likewise, Dr. Porterfield opines that based on Ms. Montgomery's current behavior, in the context of past interactions, Ms. Montgomery's "concept of reality is [] impaired." *Id.* at 4, ¶ 6.

The respondent argues that none of Ms. Montgomery's experts' conclusions are reliable because they have not interviewed Ms. Montgomery in her current condition. But experts may rely on the statements of laypeople in forming opinions about Ms. Montgomery's mental state. *See, e.g.*, *United States v. Brownlee*, 744 F.3d 479, 481–82 (7th Cir. 2014) ("[A]n expert witness is permitted to rely on any evidence, whether it would be admissible or inadmissible if offered by a lay witness, that experts in the witness's area of expertise customarily rely on."). Indeed, each expert acknowledged that a direct interview would be useful for diagnosis, but that the descriptions of Ms. Montgomery's

current behavior, when coupled with their past treatment or evaluations, was sufficient to allow them to reach an opinion to a reasonable degree of scientific (or medical) certainty. Dkt. 11-12 at 4, ¶ 6; *id.* at 41; dkt. 16-1 at 2, ¶ 17.

The Court finds these experts' declarations satisfy the required preliminary showing that Ms. Montgomery's current mental state would bar her execution. *Ford* did not set a precise standard for competency, *Panetti*, 551 U.S. at 957, and the concept of "rational understanding" is hard to define. *Id.* at 959. While there similarly are no set criteria describing what constitutes a "substantial threshold showing," the record before the Court contains ample evidence that Ms. Montgomery's current mental state is so divorced from reality that she cannot rationally understand the government's rationale for her execution. Dkt. 16-1, at 2, ¶ 17 (Dr. Kempke); dkt. 11-2 at 4, ¶ 6 (Dr. Porterfield); *id.* at 41 (Dr. Woods). *See Panetti*, 551 U.S. at 950 (finding that petitioner had made substantial threshold showing); *see id.* at 970 (Thomas, J., dissenting) (noting that the majority found the "threshold showing" satisfied with one unsworn, one-page letter from a doctor and another one-page declaration from a law professor, both relying on the petitioner's past medical history).

The government presents relevant contrary evidence, including transcripts of Ms. Montgomery's recent phone conversations and reports from BOP staff observations. While this evidence certainly shows that Ms. Montgomery understands that she is supposed to be executed soon, it does not demonstrate that she rationally understands the "meaning and purpose of the punishment." *Madison*, 139 S. Ct. at 727. Moreover, "[a]s *Ford* and *Panetti* recognize, a

18

delusional disorder can be of such severity—can 'so impair the prisoner's concept of reality'—that someone in its thrall will be unable 'to come to grips with' the punishment's meaning." *Madison*, 139 S. Ct. at 729.

### B. Irreparable Injury

Ms. Montgomery would be irreparably injured if the government executes her when she is not competent to be executed.

### C. Balancing Harms, Public Interest, and Equitable Concerns

"'Both the [government] and the victims of crime have an important interest in the timely enforcement of a sentence.'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). It is also in the public interest to ensure that the government does not execute a prisoner who due to her mental condition "cannot appreciate the meaning of a community's judgment." *Madison,* 139 S. Ct. at 727. "[I]f the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being." *Panetti*, 551 U.S. at 948–49. A hearing has not been held to determine Ms. Montgomery's competence. Because Ms. Montgomery has made "a substantial threshold showing of insanity," she is entitled to a fair hearing. *Ford*, 477 U.S. at 426.

The government's primary equitable argument is that counsel should have filed this claim and motion for stay sooner. Indeed, "last-minute filings that are frivolous and designed to delay executions can be dismissed in the regular course." *Panetti*, 551 U.S. at 946. But counsel's filing is not frivolous. As

discussed elsewhere in this order, Ms. Montgomery has been diagnosed with physical brain impairments and multiple mental illnesses, and three experts are of the opinion that, based on conduct and symptoms reported to them by counsel, Ms. Montgomery's perception of reality is currently distorted and impaired.

Additionally, the timing is not unreasonable given Ms. Montgomery's deterioration, this case's procedural history and what's at stake. Ms. Montgomery's condition began to devolve when the government first announced her execution date. But within a month, the execution was stayed. Counsel believed, and the District of Columbia District Court agreed, that the January 12 execution date was unlawful. Not until January 1, 2021, was the January 12 execution date relatively set in stone, and counsel filed this petition one week later. It is also worth noting that a brief stay of execution was initially granted to provide counsel time to recover from debilitating COVID-19 symptoms that included extreme fatigue, impaired thinking and judgment, and inability to concentrate. *See Montgomery v. Barr*, No. 20-3261 (D.D.C. Nov. 19, 2020), 2020 WL 6799140 at *7.

While the Court is mindful about the possibility of strategic litigation, neither that possibility or the delay outweigh the need for the stay when counsel has made a threshold showing that Ms. Montgomery is presently incompetent to be executed. *Madison,* 139 S. Ct. at 727 ("Similarly, *Ford* and *Panetti* stated that it 'offends humanity' to execute a person so wracked by mental illness that he cannot comprehend the 'meaning and purpose of the punishment.'").

## V.    CONCLUSION

Ms. Montgomery's motion to stay execution, dkt. [12], is **GRANTED** to allow the Court to conduct a hearing to determine Ms. Montgomery's competence to be executed. The Court will set a time and date for the hearing in a separate order in due course.

**SO ORDERED.**

Date: 1/11/2021

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Amy D. Harwell
FEDERAL PUBLIC DEFENDER TNM
amy_harwell@fd.org

Kelley J. Henry
FEDERAL PUBLIC DEFENDER TNM
kelley_henry@fd.org

Lisa Nouri
lisanouri_atty@hotmail.com